UNITED STATES DISTRICT COURT
THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PENNSYLVANIA GENERAL ENERGY COMPANY, L.L.C.<br><br>      Plaintiff,<br><br>vs.<br><br>GRANT TOWNSHIP,<br><br>      Defendant. | Case No. 1:14-cv-209<br><br>Magistrate Judge Susan Paradise Baxter |

**PLAINTIFF'S CONCISE STATEMENT OF MATERIAL FACTS**

Plaintiff, Pennsylvania General Energy Company, L.L.C. ("PGE"), pursuant to LCvR 56(B)(1), and by its undersigned counsel, submits the following Concise Statement of Material Facts in support of its concurrently filed Motion for Summary Judgment as to Counts I through VI of the Amended Complaint and Count I of Grant Township's Counterclaim.

1. PGE is in the business of exploration and development of oil and gas, and PGE currently owns and operates natural gas wells in Grant Township, Pennsylvania. (Am. Complaint, Docket No. 5, ¶¶ 1, 27; Affidavit of James Ashbaugh[1] ("Ashbaugh Affidavit"), ¶ 4.)

2. PGE's exploration and development activities include drilling and operating gas wells and managing brine and other produced fluids from operating wells. (Am. Complaint, ¶ 18; Ashbaugh Affidavit, ¶ 5.)

3. In 1997, PGE's predecessor in interest put into production a deep gas well in Grant Township on property known as the Yanity Farm (the "Yanity Well"). Based on its

---

[1] A true and correct copy of the Affidavit of James Ashbaugh, P.E. is attached to the Appendix as Exhibit "A."

intention to convert the use of the Yanity Well to an injection well for disposal of produced fluids generated at other PGE oil and gas wells, PGE proceeded to obtain regulatory approval for such use. (Am. Complaint, ¶ 19; Ashbaugh Affidavit, ¶¶ 6-7.)

4. The United States Environmental Protection Agency ("EPA") issues underground injection control ("UIC") permits to authorize the injection of brine and other produced fluids for disposal. (Am. Complaint, ¶ 21; Ashbaugh Affidavit, ¶ 8.)

5. PGE submitted an application to EPA for a UIC permit to convert the Yanity Well into an injection well and to inject produced fluids generated at other PGE oil and gas wells into the Yanity Well. (Am. Complaint, ¶ 22; Ashbaugh Affidavit, ¶ 9.)

6. EPA issued the UIC permit to PGE on March 19, 2014, which was subsequently appealed to the United States Environmental Appeals Board. On August 21, 2014, the Environmental Appeals Board issued an order denying review of the petitions for appeal, and on September 11, 2014, EPA issued a final UIC permit to PGE. (Am. Complaint, ¶ 23; Answer, Docket No. 10, ¶ 23; Ashbaugh Affidavit, ¶ 10.)

7. Pennsylvania also regulates injection wells and ancillary facilities under the authority of Pennsylvania environmental statutes. (Am. Complaint, ¶ 24; Answer, ¶ 24; Ashbaugh Affidavit, ¶ 11.)

8. PGE intends to and will use the Yanity Well to inject produced fluids from its other oil and gas development operations. (Am. Complaint, ¶ 26; Counterclaim, Docket No. 10, ¶ 6; Ashbaugh Affidavit, ¶ 7.)

9. PGE submitted an application to the Pennsylvania Department of Environmental Protection ("DEP") to change the status of the Yanity Well so that it could be used as an injection well. (Ashbaugh Affidavit, ¶ 12.)

10. On October 22, 2014, DEP issued a permit which authorized a change in the status of the Yanity Well and which allowed PGE to use the Yanity Well as an injection well ("DEP Permit"). Starting on October 22, 2014, PGE had all permits required to start to use the Yanity Well to inject produced fluids from PGE's other oil and gas development operations. The only reason PGE did not start to operate the Yanity Well to receive produced fluids on or around October 22, 2014, was due to the enactment by Grant Township of the ordinance known as the Community Bill of Rights Ordinance (the "Ordinance"). (Ashbaugh Affidavit, ¶ 13.)

11. On March 12, 2015, DEP withdrew the DEP Permit. PGE, which possessed all required federal and state permits, would have operated the Yanity Well as an injection well from on or around October 22, 2014 until March 12, 2015, but for the enactment of the Ordinance. From October 22, 2014 until March 12, 2015, PGE was unable to operate the Yanity Well as an injection well because of the Ordinance. As a result, PGE incurred substantial damages. PGE will provide evidence of its damages at the trial of this matter. (Ashbaugh Affidavit, ¶ 14.)

12. In response to the withdrawal of the DEP Permit, PGE re-submitted an application to DEP for a permit to change the status of the Yanity Well to an injection well. That application is pending. (Ashbaugh Affidavit, ¶ 15.)

