**UNITED STATES DISTRICT COURT**
**THE WESTERN DISTRICT OF PENNSYLVANIA**

PENNSYLVANIA GENERAL ENERGY )
COMPANY, L.L.C., )   Civ. No. 1:14-cv-209
)   Magistrate Judge
Plaintiff, )   Susan Paradise Baxter
)
PENNSYLVANIA INDEPENDENT OIL AND )
GAS ASSOCIATION, )   **BRIEF IN SUPPORT OF**
)   **MOTION FOR SUMMARY**
Plaintiff-Intervenor, )   **JUDGMENT ON GRANT**
)   **TOWNSHIP'S**
v. )   **COUNTERCLAIM -**
)   **RIGHT OF LOCAL,**
)   **COMMUNITY SELF-**
GRANT TOWNSHIP, )   **GOVERNMENT**
)
)   *Electronically Filed*
Defendant. )
_____)

**DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

    *AND NOW*, comes the Defendant Grant Township and files this brief in support of its

motion for summary judgment on its Counterclaim in the above-captioned action, seeking a

dismissal of the Plaintiff's remaining claims, for the following reasons:

## I.      FACTUAL AND PROCEDURAL HISTORY

    Grant Township is a small, rural community of seven hundred residents. Pennsylvania

General Energy Company, LLC (hereinafter "PGE") currently operates natural gas wells within

the Township, including a deep gas well on property known as the Yanity Farm (hereinafter

"Yanity Well").  The company is currently seeking to convert that existing deep gas well to an injection well – thus enabling it to inject waste fluids, toxic chemicals, radioactive materials, and brine produced by fracking and other oil and gas extraction activities. [ECF Doc. 5 at ¶¶ 18-28 and ECF Doc. 150 at ¶¶ 12-14].

The people of Grant Township, and the Grant Township Board of Supervisors, do not want oil and gas waste injected into land within their community. [ECF Doc. 1-1 at ¶ 2]. They fear that injecting waste materials from oil and gas extraction will contaminate their water and otherwise adversely affect the health, safety, and welfare of the residents and their community.[1] They believe that the relevant state and federal regulatory agencies are more interested in issuing permits to allow the injection to occur, than in protecting the people and natural environment of Grant Township; and that federal and state regulations are inadequate to protect their water, health, safety, and welfare. [*Id*. at ¶¶ 2-3].

On June 3, 2014, the people of Grant Township, through their municipal elected officials, adopted a Community Bill of Rights Ordinance [hereinafter "Ordinance"] [ECF Doc. 1-1]. That Ordinance established a local bill of rights and then prohibited certain activities – like the depositing of oil and gas waste materials into the Township – that would violate those rights. The local bill of rights recognized the rights of residents to clean air, clean water, and a sustainable energy future. [ECF Doc. 1-1 (Ordinance at §2)] (codifying the "right to clean air, water, and soil;" the "right to scenic preservation;" and the "right to a sustainable energy future").

---

[1] The Ordinance declared that "this community finds that the depositing of waste from oil and gas extraction is economically and environmentally unsustainable, in that it damages property values and the natural environment, and places the health of residents at risk, while failing to provide real benefits to the people of this community." [ECF Doc. 1-1 (Ordinance at ¶1)].

The Ordinance also recognized that the people of the Township have a federal, state, and locally-secured constitutional right to govern their own community. That right – the right of local, community self-government - includes the right to change their municipal system of governance if it has been rendered incapable of either protecting their civil and political rights, or of recognizing the authority of a community majority to make governing decisions for the locality. [ECF Doc. 1-1 (Ordinance at §2(a) (recognizing and securing the "right to local self-government")].

In response to the adoption of the Community Bill of Rights Ordinance by the people and elected officials of Grant Township, PGE sued the Township on August 12, 2014. [ECF Doc. 1]. The thirteen count amended complaint sought to nullify Grant's Ordinance based on three categories of claims – the first alleges that the Ordinance violated corporate constitutional "rights," [ECF Doc. 5 at Counts I-VI], the second alleges that the Township lacked the authority to adopt the Ordinance pursuant to the doctrine of "Dillon's Rule," [ECF Doc. 5 at Count VII], and the third alleges that certain state laws preempt the Ordinance [ECF Doc. 5 at Counts VIII-XI].[2]

In its Answer to the Complaint, Grant Township filed a Counterclaim against PGE, asserting that PGE's action violated the right of the people of Grant Township to local, community self-government. [ECF Doc. 10 at 18-30]. PGE filed an Answer to that Counterclaim on November 3, 2014. [ECF Doc. 22].

---

[2] PGE's Amended Complaint also contained a claim (count XII) under the state Sunshine Act, a claim that PGE has not pursued since filing, as the claim was merely a tactical effort by PGE to pursue discovery against Grant Township's legal counsel - a tactic this Court properly rejected by denying such discovery.

On December 15, 2014, each party filed a motion for judgment on the pleadings. [ECF Doc. 50 and Doc. 52]. PGE's motion only sought judgment on nine of the thirteen counts. [ECF Doc. 113 at 9, fn.4]. After various filings and rulings by this Court on preliminary injunctive relief, intervention by various parties, and a stay, this Court granted PGE's motion for judgment on the pleadings on eight of nine counts, while denying Grant Township's motion for judgment on the pleadings. [ECF Doc. 113].

On November 3, 2015, the residents of Grant Township adopted a Home Rule Charter which repealed the challenged Ordinance, and transformed Grant from being a Second Class Township under Pennsylvania law into being a home rule municipality. Accordingly, on December 28, 2015, Grant Township moved to dismiss the remaining counts of this action on mootness and jurisdictional grounds. [ECF Doc. 152]. A previous filing asked this Court to dismiss the intervenor's complaint on the same grounds. [ECF Doc. 142 (motion to dismiss complaint-in-intervention filed by the Pennsylvania Independent Oil and Gas Association ("PIOGA"))].

Grant Township now files this motion for summary judgment, in the event that its motions to dismiss are denied, to dispose of PGE's remaining counts, which are currently pending before this court.

## II.    STANDARD OF REVIEW AND 42 U.S.C. §1983

Summary judgment is appropriate "if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.Pro. 56(c). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v.*

*Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, or if that basis could otherwise affect the outcome of the suit under governing law. *See* Anderson, 477 U.S. at 249.

