**UNITED STATES DISTRICT COURT**
**THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| PENNSYLVANIA GENERAL ENERGY COMPANY, L.L.C., | ) ) ) | Civ. No.: 1:14-cv-209 Magistrate Judge |
| Plaintiff, | ) ) | Susan Paradise Baxter |
| PENNSYLVANIA INDEPENDENT OIL AND GAS ASSOCIATION, | ) ) ) | |
| Plaintiff-Intervenor, | ) ) | |
| v. | ) ) ) ) | **GRANT'S RESPONSE TO PGE'S STATEMENT OF MATERIAL FACTS - SUMMARY JUDGMENT** |
| GRANT TOWNSHIP, | ) ) | |
| Defendant. | ) ) ) | *Electronically Filed* |

**GRANT TOWNSHIP'S RESPONSE TO PENNSYLVANIA GENERAL ENERGY COMPANY, LLC'S ("PGE's") CONCISE STATEMENT OF MATERIAL FACTS IN SUPPORT OF SUMMARY JUDGMENT**

1.      PGE is in the business of exploration and development of oil and gas, and PGE currently owns and operates natural gas wells in Grant Township, Pennsylvania. (Am. Complaint, Docket No. 5, ¶¶ 1, 27; Affidavit of James Ashbaugh ("Ashbaugh Affidavit"), ¶ 4.)

**Response:  Admitted.**

2.      PGE's exploration and development activities include drilling and operating gas wells and managing brine and other produced fluids from operating wells. (Am. Complaint, ¶18; Ashbaugh Affidavit, ¶ 5.)

**Response:  Admitted.**

3.      In 1997, PGE's predecessor in interest put into production a deep gas well in Grant Township on property known as the Yanity Farm (the "Yanity Well"). Based on its intention to convert the use of the Yanity Well to an injection well for disposal of produced fluids generated at other PGE oil and gas wells, PGE proceeded to obtain regulatory approval for such use. (Am. Complaint, ¶ 19; Ashbaugh Affidavit, ¶¶ 6-7.) A true and correct copy of the Affidavit of James Ashbaugh, P.E. is attached to the Appendix as Exhibit "A."

**Response: Admitted.**

4.      The United States Environmental Protection Agency ("EPA") issues underground injection control ("UIC") permits to authorize the injection of brine and other produced fluids for disposal. (Am. Complaint, ¶ 21; Ashbaugh Affidavit, ¶ 8.)

**Response: Admitted.**

5.      PGE submitted an application to EPA for a UIC permit to convert the Yanity Well into an injection well and to inject produced fluids generated at other PGE oil and gas wells into the Yanity Well. (Am. Complaint, ¶ 22; Ashbaugh Affidavit, ¶ 9.)

**Response: Admitted.**

6.      EPA issued the UIC permit to PGE on March 19, 2014, which was subsequently appealed to the United States Environmental Appeals Board. On August 21, 2014, the Environmental Appeals Board issued an order denying review of the petitions for appeal, and on September 11, 2014, EPA issued a final UIC permit to PGE. (Am. Complaint, ¶ 23; Answer, Docket No. 10, ¶ 23; Ashbaugh Affidavit, ¶ 10.)

**Response: Admitted.**

7.      Pennsylvania also regulates injection wells and ancillary facilities under the authority of Pennsylvania environmental statutes. (Am. Complaint, ¶ 24; Answer, ¶ 24; Ashbaugh Affidavit, ¶ 11.)

**Response: Admitted.**

8.      PGE intends to and will use the Yanity Well to inject produced fluids from its other oil and gas development operations. (Am. Complaint, ¶ 26; Counterclaim, Docket No. 10, ¶ 6; Ashbaugh Affidavit, ¶ 7.)

**Response: Admitted in Part, Denied in Part. Grant Township admits that PGE intends to use the Yanity Well to inject produced fluids from its other oil and gas development operations. Grant Township denies that PGE will use the Yanity Well to inject produced fluids from its other oil and gas development operations. PGE does not possess the required state Department of Environmental Protection (DEP) permit, has not satisfied conditions imposed by the required Environmental Protection Agency (EPA) permit, and PGE's use of the well to inject produced fluids violates the people of Grant Township's right to local**

2

community self-government and Grant Township's Home Rule Charter. **This Statement is thus disputed by Grant Township.**

9.      PGE submitted an application to the Pennsylvania Department of Environmental Protection ("DEP") to change the status of the Yanity Well so that it could be used as an injection well. (Ashbaugh Affidavit, ¶ 12.)