13. On June 3, 2014, Grant Township adopted the Ordinance. (Am. Complaint, ¶ 7; Answer, ¶ 7.)

14. The Ordinance expressly prohibits within Grant Township any corporation from "engag[ing] in the depositing of waste from oil and gas extraction" and invalidates any "permit, license, privilege, charter, or other authority issued by any state or federal entity which would

violate [this prohibition] or any rights secured by [the Ordinance], the Pennsylvania Constitution, the United States Constitution, or other laws." (Am. Complaint, ¶ 8; Ex. 1, §§ 3(a) and 3(b))

15. The Ordinance defines "[c]orporations" as "any corporation, limited partnership, limited liability partnership, business trust, public benefit corporation, business entity, or limited liability company organized under the laws of any state of the United States or under the laws of any County." (Am. Complaint, ¶ 9; Ex. 1 § 1(a).)

16. PGE is a "corporation" as the term is defined in the Ordinance. (Am. Complaint, ¶ 10; Answer, ¶ 10; Ashbaugh Affidavit, ¶ 16.)

17. "Depositing of waste from oil and gas extraction," as defined by the Ordinance, includes, without limitation: "[T]he depositing, disposal, storage, beneficial use, treatment, recycling, injection or introduction of materials including, but not limited to, brine, "produced water," "fract [sic] water," tailings, flowback or any other waste or by-product of oil and gas extraction, by any means. The phrase shall also include the issuance of, or application for, any permit that would purport to allow these activities." (Am. Complaint, ¶ 11; Ex. 1, § 1(b).)

18. The operation of oil and gas wells unavoidably requires engaging in the activity of "disposing of waste from oil and gas extraction" since any producing well will produce brine and other fluids, which must be disposed of by the operator. (Am. Complaint, ¶ 28; Counterclaim, ¶ 6; Ashbaugh Affidavit, ¶ 17.)

19. The Ordinance further provides that corporations that violate or seek to violate the Ordinance "shall not be deemed to be 'persons,' nor possess any other legal rights, privileges, powers, or protections which would interfere with the rights or prohibitions enumerated by this Ordinance. 'Rights, privileges, powers or protections' shall include the power to assert state or federal preemptive laws in an attempt to overturn this Ordinance, and the power to assert that the

people of the municipality lack the authority to adopt this Ordinance." (Am. Complaint, ¶ 12; Ex. 1, § 5(a).)

20. Under the Ordinance, "[a]ny corporation or government that violates any provision of [the Ordinance] shall be guilty of an offense and, upon conviction thereof, shall be sentenced to pay the maximum fine allowable under State law for that violation." (Am. Complaint, ¶ 15, Ex. 1, § 4(a).)

21. The Ordinance asserts that "private corporations engaged in the depositing of waste from oil and gas extraction are wrongly recognized by the federal and state government as having more 'rights' than the people who live in our community, and thus, recognition of corporate 'rights' is a denial of the rights of the people of Grant Township." (Am. Complaint, Ex. 1.)

22. Grant Township acknowledges that the claims and arguments of Grant Township in this matter are contrary to existing law. For example, in the pleadings filed in this matter, Grant Township has admitted the following:

> a. In Grant Township's Brief in Support of its Motion for Judgment on the Pleadings ("Brief in Support"), Grant Township asserted that it "understands that arguments in later sections of the brief raise issues related to what may be considered 'well-settled' law." (Docket No. 53, p. 8, n. 2.) Grant Township alerted this Court that it sought relief that is contrary to the law and asked this Court to render a decision against well-settled legal precedent.
>
> b. With respect to the long-standing limits on local governments, Grant Township made the following startling admission: "Community

        lawmaking as the legitimate exercise of self government by people **where they live** has generated mostly critical, occasionally derisive treatment from legislators, jurists, and commentators since the time of the founding. Consistent with this attitude, American jurisprudence has developed legal doctrines to infringe the right of local, community self-government, both by denying it outright, and by severely restricting local governmental power allowed for communities by state law. Such doctrines include corporate constitutional 'rights,' Dillon's Rule, and preemption." (Docket No. 53, p. 30. (emphasis original))

  c.  Grant Township has further admitted that for "the past 150 years, the judiciary has 'found' corporations within the U.S. Constitution and bestowed constitutional rights upon them." (Docket No. 53, p. 33.)

  d.  With respect to Dillon's Rule, Grant Township admitted that "Pennsylvania jurisprudence has long applied Dillon's Rule to subordinate municipal corporations to the state, and continues to do so today." (Docket No. 53, p. 39.)

  e.  Last, Grant Township admitted that it is trying to change the landscape of federal constitutional law and Pennsylvania state law: "By enacting the Community Bill of Rights Ordinance, the people of Grant Township decided that the existing municipal system of law – constrained by precisely the same legal doctrines asserted against the Township by PGE in this action – was failing to provide the most basic constitutional guarantees of American governments." (Docket No. 53, pp. 44-45.)