"To state a claim under § 1983, a party must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *Harvey v. Plains Tp. Police Dept.*, 421 F.3d 185, 189 (3d Cir. 2005) (*quoting West v. Atkins,* 487 U.S. 42, 48 (1988)). A showing that the party used some state-derived authority to cause the alleged harm is sufficient to show state action. *See Abbott v. Latshaw*, 164 F.3d 141,146 (3d Cir.1998).


## **ARGUMENT**

### III.    **A constitutionally-protected right of local, community self-government exists, and enforcement of corporate constitutional "rights" violates that right.**

It is well-settled law that the United States Supreme Court "has never held that the Bill of Rights or the Fourteenth Amendment protects only those rights that the Constitution specifically mentions by name." *Griswold v. Connecticut*, 381 U.S. 479, 499 (1965) (Goldberg, concurring). Indeed, federal courts have constitutionally protected those rights deemed to be "older than the Bill of Rights" and those "so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Griswold* at 486-487 (*citing Snyder v. Massachusetts*, 291 U.S. 7, 105 (1934)). Judges must "look to the 'traditions and [collective] conscience of our people' to determine whether a principle is 'so rooted [there]. . . as to be ranked as fundamental." *Id*. at 493 (Goldberg, J., concurring). The inquiry is whether a right "is of such a character that it cannot be

denied without violating those 'fundamental principles of liberty and justice which lie at the base of all our civil and political institutions,'" and which emanate "from experience with the requirements of a free society." *Id.* (*citing Powell v. Alabama*, 287 U.S. 45, 67 (1932)).[3]

Supreme Court justices have declared that "the Ninth Amendment simply lends strong support to the view that the 'liberty' protected by the Fifth and Fourteenth Amendments from infringement. . . is not restricted to rights specifically mentioned in the first eight amendments." *Id*. at 493 (*citing United Public Workers v. Mitchell*, 330 U.S. 75, 94-95 (1947). Those rights have included the right to marry, the right to establish a home and bring up children, the right of privacy, the right to interstate travel, and the right to intrastate travel. *See, e.g., Troxel v. Granville*, 530 U.S. 57, 65-67 (2000) (interest of parents in the care, custody, and control of their children is a fundamental liberty interest).

In its earlier-filed motion for judgment on the pleadings, Grant Township asserted that the people of the Township possess an individual, constitutionally-rooted right of local, community self-government, and that they asserted that right collectively to adopt their Community Bill of Rights Ordinance. [ECF Doc. 53 at 8-29].[4] Grant Township then argued that several legal doctrines – corporate constitutional "rights," Dillon's Rule, and the doctrine of

---

[3] Throughout this litigation, Grant has argued that the right of local, community self-government is one of the most fundamental rights possessed by citizens of the United States. As recounted in the brief filed in support of Grant's *Motion for Judgment on the Pleadings*, the securing of local self-governance was the reason for the American Revolution, the platform for the Declaration of Independence, and the guiding ideal for the "we the people" of the United States Constitution, while being pivotal to state ratification of the federal document. [ECF Doc. 53 at 25-29]. The right is so critical to the American people that it lies at the heart of the "liberty" interest secured by the Fifth, Fourteenth, and Ninth Amendments to the United States Constitution.
[4] For purposes of 42 U.S.C. §1983 liability, it is the people of Grant's federal constitutional right of local, community self-government which is the subject of Grant's Counterclaim. It is also, of course, well-settled law that a municipal corporation is considered a "person" pursuant to that statute. *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

"ceiling" preemption – violate the right of the people of Grant Township to local, community self-government, and so cannot be applied to defeat the Ordinance. [ECF Doc. 53 at 30-41].

On October 14, 2015, this Court denied Grant's motion for judgment on the pleadings, declaring that

> Defendant claims the right to local, community self-government is deeply rooted in our nation's history and tradition. In support of its alleged right to local community self-government, Defendant undertakes a lengthy examination of historical documents. . . Defendant seeks judgment upholding its Ordinance based solely upon these historical events. Defendant provides no precedential statute or constitutional provision authorizing its action other than its assertion that Plaintiff has no rights. . . This view is contrary to over one hundred years of Supreme Court precedent that establishes that corporations are considered "persons" under the United States Constitution. . .
>
> Defendant has provided no legal precedent to the contrary. Without a legal basis for its actions, as opposed to historical documents and events, this Court cannot provide the relief Grant Township seeks.

[ECF Doc. 113 at 7-9].

While Grant Township has asserted that the *existence* of corporate constitutional "rights" violates the right of local, community self-government possessed by the residents of the Township; it is the *assertion and enforcement* of those corporate "rights" which nullifies the right.[5] Contrary to the October 14, 2015 ruling of this Court, a finding that the right of local, community self-government must be elevated above the constitutional "rights" of corporations does not require a repudiation of the United States Supreme Court's recognition of corporate "personhood." It merely requires a finding that corporate "rights" may conflict with assertions of the right of local, community self-government, and when that conflict occurs, that the right of the

---

[5] In ruling that Grant Township lacked the authority to adopt - and was preempted from adopting - certain parts of the challenged Ordinance, this Court has ruled that the right of local, community self-government does not exist in relation to those state law claims. This Court has not ruled, however, that the corporate "rights" of PGE must be elevated above the right of local, community self-government held by the people of the Township. So, if upon consideration of the precedents here provided, the Court is persuaded that the right of local community self-government exists, it then must reach the next question: whether PGE's asserted corporate rights can defeat it.

people of the Township to local, community self-government must be elevated above corporate "rights."

**A.  The Pennsylvania Supreme Court and other courts have recognized the right of local, community self-government.**

Not only does the foundation and history of this country require a recognition of the inherent right of local, community self-government, the Pennsylvania Supreme Court and many other courts have found that such a right exists.[6]

In Pennsylvania, as recounted by Grant in its brief in support of its motion for judgment on the pleadings, the Pennsylvania Constitution explicitly guarantees the right of local, community self-government to the people of Grant Township.[7] [ECF Doc. 53 at 22-25]. Indeed, as noted, Pennsylvania's first Constitution explicitly recognized that "the *community* hath an indubitable, unalienable, and indefeasible right to reform, alter, or abolish government in such manner as shall be by that *community* judged most conducive to the public weal." [*Id.* at 22 (*quoting* the Constitution of Pennsylvania (September 28, 1776) (emphasis added))].

---

[6] It should be noted that this line of cases is distinguishable from the line of cases recognizing the rule known as "Dillon's Rule," because the right of local, community self-government is a *right* inuring to *people*, rather than a *power* possessed by *municipal corporations*. *See, e.g.*, *Commissioners of Laramie County v. Commissioners of Albany County, et al.*, 92 U.S. 307 (1875) (recognizing that the power of municipal corporations may be circumscribed by other levels of government).