**Response:  Admitted.**

10.     On October 22, 2014, DEP issued a permit which authorized a change in the status of the Yanity Well and which allowed PGE to use the Yanity Well as an injection well ("DEP Permit"). Starting on October 22, 2014, PGE had all permits required to start to use the Yanity Well to inject produced fluids from PGE's other oil and gas development operations. The only reason PGE did not start to operate the Yanity Well to receive produced fluids on or around October 22, 2014, was due to the enactment by Grant Township of the ordinance known as the Community Bill of Rights Ordinance (the "Ordinance"). (Ashbaugh Affidavit, ¶ 13.)

**Response: Admitted in Part, Denied in Part. Grant Township admits that on October 22, 2014, DEP issued a permit which authorized a change in the status of the Yanity Well and which allowed PGE to use the Yanity Well as an injection well; and that starting on October 22, 2014, PGE had all permits required to start to use the Yanity Well to inject produced fluids from PGE's other oil and gas development operations. Grant Township denies that the only reason PGE did not start to operate the Yanity Well to receive produced fluids on or around October 22, 2014, was due to the enactment by Grant Township of the ordinance known as the Community Bill of Rights Ordinance. Specifically, PGE has admitted that it failed to satisfy conditions imposed on PGE by its EPA permit, including the performance and witnessing of a mechanical integrity test, prior to the time in which it seeks damages from Grant.** *See PGE's Response to Grant's Renewed Motion to Dismiss for Lack of Jurisdiction* **at 3 [ECF Doc. 100 at 3] ("PGE has not proceeded with mechanical integrity testing" of the proposed injection well);** *PGE's Sur-Reply to Grant's Motion for Entry of Case Management Order* **at ¶ 7 [ECF Doc. 169 at ¶ 7] ("PGE did not test the integrity of the well until the Ordinance had been deemed invalid."). Without the performance and witnessing of a mechanical integrity test, which could have been performed without violating Grant's Ordinance, PGE was legally incapable of creating or operating the injection well. 40 CFR 146.8;** *See* **Exhibit #2 in Appendix at Exhibit A (***Affidavit of Thomas Linzey, Esq.* **at Exhibit #2-A ("DEP reverses decision over wastewater disposal well"); Exhibit #2 in Appendix at Exhibit B (***Affidavit of Thomas Linzey, Esq.* **at Exhibit #2-B,** *Email from James Bennett to Thomas Linzey***, dated February 9, 2016). PGE has failed to show that it had satisfied all of the EPA permit conditions prior to the date of the revocation of the DEP permit on March 12, 2015. This Statement is thus disputed by Grant Township.**

11.     On March 12, 2015, DEP withdrew the DEP Permit. PGE, which possessed all required federal and state permits, would have operated the Yanity Well as an injection well from on or around October 22, 2014 until March 12, 2015, but for the enactment of the Ordinance. From October 22, 2014 until March 12, 2015. PGE was unable to operate the Yanity Well as an injection well because of the Ordinance. As a result, PGE incurred substantial damages. PGE will provide evidence of its damages at the trial of this matter. (Ashbaugh Affidavit, ¶ 14.)

**Response: Admitted in Part, Denied in Part. Grant Township admits that on March 12, 2015, DEP revoked the DEP Permit. Grant Township denies that PGE would have operated the Yanity Well as an injection well from on or around October 22, 2014 until March 12, 2015, but for the enactment of the Ordinance. Specifically, PGE has admitted that it failed to satisfy conditions imposed on PGE by its EPA permit, including the performance and witnessing of a mechanical integrity test, prior to the time in which it seeks damages from Grant. *See PGE's Response to Grant's Renewed Motion to Dismiss for Lack of Jurisdiction* at 3 [ECF Doc. 100 at 3] ("PGE has not proceeded with mechanical integrity testing" of the proposed injection well); *PGE's Sur-Reply to Grant's Motion for Entry of Case Management Order* at ¶ 7[ECF Doc. 169 at ¶ 7] ("PGE did not test the integrity of the well until the Ordinance had been deemed invalid."). Without the performance and witnessing of a mechanical integrity test, which could have been performed without violating Grant's Ordinance, PGE was legally incapable of creating or operating the injection well. 40 CFR 146.8; *See* Exhibit #2 in Appendix at Exhibit A (*Affidavit of Thomas Linzey, Esq.* at Exhibit #2-A ("DEP reverses decision over wastewater disposal well"); Exhibit #2 in Appendix at Exhibit B (*Affidavit of Thomas Linzey, Esq.* at Exhibit #2-B, *Email from James Bennett to Thomas Linzey*, dated February 9, 2016). PGE has failed to show that it had satisfied all of the EPA permit conditions prior to the date of the revocation of the DEP permit on March 12, 2015. This Statement is thus disputed by Grant Township.**