23. Moreover, Grant Township's counsel, the Community Environmental Legal Defense Fund ("CELDF"), has conceded publicly on multiple occasions that claims like those raised by Grant Township are against existing precedent and that Grant Township and its counsel are essentially seeking to alter our country's structure of government, either peacefully or through open civil disobedience.

    a. Most recently, counsel for Grant Township encouraged active civil disobedience because CELDF was not able to successfully use the legal process to stop natural gas companies. Specifically, CELDF encouraged its followers to seek to stop projects, "And that means, I think, successive days. It means rotating people through. It means bringing people in from other places. **It means filling up jails**." (emphasis in the original article)[2]

    CELDF continued as follows:

> I mean, our resistance has to ratchet up, the opposition has to ratchet up our stuff to a point where it's actually actively interfering with these projects, because **if you don't do that and you rely entirely on the legal process and the legal process is so stacked against you in terms of what municipalities can and can't do**, that at that point you have no other option but to engage in that type of action. (emphasis in the original article)[3]

    b. Grant Township's counsel was quoted in a November 15, 2015 article from The Athens News titled "Anti-fracking figure makes case in Athens." In the article, counsel for Grant Township discussed the substantive legal issues and made the following concessions:

---

[2] A true and correct copy of the December 14, 2015 article entitled "Leader of National Ban-Fracking Campaign Calls on Activists to Ignore the Law and 'Fill Up Jails'" is attached to the Appendix as Exhibit "B."

[3] *Id*.

> The U.S. Constitution, [Tom Linzey] argued, is based heavily in Colonial-era English common law—and that law helped turn the U.S. into an industrial powerhouse. Linzey said the Constitution gives corporations the same legal rights it gave European colonizers: the power to impose on local populations and make use of local resources, without local residents' consent.
>
> That means it's legally within corporations' rights to sue any group that prevents them from exercising their constitutionally guaranteed privileges.
>
> **"Corporations are persons under the law," Linzey said. "If you tell them they can't use the permit, then you're depriving the corporation of their property, because corporations are persons under the law. They have the same protections we do."** (emphasis added).[4]

    b.    In a press release by the CELDF regarding the attempt by Grant Township to avoid this Court's ruling in its October 14, 2015 Memorandum Opinion, CELDF admits that "They are mobilizing against a system of law that empowers corporations over communities, and empowers government to preempt communities from protecting their air and water. Communities are saying this is not acceptable, it's not sustainable, it's not democratic, and it's going to change."[5]

    c.    In a description of the concept of a community bill of rights, CELDF openly concedes that a community bill of rights is designed to pursue "the supremacy of inalienable rights over other laws" and that "there are well-

---

[4] A true and correct copy of the November 15, 2015 article is attached to the Appendix as Exhibit "C."
[5] A true and correct copy of the November 3, 2015 CELDF Press Release is attached to the Appendix as Exhibit "D."

{B2394842.1}    8

established legal barriers to the exercise of the right to local self-government."[6]

d. In perhaps the most honest explanation by CELDF of its goals and willingness to ignore the law, in connection with this matter and the Pennsylvania Department of Environmental Protection's decision to wait for this Court to rule on the validity of the Ordinance before rendering decisions on permit applications, CELDF is quoted as saying: "The reason why these ordinances are surfacing is because people have given up hope that the state is going to do anything for them. People have given up, they're done. And it's a new kind of activism that's emerging that says **screw you, we're going to make laws ourselves."**[7] (emphasis added).

e. In addition, CELDF recognizes that by taking positions that are contrary to law, it places it clients at risk of significant adverse money judgments. In that vein, CELDF is quoted as saying that: "And if a town goes bankrupt trying to defend one of our ordinances, well, perhaps that's exactly what is needed to trigger a national movement." [8]

---

[6] A true and correct copy of the August 31, 2015 CELDF statement entitled "What's in a Community Bill of Rights?" is attached to the Appendix as Exhibit "E."
[7] A true and correct copy of the Article entitled "DEP Delays Deep Injection Well Decisions," State Impact PA, September 8, 2015, is attached to the Appendix as Exhibit "F."
[8] A true and correct copy of the Article entitled "CELDF Threat of Bankrupting Communities with Fracking Bans Comes to Colorado," October 9, 2015, is attached to the Appendix as Exhibit "G."

Respectfully submitted,

Dated: January 6, 2016		By: /s/ James V. Corbelli

		Kevin J. Garber, Esquire
		Pa. I.D. #51189
		James V. Corbelli, Esquire
		Pa. I.D. #56671
		Alana E. Fortna, Esquire
		Pa. I.D. #309691

		Babst, Calland, Clements & Zomnir, P.C.
		Two Gateway Center, 6th Floor
		Pittsburgh, PA  15222
		412-394-5400

		*Counsel for Plaintiff, Pennsylvania General Energy Company, L.L.C.*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed a true and correct copy of the foregoing **Plaintiff's Concise Statement of Material Facts** this 6th day of January, 2016, using the Court's CM/ECF system, which will automatically serve a copy upon all counsel of record.

By: */s/ James V. Corbelli*