[7] All Pennsylvania Constitutions since that of 1790, including the current Pennsylvania Constitution, have contained, in the Declaration of Rights, both the inalienable right of self-government, and the exception of the right from the general powers of the state government. *See* PENNSYLVANIA CONSTITUTION OF 1838, Art. IX Declaration of Rights, §§II, XXVI (reprinted in Gormley, THE PENNSYLVANIA CONSTITUTION at 884, 887); PENNSYLVANIA CONSTITUTION OF 1874, Art. I Declaration of Rights, §§2, 26 (reprinted in Gormley, THE PENNSYLVANIA CONSTITUTION at 887, 891); PENNSYLVANIA CONSTITUTION OF 1968, Art. I Declaration of Rights, §§2 ("Reservation of Powers in People"), 25 (reprinted in Gormley, THE PENNSYLVANIA CONSTITUTION at 891, 895).

In *Commonwealth v. McElwee*, 327 Pa. 148, 193 A.628 (Pa. 1937), the Pennsylvania

Supreme Court recognized the right of local, community self-government. In that case, the state

legislature adopted an act which empowered the Pennsylvania Auditor General to appoint

individuals to serve on a board of taxation assessment which would set tax rates in all counties of

the third class. The constitutionality of the act was challenged by Montgomery County's existing

board of taxation assessment. In finding the act unconstitutional, the Court explained that

> one is impressed with the fact that it violates the principle of "home rule," i.e., local self-government, which, like the tripartite separation of governmental powers, is a vital part of both the foundations and the general framework of our state and federal governments. . . In other states, notably Michigan, the principle of "home rule" is declared by the highest courts of these states to be implicit in the Constitution. Some of the most eminent juristic authorities uphold th[at] view. . .

*Id*. at 193 A.630.

> The Court further declared that

> Cooley in his "Constitutional Limitations" (8th Ed.), aptly says: "In the examination of American constitutional law, we shall not fail to notice the care taken and the means adopted to bring the agencies by which power is to be exercised as near as possible to the subjects upon which the power is to operate. In contradistinction to those governments where power is concentrated in one man, or one or more bodies of men, whose supervision and active control extends to all the objects of government within the territorial limits of the State, the American system is one of complete decentralization, the primary and vital idea of which is, that local affairs shall be managed by local authorities, and general affairs only by the central authority. . . The system is one which seems a part of the very nature of the race to which we belong."

*Id*.

The Court then adopted the reasoning of the Michigan Supreme Court in *People v. Hurlbut*, 24

Mich. 44 (1871) (*see* infra), in which the Court declared that

[t]he constitution has been adopted in view of a system of local government, well understood and tolerably uniform in character, existing from the very earliest settlement of the country; never for a moment suspended or displaced, and the continued existence of which is assumed. . . and that the liberties of the people have generally been supposed to spring from, and be dependent upon, that system.

*Id.* [8]

In 1857, in the case of *People v. Draper*, 15 N.Y. 532 (1857), in the Court of Appeals of New York, the Court ruled that it was constitutional for the state legislature to create a police review board for a new, local four-county district. In a seminal dissent that eventually became the majority opinion in future cases, Justice Brown declared that

The right of self-government in the local bodies, and the power of the people of those communities to select the local officers and conduct the local administration, a right of very ancient origin, and hitherto deemed to be of inestimable value, would utterly disappear, or exist only at the pleasure of the legislature. . . The constitution of 1846 did not provide a government for a new people, for a community of men just collected together and without civil government. . . It was the amendment and reformation of a scheme already existing; the substantial and material institutions and forms of which had come down to us from our English ancestors. . . It was the object of the organic instrument to preserve them, to perpetuate them, to improve and perfect them by the knowledge and suggestions of later times; not to impair their strength or deform their fair propositions. . .

When the present instrument was formed, the entire territory of the state was separated, and appropriated by its civil divisions, its counties, cities, and towns. . . These

---

[8] *McElwee* is good law to this day. The Pennsylvania Supreme Court has not overruled any part of it, and has relied on it much, and recently, including for propositions pertinent to this case. *See, e.g., Robinson Twp. v. Commonwealth*, 83 A.3d 901, 948 (Pa. 2014); *Western Pennsylvania Socialist Workers 1982 Campaign v. Conn. Gen. Life Ins. Co.*, 515 A.2d 1331, 1335 (Pa. 1986) (citing *McElwee* for the proposition that the Declaration of Rights limits state governmental power); *Citizens Committee to Recall Rizzo v. Board of Elections of City and County of Philadelphia*, 367 A.2d 232, 294 (Pa. 1976) (Justice Roberts dissenting, citing *McElwee* for the propositions, "Written constitutions should be construed with reference to and in the light of well-recognized and fundamental principles lying back of all constitutions, and constituting the very warp and woof of these fabrics," and "the principle of 'home rule,' i.e., local self-government, which, like the tripartite separation of governmental powers, is a vital part of both the foundations and the general framework of our state and federal governments."); *Commonwealth v. Martin*, 232 A.2d 729, 738 (Pa. 1967) (citing *McElwee* for the proposition that "what is forbidden, either expressly or by necessary implication, in the Constitution cannot become law."); *In re Shelley*, 2 A.2d 809, 816 (Pa. 1938) (Justice Maxey concurring in part and dissenting in part, citing *McElwee* for the proposition, "[L]ocal self-government … is a vital part of both the foundations and general framework of our state and federal governments.").

civil divisions are coeval with the government. The state has never existed a moment without them. All our thoughts and notions of civil government are inseparably associated with counties, cities and towns. They are permanent elements in the frame of government, and so treated in the instrument that creates it. . . The state at large is, and ever has been, an aggregate of these local bodies. They have habitually and uninterruptedly exercised many of the powers and functions of government. . . They are the opposites of those systems which collect all power at a common centre, to be wielded by a common will, and to effect a given purpose, which absorb all political authority, exercise all its functions, distribute all its patronage, repress the public activity, stifle the public voice, and crush out the public liberty.

*Id*. at 556-58, 560-62.