12.     In response to the withdrawal of the DEP Permit, PGE re-submitted an application to DEP for a permit to change the status of the Yanity Well to an injection well. That application is pending. (Ashbaugh Affidavit, ¶ 15.)

**Response: Admitted.**

13.     On June 3, 2014, Grant Township adopted the Ordinance. (Am. Complaint, ¶ 7; Answer, ¶ 7.)

**Response: Admitted.**

14.     The Ordinance expressly prohibits within Grant Township any corporation from "engag[ing] in the depositing of waste from oil and gas extraction" and invalidates any "permit, license, privilege, charter, or other authority issued by any state or federal entity which would violate [this prohibition] or any rights secured by [the Ordinance], the Pennsylvania Constitution, the United States Constitution, or other laws." (Am. Complaint, ¶ 8; Ex. 1, §§ 3(a) and 3(b)).

**Response: Admitted.**

4

15.     The Ordinance defines "[c]orporations" as "any corporation, limited partnership, limited liability partnership, business trust, public benefit corporation, business entity, or limited liability company organized under the laws of any state of the United States or under the laws of any County." (Am. Complaint, ¶ 9; Ex. 1 § 1(a).)

**Response: Admitted.**

16.     PGE is a "corporation" as the term is defined in the Ordinance. (Am. Complaint, ¶ 10; Answer, ¶ 10; Ashbaugh Affidavit, ¶ 16.)

**Response: Admitted.**

17.     "Depositing of waste from oil and gas extraction," as defined by the Ordinance, includes, without limitation: "[T]he depositing, disposal, storage, beneficial use, treatment, recycling, injection or introduction of materials including, but not limited to, brine, "produced water," "fract [sic] water," tailings, flowback or any other waste or by-product of oil and gas extraction, by any means. The phrase shall also include the issuance of, or application for, any permit that would purport to allow these activities." (Am. Complaint, ¶ 11; Ex. 1, § 1(b).)

**Response: Admitted.**

18.     The operation of oil and gas wells unavoidably requires engaging in the activity of "disposing of waste from oil and gas extraction" since any producing well will produce brine and other fluids, which must be disposed of by the operator. (Am. Complaint, ¶ 28; Counterclaim, ¶ 6; Ashbaugh Affidavit, ¶ 17.)

**Response: Admitted.**

19.     The Ordinance further provides that corporations that violate or seek to violate the Ordinance "shall not be deemed to be 'persons,' nor possess any other legal rights, privileges, powers, or protections which would interfere with the rights or prohibitions enumerated by this Ordinance. 'Rights, privileges, powers or protections' shall include the power to assert state or federal preemptive laws in an attempt to overturn this Ordinance, and the power to assert that the people of the municipality lack the authority to adopt this Ordinance." (Am. Complaint, ¶ 12; Ex. 1, § 5(a).)

**Response: Admitted.**

20.     Under the Ordinance, "[a]ny corporation or government that violates any provision of [the Ordinance] shall be guilty of an offense and, upon conviction thereof, shall be sentenced to pay the maximum fine allowable under State law for that violation." (Am. Complaint, ¶ 15, Ex. 1, § 4(a).)

**Response: Admitted.**

21.    The Ordinance asserts that "private corporations engaged in the depositing of waste from oil and gas extraction are wrongly recognized by the federal and state government as having more 'rights' than the people who live in our community, and thus, recognition of corporate 'rights' is a denial of the rights of the people of Grant Township." (Am. Complaint, Ex. 1.)