In 1871, the Michigan Supreme Court decided *People v. Hurlbut*, 24 Mich. 44 (1871), in which the Court held that the *inherent* right of local self-government prevented the legislature from permanently appointing members of a new Detroit board of public works. The opinion of the Court established the "Cooley Doctrine" – that people possess an inherent, constitutionally-protected right of local, community self-government that state action cannot infringe. Chief Justice Cooley described it thusly:

[T]he question, broadly and nakedly stated, can be nothing short of this: Whether local self-government in this state is or is not a mere privilege, conceded by the legislature in its discretion, and which may be withdrawn at any time at pleasure? I state the question thus broadly because, notwithstanding the able arguments made in this case, and after mature deliberation, I can conceive of no argument in support of the legislative authority which will stop short of this plenary and sovereign right.

Now, it must be conceded that the judicial decisions and law writers generally assert that the state creates the municipal bodies, endows them with such of the functions of corporate life and entrusts them with such share in the local government, as to the legislative judgment shall seem best; that it controls and regulates their action while they exist, subjects them to such changes as public policy may dictate, and abolishes them at discretion; in short that the corporate entities are mere agencies which the state employs for the convenience of government, clothing them for the time being with a portion of its sovereignty, but recalling the whole or any part thereof whenever the necessity or usefulness of the delegation is no longer apparent. This I understand to be the accepted theory of state constitutional law as regards the municipal governments. We seldom have occasion to inquire whether this amplitude of legislative authority is or is not too strongly expressed, for the reason that its exercise is generally confined within such bounds as custom has pointed out, so that no question is made concerning it. But such maxims of government are very seldom true in anything more than a general sense; they never are and never can be literally accepted in practice.

Our constitution assumes the existence of counties and townships, and evidently contemplates that the state shall continue to be subdivided as it has hitherto been; but it nowhere expressly provides that every portion of the state shall have county or township organizations. . . If, therefore, no restraints are imposed upon legislative discretion beyond those specifically stated, the township and county government of any portion of the state might be abolished, and the people be subjected to the rule of commissions appointed at the capital. The people of such portion might thus be kept in a state of pupilage and dependence to any extent, and for any period of time the state might choose.

The doctrine that within any general grant of legislative power by the constitution there can be found authority thus to take from the people the management of their local concerns, and the choice, directly or indirectly, of their local officers, if practically asserted, would be somewhat startling to our people, and would be likely to lead hereafter to a more careful scrutiny of the charters of government framed by them, lest sometime, by an inadvertent use of words, they might be found to have conferred upon some agency of their own, the legal authority to take away their liberties altogether. If we look into the several state constitutions to see what verbal restrictions have heretofore been placed upon legislative authority in this regard, we shall find them very few and simple. We have taken great pains to surround the life, liberty, and property of the individual with guaranties, but we have not, as a general thing, guarded local government with similar protections. We must assume either an intention that the legislative control should be constant and absolute, *or, on the other hand, that there are certain fundamental principles in our general framework of government, which are within the contemplation of the people when they agree upon the written charter, subject to which the delegations of authority to the several departments of government have been made....*

The circumstances from which these implications arise are: *First,* that the constitution has been adopted in view of a system of local government, well understood and tolerably uniform in character, existing from the very earliest settlement of the country, never for a moment suspended or displaced, and the continued existence of which is assumed; and, *second,* that the liberties of the people have generally been supposed to spring from, and be dependent upon that system.

DeTocqueville. . .speaking of the New England township government, whose system we have followed in the main, says: "In this part of the union the impulsion of political activity was given in the townships; and it may almost be said that each of them originally formed an independent nation. When the kings of England asserted their supremacy, they were contented to assume the central power of the state. The townships of New England remained as they were before; and, although they are now subject to the state, they were at first scarcely dependent upon it. It is important to remember that they have not been invested with privileges, but that they seem on the contrary, to have surrendered a portion of their independence to the state. The townships are only subordinate to the states in those interests which I shall term *social,* as they are common to all the citizens. They are independent in all that concerns themselves; and among the inhabitants of New England, I believe that not a man is to be found who would acknowledge that the state has any right to interfere in their local interests:" Now, if this author is here speaking of the theory of our institutions, he is in error. It is not the accepted theory that the states have received delegations of power from independent towns; but the theory is, on the other hand, that the state governments precede the local,

create the latter at discretion, and endow them with corporate life. But, historically, it is as difficult to prove this theory as it would be to demonstrate that the origin of government is in compact, or that title to property comes from occupancy. The historical fact is, that local governments universally, in this country, were either simultaneous with, or preceded, the more central authority. . .

. . . .

[L]ocal government is a matter of absolute right; and the state cannot take it away. It would be the boldest mockery to speak of a city as possessing municipal liberty where the state not only shaped its government, but at discretion sent in its own agents to administer it; or to call that system one of constitutional freedom under which it should be equally admissible to allow the people full control in their local affairs, or no control at all.

. . . .

[W]hen the state reaches out and draws to itself and appropriates the powers which from time immemorial have been locally possessed and exercised, and introduces into its legislation the centralizing ideas of continental Europe, under which despotism, whether of monarch or commune, alone has flourished, we seem forced back upon and compelled to take up and defend the plainest and most primary axioms of free government, as if even in Anglican liberty, which has been gained step by step, through extorted charters and bills of rights, the punishment of kings and the overthrow of dynasties, nothing was settled and nothing established.

*Id*. at *29, *30, *31, *32, *34, *35 (emphasis added).

Following the seminal decision in *Hurlbut*, other state supreme courts also recognized the existence of a right of local, community self-government. In *People v. Lynch*, 51 Cal. 15 (1875), the California Supreme Court ruled on a challenge by a landowner to a local property tax assessment, which had been mandated directly by the state legislature rather than by the local government. In striking down the authority of the state to impose the assessment and thus exercise a local governmental power, the Court declared that

[h]ad the Constitution of California been silent in respect to cities and incorporated villages, the Legislature would have possessed the power to create them; but it would perhaps have been more difficult to say whether the people could not have been deprived of these local governments.  .  .What did they have in their minds when they spoke of cities and villages? It needed but to recall their origin and history to impress the Constitutional Convention with a conviction that municipalities are invaluable to a great and free people. The enlightened genius of the Roman civilization was planted and fostered by the establishment of colonies with urban privileges. In the Dark Ages the chartered towns in Europe served to curb the turbulence of the more potent of the crown vassals, and to erect barriers for the protection of personal rights against the rude force of the feudal barons.