**Response: Admitted.**

22.    Grant Township acknowledges that the claims and arguments of Grant Township in this matter are contrary to existing law. For example, in the pleadings filed in this matter, Grant Township has admitted the following:

    a.    In Grant Township's Brief in Support of its Motion for Judgment on the Pleadings ("Brief in Support"), Grant Township asserted that it "understands that arguments in later sections of the brief raise issues related to what may be considered 'well-settled' law." (Docket No. 53, p. 8, n. 2.) Grant Township alerted this Court that it sought relief that is contrary to the law and asked this Court to render a decision against well-settled legal precedent.

    b.    With respect to the long-standing limits on local governments, Grant Township made the following startling admission: "Community lawmaking as the legitimate exercise of self-government by people where they live has generated mostly critical, occasionally derisive treatment from legislators, jurists, and commentators since the time of the founding. Consistent with this attitude, American jurisprudence has developed legal doctrines to infringe the right of local, community self-government, both by denying it outright, and by severely restricting local governmental power allowed for communities by state law. Such doctrines include corporate constitutional 'rights,' Dillon's Rule, and preemption." (Docket No. 53, p. 30. (emphasis original))

    c.    Grant Township has further admitted that for "the past 150 years, the judiciary has 'found' corporations within the U.S. Constitution and bestowed constitutional rights upon them." (Docket No. 53, p. 33.)

    d.    With respect to Dillon's Rule, Grant Township admitted that "Pennsylvania jurisprudence has long applied Dillon's Rule to subordinate municipal corporations to the state, and continues to do so today." (Docket No. 53, p. 39.)

    e.    Last, Grant Township admitted that it is trying to change the landscape of federal constitutional law and Pennsylvania state law: "By enacting the Community Bill of Rights Ordinance, the people of Grant Township decided that the existing municipal system of law – constrained by precisely the same legal doctrines asserted against the Township by PGE in this action – was failing to provide the most basic constitutional guarantees of American governments." (Docket No. 53, pp. 44-45.)

**Response: Denied as to the assertion that Grant Township acknowledges that the claims and arguments of Grant Township in this matter are contrary to existing law. Grant Township further submits that arguments from its court filings about the law are not facts, much less material facts. Paragraphs 22(a)-(e) are further denied as irrelevant, not material, and inadmissible. Federal Rules of Evidence 401(a) and 401(b); 403. This Statement is thus both disputed and deemed immaterial by Grant Township.**

23.     Moreover, Grant Township's counsel, the Community Environmental Legal Defense Fund ("CELDF"), has conceded publicly on multiple occasions that claims like those raised by Grant Township are against existing precedent and that Grant Township and its counsel are essentially seeking to alter our country's structure of government, either peacefully or through open civil disobedience.

     a.  Most recently, counsel for Grant Township encouraged active civil disobedience because CELDF was not able to successfully use the legal process to stop natural gas companies. Specifically, CELDF encouraged its followers to seek to stop projects, "And that means, I think, successive days. It means rotating people through. It means bringing people in from other places. It means filling up jails." (emphasis in the original article). CELDF continued as follows: I mean, our resistance has to ratchet up, the opposition has to ratchet up our stuff to a point where it's actually actively interfering with these projects, because if you don't do that and you rely entirely on the legal process and the legal process is so stacked against you in terms of what municipalities can and can't do, that at that point you have no other option but to engage in that type of action. (emphasis in the original article).

     b.  Grant Township's counsel was quoted in a November 15, 2015 article from The Athens News titled "Anti-fracking figure makes case in Athens." In the article, counsel for Grant Township discussed the substantive legal issues and made the following concessions: The U.S. Constitution, [Tom Linzey] argued, is based heavily in Colonial-era English common law—and that law helped turn the U.S. into an industrial powerhouse. Linzey said the Constitution gives corporations the same legal rights it gave European colonizers: the power to impose on local populations and make use of local resources, without local residents' consent. That means it's legally within corporations' rights to sue any group that prevents them from exercising their constitutionally guaranteed privileges. "Corporations are persons under the law," Linzey said. "If you tell them they can't use the permit, then you're depriving the corporation of their property, because corporations are persons under the law. They have the same protections we do." (emphasis added).