It often happened that from such centres of self-government the spirit of freedom was extended and expanded, and it may safely be said of the English boroughs--for example--that they were largely instrumental in developing the constitution of government which made that people jealous of the liberty they possessed, and capable of receiving still greater accessions of the same blessing. In our own country the existence of local political corporations began with the earlier settlement of the colonies. The benefits of such subordinate communities as schools of preparation for the discharge by the citizen of the duties he owes to his country at large, have been highly estimated by philosophical writers who have given their attention to the subject,--the distinguished author of *La Democratie en Amerique* considering the New England "towns"--which are like cities in so far as they possess certain powers of government--as the very life of American liberty.

*Id*. at *27-28, *29-31, 33.

In *State v. Denny*, 21 N.E. 274 (Ind. 1889), the Supreme Court of Indiana overturned a

state act that sought to replace existing fire and police boards with new boards appointed by the

state legislature. In declaring that the act violated the right of the people of those communities to

local self-government, the Court declared

It is contended by counsel for appellants that by the constitution of the state all power is vested in the legislative department of the government, except such as is expressly granted to the executive, the judiciary, and retained by the people in the constitution itself. We are not in harmony with counsel's theory of our state government, but we state it this way: At the adoption of the state constitution all power was vested in the people of the state. The people still retain all power except such as they expressly delegated to the several departments of the state government by the adoption of the constitution; that the legislative, executive, and judiciary departments of the state have only such powers as are granted to them by the constitution. In the first section and first article of the constitution it is declared "that all power is inherent in the people.".  .  . In construing and giving an interpretation to the constitution, we must take into consideration the situation as it existed at the time of its adoption, the fact expressed in the instrument that all power is inherent in the people, the rights and powers vested in and then exercised by the people, the existence of cities and towns, and the right of local self-government exercised by them, the laws in force, and form of government existing at the time of its adoption. *One of the fundamental principles of municipal corporations is the right of local self-government*, including the right to choose local officers to administer the affairs of the municipality.
.  .  .  .
We might quote from numerous other authorities to the same effect as the above, but we have quoted sufficient to show that the right of local self-government, including the right of the people of a municipality to select their own officers, was a sacred fundamental principle and idea of municipal corporations, well founded, sacredly guarded, and long enjoyed by the people of the state at the time of the adoption of the constitution. *As we*

14

*interpret the theory of our state government, this right of local self-government vested in, exercised, and enjoyed by the people of the municipalities of the state at the time of the adoption of the constitution yet remains in them*, unless expressly yielded up and granted to one of the branches of the state government by the constitution.

.   .   .

*The conclusion we unhesitatingly reach is that the right of local self-government in towns and cities of this state is vested in the people of the respective municipalities*, and that the general assembly has no right to appoint the officers to manage and administer municipal affairs; that the right of the general assembly ends with the enactment of laws prescribing the manner of selection and the duties of the officers.  .  .

.   .   .

Judge Cooley, in his work on Constitutional Limitation, (5th Ed. 47) says: "In considering state constitutions we must not commit the mistake of supposing that because individual rights are guarded and protected by them they must also be considered as owing their origin to them. These instruments measure the powers of the rulers, but they do not measure the rights of the governed. What is a constitution, and what are its objects? It is easier to tell what it is not than what it is. It is not the beginning of a community, nor the origin of private rights; it is not the fountain of law, nor the incipient state of government; it is not the cause but consequence of personal and political freedom; it grants no rights to the people, but is the creature of their power, the instrument of their convenience. Designed for their protection in the enjoyment of the rights and powers which they possessed before the constitution was made, it is but the frame-work of the political government, and necessarily based upon the pre-existing condition of laws, rights, habits, and modes of thought." Again, he says on the same page: "A written constitution is, in every instance, a limitation upon the powers of government in the hands of agents, for there never was a written republican constitution which delegated to functionaries all the latent powers which lie dormant in every nation, and are boundless in extent and incapable of definition."

*Id*. at 281-283 (emphasis added).

The Iowa Supreme Court recognized the right of local, community self-government in

*State v. Barker*, 89 N.W. 204 (Iowa 1902), in which the Court struck a state statute which

authorized the legislature to replace a local board with a board of state appointees. In finding the

existence of a right of local self-government, the Court explained that

[o]ur own towns were established in accordance with the English principles of liberty, but they generally possess greater powers of local self-government than their English prototypes; and, as said by Cooley in his work on Constitutional Limitations (page 223): "In contradistinction to those governments where powers are concentrated in one man, or in one or more bodies of men, whose supervision and active control extends to all the objects of government within the territorial limits of the state, the American system is one of complete decentralization, the primary and vital idea of which is that local affairs shall be managed by local authorities, and general affairs only by the central authorities."

. . . .

This immunity from unlimited legislative control has been expressly recognized by the supreme court of the United States in *City of New Orleans v. New Orleans Waterworks Co.*, 142 U. S. 79, 12 Sup. Ct. 142, 35 L. Ed. 943, where it is said "that the municipality, being a mere agent of the state, stands in its governmental or public character in no contract relation with its sovereign, at whose pleasure its charter may be amended, changed, or revoked without the impairment of any constitutional obligation, while with respect to its private or proprietary rights and interests it may be entitled to the constitutional protection.". . .Some of the cases cited proceed on the theory that the legislature has no power, after creating a municipal corporation, to take away from it the right of local self-government. The argument is that the intention to preserve and perpetuate the ancient right of local self-government, which the law recognizes as of common-law origin, and having no less than common-law franchises, is apparent throughout the scope of most American constitutions. Some of the judges even go so far as to say "that, local self-government having always been a part of the English and American systems, we shall look for its recognition in any such instrument [constitution]; and, if not expressly recognized, it is still to be understood that all these instruments are framed with its present existence and anticipated continuance in view"; "that back of all constitutions are certain usages and maxims that have sprung from the habits of life, mode of thought, methods of trying facts, and mutual responsibility in neighborhood interests; precepts that have come from revolutions which overturned tyrannies; sentiments of manly independence and self-control, which impelled our ancestors to summon the local community to redress local evils, instead of relying upon king or legislature at a distance to do so; that form the living spirit of the lifeless skeleton known as the constitution; that gives it force and attraction, and that distinguishes it from the numberless so-called constitutions of Europe; and that this so-called living spirit should supply the interpretation of the words of the written charter." We are not to be understood as fully approving all that is said in some of the cases regarding the right of local self-government, nor do we mean to hold that there is an unwritten constitution complete and comprehensive in itself. All that we intend to announce is that written constitutions should be construed with reference to and in the light of well-recognized and fundamental principles lying back of all constitutions, and constituting the very warp and woof of these fabrics. . .

*Id*. at 205-08.