     c.  In a press release by the CELDF regarding the attempt by Grant Township to avoid this Court's ruling in its October 14, 2015 Memorandum Opinion, CELDF admits that "They are mobilizing against a system of law that empowers corporations over communities, and empowers government to preempt communities from protecting their air and water. Communities are saying this is not acceptable, it's not sustainable, it's not democratic, and it's going to change." [Note: This paragraph was mistakenly numbered as "b" in original *Concise Statement of Facts*].

d.  In a description of the concept of a community bill of rights, CELDF openly concedes that a community bill of rights is designed to pursue "the supremacy of inalienable rights over other laws" and that "there are well-established legal barriers to the exercise of the right to local self government." [Note: This paragraph was mistakenly numbered as "c" in the original *Concise Statement of Facts*].

e.  In perhaps the most honest explanation by CELDF of its goals and willingness to ignore the law, in connection with this matter and the Pennsylvania Department of Environmental Protection's decision to wait for this Court to rule on the validity of the Ordinance before rendering decisions on permit applications, CELDF is quoted as saying: "The reason why these ordinances are surfacing is because people have given up hope that the state is going to do anything for them. People have given up, they're done. And it's a new kind of activism that's emerging that says screw you, we're going to make laws ourselves."(emphasis added). [Note: This paragraph was mistakenly numbered as "d" in the original *Concise Statement of Facts*].

f.  In addition, CELDF recognizes that by taking positions that are contrary to law, it places it clients at risk of significant adverse money judgments. In that vein, CELDF is quoted as saying that: "And if a town goes bankrupt trying to defend one of our ordinances, well, perhaps that's exactly what is needed to trigger a national movement." [Note: This paragraph was mistakenly numbered as "e" in the original *Concise Statement of Facts*].

**Response: Denied as irrelevant, disputed, immaterial, and inadmissible. Federal Rules of Evidence 401(a), 401(b); 403.**

**GRANT TOWNSHIP'S STATEMENT OF UNDISPUTED FACTS IN OPPOSITION TO PENNSYLVANIA GENERAL ENERGY COMPANY, LLC'S ("PGE's") MOTION FOR SUMMARY JUDGMENT, AND IN SUPPORT OF GRANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

1.  The Grant Township Board of Supervisors has taken no action to enforce the Ordinance against PGE or against any other business entity. *See* Exhibit #1 in Appendix at ¶¶ 6-8 (*Affidavit of Chairman Jon Perry* at ¶¶ 6-8).

2.  The Grant Township Board of Supervisors has not filed any enforcement action against PGE, or against any other business entity, to enforce the Ordinance. *See* Exhibit #1 in Appendix at ¶ 7 (*Affidavit of Chairman Jon Perry* at ¶ 7).

3.     Only business entities, and no individuals, have applied for permits to operate Class-IID injection wells in Pennsylvania. *See* Exhibit #2 in Appendix at Exhibit C, at 11 (*Affidavit of Thomas Linzey, Esq.* at Exhibit C at 11 (*EPA's Underground Injection Control Program Overview*, DEP's Solid Waste Advisory Committee Meeting, June 5, 2014).[1]

4.     PGE's EPA permit requires, among other things, that PGE satisfy certain conditions before operating the injection well. *See* Exhibit #3 in Appendix at 8 at D(2) (*EPA Permit* at 8 at D(2)).

5.     As of October 14, 2015, PGE had not satisfied at least one condition imposed by its EPA-issued permit, and the injection well could not have been operated without satisfaction of those conditions. *PGE's Sur-Reply to Grant Township's Reply to Response to Motion for Entry of Case Management Order* at ¶ 7 [ECF Doc. 169 at ¶7].

6.     One of the conditions required by PGE's EPA permit is satisfactory performance of what is known as a mechanical integrity test. That test ensures that the well is safe to operate as an injection well. *See* Exhibit #3 in Appendix at 8 at D(2) (*EPA Permit* at 8 at D(2)).

7.     PGE never satisfied the mechanical integrity test during the time it held both the required federal and state permits. *PGE's Sur-Reply to Grant Township's Reply to Response to Motion for Entry of Case Management Order* at ¶ 7 [ECF Doc. 169 at ¶7].