In *Ex Parte Lewis*, 73 S.W. 811 (Tex. Ct. Crim. App. 1903), the Texas Court of Criminal Appeals overturned a conviction obtained under a Galveston city ordinance, which had, in turn, been adopted by three gubernatorial appointees, rather than local officials. The convicted man argued that because the state had appointed a majority of the members of the board, the right of local self-government had been violated and therefore, the conviction must be overturned. In agreeing with the appellant, the Court explained

In *State v. McAlister*, 88 Tex. 284, 31 S. W. 187, 28 L. R. A. 523, it was said that municipal governments had existed before the formation of the Constitution, and the well-known and common method of city government was recognized as pre-existent. It was further said "that a purpose to destroy a system of municipal government so common in the state will not be attributed to the convention that framed the Constitution unless the language used is so certain as to compel such a construction by the courts." This, as we have seen, is in consonance with the views expressed by Judge Cooley and other jurists. The fact that a system of municipal government was long in vogue prior to the enactment of the Constitution, and that under this system, from time immemorial, local self-government was recognized, and the power of the suffragans in cities to elect their own municipal officers was conceded, and that nowhere and at no time had the power ever been claimed on the part of the Legislature to interfere by authorizing the Governor to appoint local municipal officers, must afford strong evidence of an existing condition which would indicate that there was no purpose on the part of those who framed our organic law to destroy a system of municipal government which had always heretofore been recognized. We do not understand that the Constitution grants all power which is not expressly reserved to the legislative body of the government. This is reserved to the people. Only the lawmaking power belongs to the Legislature, and this must be in accordance with the Constitution and with the principles of local self-government reserved to the people of the state, because the Constitution says that all political power is inherent in the people, not in the Legislature, and the right of local self-government is reserved to the state.

Local self-government is not the mere whim and caprice of the legislative department, nor does it appertain to any distinctive locality of the state, but to the whole state, and as it had aforetime existed in the state. The principle of local self-government is applicable to every organized portion of the state; and if in the history and traditions of our commonwealth, as well as that of other states, municipalities always exercised the right to select their own local municipal officers, then it would seem to follow that this was a part of the local self-government which remains unimpaired to the state. The Legislature is the lawmaking power, and to it alone is referred the authority to make laws; but it has no right, under the guise of its lawmaking authority, to overturn the principles of local self-government which have been handed down to us from our fathers.

.   .   .   .

It may be that here and there, under our American system, cities may be given over to corruption, and lawless elements permitted to run riot over the best interests of the municipality, but this can only be temporary. If we adhere rigidly to the principles of local self-government, in the end conservatism and enlightenment and American citizenship will triumph. But if this incentive on the part of the better classes for good government is removed, and localities taught to depend on some central power to take care of them, we may never expect an improvement. On the contrary, the seeds of our free institutions, planted by the fathers in the townships and municipalities, will be scattered to the winds, anarchy will run riot throughout the entire body politic, while we look in vain for some strong central power to arrest the destruction of our liberties which have rested hitherto upon that vital and essential principle of the republic-local self-government by the people.

*Id*. at 813-14, 817-18, 819.

The above is a small sampling of the judicial recognition of the right of local, community self-

government.[9]

_____

[9] The highest courts of thirteen states, including Pennsylvania, have followed Cooley's opinion from *Hurlbut*, finding as he did the existence of an inherent right of local self-government. Only one of those decisions (in Nebraska) has been overturned, the others presumably remaining good law: *People v. Lynch*, 51 Cal. 15, 27 (1875) (approving Judge Cooley's opinion that the right of local self-government is implied in our constitutions, and adding in this regard, "By the Tenth Amendment of the Constitution of the United States … The Government of the United States can exercise only such powers as are expressly granted to it, and such as are necessarily implied from those granted. It follows from this, that the people of the States respectively retain such powers as have neither been granted, expressly or by implication, to the Government of the United States, nor conferred on the State governments."); *State v. Moores*, 76 N.W. 175, 177-180 (Neb. 1898), *overruled*, *Redell v. Moores*, 88 N.W. 243 (Neb. 1901) ("It cannot be asserted that the only rights reserved to the people are those enumerated in said article of the constitution, since section 26 thereof declares, "This enumeration of rights shall not be construed to impair or deny others, retained by the people, and all powers not herein delegated, remain with the people…. On the contrary, it is very evident that the constitution was framed upon the theory of local self-government."); *State ex rel. Pearson v. Hayes*, 61 N.H. 264, 322 (1881) ("Local self-government (including much administration of law, and the extensive use of the law-making powers of taxation and police), introduced not only before the organization of both the state and province of New Hampshire, but also before the extension of Massachusetts jurisdiction to the Piscataqua, and continuing in uninterrupted operation more than two hundred years, has been constitutionally established by recognition and usage."); *Rathbone v. Wirth*, 45 N.E. 15, 17 (N.Y. 1896) (the right of local self-government "inheres in a republican government and with reference to which our Constitution was framed…. [A]s Judge Cooley has remarked with reference to the Constitutions of the states, 'if not expressly reserved, it is still to be understood that all these instruments are framed with its present existence and anticipated continuance in view.'"); *Helena Consol. Water Co. v. Steele*, 49 P. 382, 386 (Mont. 1897) ("We think the two provisos of the law under discussion are in violation of the clauses of the constitution quoted and referred to above, as well as the spirit of our governmental system, which recognizes 'that the people of every hamlet, town, and city of the state are entitled to the benefits of local self-government.'"); *State v. Standford*, 66 P. 1061, 1062 (Utah 1901) ("An examination into its early history will show the existence of a system of territorial subdivisions of the state into counties when the present constitution was adopted. At this early date the system of local self-government existed under the general laws of the territory, and there is no provision in the constitution which can be construed as impairing that right…. [T]he Constitution implies a right of local self-government to each county"); *Federal Gas & Fuel Co. v. City of Columbus*, 118 N.E. 103, 105 (Ohio 1917) ("If all political power is inherent in the people, as written in our Constitution, for the government of the state, it would seem at least of equal importance that all political power should be inherent in the people for the government of our cities and villages."); *State v. Essling*, 195 N.W. 539, 541 (Minn. 1923) ("The doctrine that local self-government is fundamental in American political institutions; that it existed before the states adopted their Constitutions, and that it is more than a mere privilege conceded by the Legislature in its discretion is ably discussed in *People v.*