8.     According to PGE, by March 2015, it could not use the Yanity Well as an injection well because EPA had still not witnessed its satisfactory performance of the mechanical integrity test. *PGE's Sur-Reply to Grant Township's Reply to Response to Motion for Entry of Case Management Order* at ¶ 7 [ECF Doc. 169 at ¶7].

9.     The type of mechanical integrity test that PGE performed is called a pressure test. *See* Exhibit #2 in Appendix at Exhibit B (*Affidavit of Thomas Linzey*, *Esq.* at Exhibit #2-B, *Email from James Bennett to Thomas Linzey*, dated February 9, 2016).

10.    Performance of the pressure test does not require the depositing or injection of waste in violation of the Ordinance. *See* Exhibit #2 in Appendix at Exhibit A (*Affidavit of Thomas Linzey, Esq.* at Exhibit #2-A ("DEP reverses decision over wastewater disposal well"); Exhibit #2 in Appendix at Exhibit B (*Affidavit of Thomas Linzey, Esq.* at Exhibit #2-B, *Email from James Bennett to Thomas Linzey*, dated February 9, 2016).

---

[1] Grant Township requests that the Court take judicial notice pursuant to Federal Rule of Evidence 201, of the *EPA's Underground Injection Control Program Overview* as an official agency document.

11.     In a news article dated March 18, 2015, discussing DEP's decision to revoke PGE's permit, PGE's vice president Lisa McManus conceded that the company *had been monitoring* pressure between the layers of the well casing -- despite the Ordinance -- and that it found "very little, if any, pressure." *See* Exhibit #2 in Appendix at Exhibit A (*Affidavit of Thomas Linzey, Esq.* at Exhibit #2-A, "DEP reverses decision over wastewater disposal well").[2]

12.     The news article dated March 18, 2015 quotes an electronic mail from McManus acknowledging that "being able to begin injection hinges on EPA's witnessing the test and ensuring the mechanical integrity of the well", but that the "EPA had not yet witnessed the pressure test." *See* Exhibit #2 in Appendix at Exhibit A (*Affidavit of Thomas Linzey, Esq.* at Exhibit #2-A, "DEP reverses decision over wastewater disposal well").

13.     PGE could have performed the mechanical integrity test prior to October 14, 2015 without violating the Community Bill of Rights Ordinance. *See* Exhibit #2 in Appendix at Exhibit A (*Affidavit of Thomas Linzey, Esq.* at Exhibit #2-A, "DEP reverses decision over wastewater disposal well"); Exhibit #2 in Appendix at Exhibit B (*Affidavit of Thomas Linzey, Esq.*, at Exhibit #2-B, *Email from James Bennett to Thomas Linzey*, dated February 9, 2016).

14.     PGE did not seek EPA's approval of its performance of the mechanical integrity test until after DEP revoked the company's permit and the Court had invalidated key provisions of the Ordinance. *PGE's Sur-Reply to Grant Township's Reply to Response to Motion for Entry of Case Management Order* at ¶ 7, [ECF Doc. 169 at ¶7]; *See* Exhibit #2 in Appendix at Exhibit A, "DEP reverses decision over wastewater disposal well").

15.     PGE performed the pressure test during the time that it did not have the Pennsylvania Department of Environmental Protection (DEP) permit required to operate the Yanity Well as an injection well. *PGE's Sur-Reply to Grant Township's Reply to Response to Motion for Entry of Case Management Order* at ¶ 7, [ECF Doc. 169 at ¶ 7].

16.     If performance of the pressure test required the depositing or injection of fracking waste into the well, then PGE would have knowingly and intentionally violated Pennsylvania state law and Pennsylvania Department of Environmental Protection regulations by performing the test. *See* 25 Pa. Code §§ 78.11 - 78.18.

---

[2] The statements made by PGE's Vice President are admissible as admissions of a party opponent. *See* Fed. R. Evid. 801(d)(2)(A).

Respectfully submitted this **_29th_** Day of **_February_**, 2016.


*For Defendant Grant Township:*

**/s/ Thomas Alan Linzey**
Thomas Alan Linzey, Esq.
Community Environmental Legal Defense Fund
P.O. Box 360
Mercersburg, Pennsylvania 17236
(717) 498-0054 (v)
(717) 977-6823 (c)
tal@pa.net