Grant's brief in support of its motion for judgment on the pleadings also describes how the people's right of local, community self-government has been enshrined into the United States Constitution, through its Preamble and the Ninth Amendment, and that the right is a fundamental right deeply rooted in this nation's history and tradition. [ECF Doc. 53 at 9-22; 25-29]. Indeed, jurists and legal commentators alike have recognized the constitutional basis of the right, and have written extensively about the right. *See, e.g.*, Eaton, Amasa M., *The Right to Local Self-Government*, 5 parts, 13 HARVARD L. REV. 58, 570, and 638 (1899–1900), 14 HARVARD L. REV. 20 and 116 (1900–1901); Gere, Edwin A., Jr., *Dillon's Rule and the Cooley Doctrine: Reflections of the Political Culture*, 8 J. URBAN HISTORY no. 3, p. 271 (May 1982); Jones, Alan, *Thomas M. Cooley and the Michigan Supreme Court: 1865–1885*, 10 AMER. J. LEGAL HISTORY 97 (1966); McBain, Howard Lee, *The Doctrine of an Inherent Right of Local Self-Government*, 2

---

*Hurlbut*."); *Town of Holyoke v. Smith*, 226 P. 158, 158 (Colo. 1924) ("The central idea of government in this country was and is that in local matters municipalities should be self-governing.");

A current treatise, McQuillin's *Municipal Corporations*, published today by West, acknowledges that many jurisdictions have, contrary to history and practice, rejected the concept of an inherent, inalienable right of local self-government: "Contrary to general opinion and to practice largely, it seems that the doctrine of the existence of an inherent right of local self-government or home rule does not at present exist, and according to some authorities never did. According to some, however, this view is contrary to the historical development of cities and towns both in England and in this country." McQuillin, MUNICIPAL CORPORATIONS, 3rd ed., 2010 Revised Volume, vol. 1, § 1:45 (Thomson Reuters, 2010). So McQuillin shows how, despite contrary jurisprudence, the right is firmly embedded in the history of American government, making it a component of liberty that individuals today may assert in good faith: "The history of the early American settlements establish that the principle of local self-government found a firm lodging on our soil. Everything relating to the public life of the colonists indicates that a home or local government was their central political idea." *Id.*, § 1:38. "Since our country was conceived on the theory of local self-government, political power has, from the beginning, been exercised by citizens of the various local communities. Having been so dedicated by long practice, local self-government has come to be regarded as the most important feature in our system. The American people have always acted upon the deep-seated conviction that local matters can be better regulated by the people of the locality than by the state or central authority.... Local self-government is, thus, a guaranty of individual liberty." *Id.* at § 1:40.

parts, 16 COLUMBIA L. REV. 190 and 299 (1916); McQuillin, Eugene, *Inherent right of local self-government*, § 4.82 in THE LAW OF MUNICIPAL CORPORATIONS, 3rd ed., vol. 2 (Deerfield, IL: Clark, Boardman, Callaghan, 1996); Syed, Anwar Hussain, *Sovereign or Vassal?*, in THE POLITICAL THEORY OF AMERICAN LOCAL GOVERNMENT (NY: Random House, 1966); Williams, Joan C., *The Constitutional Vulnerability of American Local Government: The Politics of City Status in American Law*, 1986 WISCONSIN L. REV. 83 (1986).

Clearly, the people of Grant Township enjoy a federally protected constitutional right of local, community self-government. It is equally clear that the enforcement of the Plaintiff's corporate constitutional "rights" amounts to a violation of that right that cannot be allowed, as Grant addresses below.

**B.   The people of Grant's right of local, community self-government – asserted in the Ordinance to protect their clean air, clean water, and natural environment – is infringed by the enforcement of the corporate constitutional "right" of PGE to inject oil and gas wastes into Grant Township.**

In Grant Township's brief in support of its motion for judgment on the pleadings, Grant argued that corporate constitutional rights claimed by PGE "unconstitutionally infringe the people's right of local, community self-government." [ECF Doc. 52 at 30]. Further in its brief, Grant explained how the judiciary had both "found" corporations within the federal Constitution and "bestowed" constitutional rights upon them; and delineated examples of how corporations routinely use those "rights" to deny "communities their right of self-governance." [ECF Doc. 52 at 33-37].

In the instant case, the confrontation between corporate "rights" and the right of the people of Grant to local, community self-government, could not be starker. In its complaint, PGE seeks to use corporate constitutional legal doctrines to find a corporate "right" to inject toxic

waste into the Township, while the people of Grant have asserted their right of local, community self-government to protect themselves by stopping the corporation from doing so.

The corporation's efforts to leverage the legal doctrine of corporate "personhood," and other assorted corporate "rights," thus butts directly up against the people's right of local, community self-government. The assertion of those corporate "rights" by PGE, and enforcement of those rights against the people of Grant Township through the nullification of their Community Bill of Rights Ordinance, therefore, constitutes a violation of the right of the people of Grant to govern their own community.

In sum, if now convinced that the people of Grant Township possess an inherent, constitutional right to local community self-government, this Court must decide whether infringement of that right by PGE's asserted constitutional "rights" constitutes a violation of the constitutional rights of the people of the Township. If so, PGE's claims based upon those rights must fail, at the same time as Grant Township's counterclaim to enforce the right must succeed.

### IV.    The right of local, community self-government is enforceable against business entities.

It is well-settled law that business corporations are creations of the state.[10] The United States Supreme Court has repeatedly reaffirmed that business corporations are "creatures" of the

---

[10] *See St. Louis, I.M. & S Ry. Co. v. Paul*, 173 U.S. 404 (1899) (declaring that corporations are "creations of state"); *Bank of Augusta v. Earle*, 38 U.S. 519, 520 (1839) (stating that "corporations are municipal creations of states"); *United States v. Morton Salt Co*., 338 U.S. 632, 650 (1950) (explaining that corporations "are endowed with public attributes. They have a collective impact upon society, from which they derive the privilege as artificial entities"); *Hale v. Henkel*, 201 U.S. 43, 75 (1906) (declaring that "the corporation is a creature of the state. It is presumed to be incorporated for the benefit of the public. . . . Its rights to act as a corporation are only preserved to it so long as it obeys the laws of its creation"); *Chincleclamouche Lumber & Broom Co. v. Commonwealth*, 100 Pa. 438, 444 (Pa. 1881) (stating that "the objects for which a corporation is created are universally such as the government wishes to promote. They are

state.[11] As such, they are chartered by the state in the name of the people. It also is well-settled

law that the Constitution not only protects people against the "State itself," but also against "all

of its creatures." *See West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 637

(1943).

Liability arises under 42 U.S.C. §1983 if the actor depriving constitutional rights is a

"state actor." *Harvey v. Plains Tp. Police Dept.*, 421 F.3d 185, 189 (3d Cir. 2005) (*quoting West

v. Atkins,* 487 U.S. 42, 48 (1988)). A showing that the party used some state-derived authority to

cause the alleged harm is sufficient to show state action. *See Abbott v. Latshaw*, 164 F.3d

141,146 (3d Cir.1998). Generally, "state actor" status can be determined by the U.S. Supreme

Court's "nexus" or "joint action" test.

---

deemed beneficial to the country"); *See also, People v. North River Sugar Refining Company*, 24
N.E. 834, 835 (NY 1890) (declaring that "[t]he life of a corporation is, indeed, less than that of
the humblest citizen."); *F.E. Nugent Funeral Home v. Beamish*, 173 A. 177, 179 (Pa. 1934)
(declaring that "[c]orporations organized under a state's laws. . . depend on it alone for power
and authority"); *People v. Curtice*, 117 P. 357, 360 (Colo. 1911) (declaring that "[i]t is in no
sense a sovereign corporation, because it rests on the will of the people of the entire state and
continues only so long as the people of the entire state desire it to continue").

[11] *See, e.g., Virginia Bankshares v. Sandberg*, 501 U.S. 1083, 1093 (1991); *Kamen v. Kember
Fin. Servs.*, 500 U.S. 90, 99 (1991); *Braswell v. United States*, 487 U.S. 99, 105 (1988); *Burks v.
Lasker*, 441 U.S. 471, 478 (1979) (declaring that "corporations are creatures of state law [] and it
is state law which is the font of corporate directors' powers"); *First Nat'l Bank of Boston v.
Bellotti*, 435 U.S. 765 (1978); *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 479 (1977); *Cort
v. Ash*, 422 U.S. 66, 84 (1975); *United Steelworkers of America v. R.H. Bouligny, Inc*., 382 U.S.
145, 147 (1965); *Shapiro v. United States*, 335 U.S. 1, 66 (1948); *Ferry v. Ramsey*, 277 U.S. 88,
96-97 (1928); *Essgee Co. of China v. United States*, 262 U.S. 151, 155 (1923); *Yazoo &
M.V.R.Co. v. Clarksdale*, 257 U.S. 10, 26 (1921); *United States v. American Tobacco Co.*, 221
U.S. 106, 142-143 (1911); *Wilson v. United States*, 221 U.S. 361, 383 (1911); *Hale v. Henkel*,
201 U.S. 43 (1906); *Terre Haute & I.R.Co. v. Indiana*, 194 U.S. 579, 584 (1904); *Fidelity Mut.
Life Assoc. v. Mettler*, 185 U.S. 308 327 (1902); *Hancock Mut. Life Ins. Co. v. Warren*, 181 U.S.
73, 76 (1901); *Jellenik v. Huron Copper Mining Co*., 177 U.S. 1, 11-13 (1900); *Woodruff v.
Mississippi*, 162 U.S. 291, 299, 309 (1896); *Philadelphia & Southern Mail S.S. Co. v.
Pennsylvania*, 122 U.S. 326 (1887); *Sinking-Fund Cases*, 99 U.S. 700, 718 (1878); *Railroad Co.
v. Maryland*, 88 U.S. 456, 469, 471 (1874); *Dodge v. Woolsey*, 59 U.S. 331 (1855); *Bank of
Augusta v. Earle*, 38 U.S. 519, 520 (1839); *Briscoe v. President & Directors of Bank of
Kentucky*, 36 U.S. 257, 328 (1837).

Under the nexus test, state action is present if the state has "exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Blum v. Yaretsky*, 457 U.S. 991, 993 (1982). A court determines under the nexus test whether there is a sufficiently close nexus between the state and the challenged conduct, such that the conduct "may be fairly treated as that of the state itself." *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974).

Under the joint action test, state action may be found if the private party is a "willful participant in joint action with the State or its agents." *Dennis v. Sparks*, 449 U.S. 24, 27 (1980) (quoting *United States v. Price*, 383 U.S. 787, 794 (1966)). Courts look to "whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights." *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1453 (10th Cir. 1995). "[I]f there is a substantial degree of cooperative action between state and private officials . . . or if there is overt and significant state participation, in carrying out the deprivation of the plaintiff's constitutional rights, state action is present." *Id.* at 1454 (internal quotations and citations omitted); *Reitman v. Mulkey*, 387 U.S. 369 (1967) (holding that state action is involved if a law significantly encourages and involves the state in discrimination).

In the instant case, depriving Grant residents of their constitutional right of local, community self-government requires many hands – the hands of the state in the legal creation of the Plaintiff company, the action of the state in its permit and regulatory capacity to enable PGE to construct and operate its proposed frack wastewater injection well, and the hands of state and federal government to bestow certain legal and constitutional powers and "rights" onto the Plaintiff. Indeed, the instant action really was filed at the end of a long chain of state and federal events without which the action would not have been possible. So, the instant action is merely

one of enforcement – PGE's enforcement of pre-existing rights and protections that have been created and recognized by both state and federal authority.

Thus, in addition to PGE being a creature of the state - a company whose form and very existence resulted from state action – the state has enabled and protected PGE to do what it seeks to do in the instant matter. That "overt" and "significant" state action thereby transforms what the law has generally treated as a "private" business entity into one almost completely dependent upon state power and authority to carry out projects harmful to the community in which it seeks to operate. For all intents and purposes, including for liability pursuant to 42 U.S.C. §1983, PGE therefore acts under the "color of state law" when it seeks to enforce its corporate constitutional "rights" against the people of Grant Township.

## V.    Conclusion

Grant Township's motion for summary judgment must be granted because Grant has satisfied the elements necessary for a claim pursuant to 42 U.S.C. §1983; that PGE has deprived, and seeks to deprive, the residents of Grant of their constitutional right of local, community self-government, and that in doing so, PGE has acted under color of law. Accordingly, PGE must be found liable to Grant Township for its deprivation of the constitutional rights of the residents of Grant.

**Respectfully submitted this _8ᵗʰ_ Day of _January_, 2016.**

**_/s Thomas Alan Linzey_**
Thomas Alan Linzey, Esq.
Community Environmental Legal Defense Fund
P.O. Box 360
Mercersburg, Pennsylvania 17236
(717) 977-6823 (c)
(717) 498-0054 (v)
