# UNITED STATES DISTRICT COURT
# THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PENNSYLVANIA GENERAL ENERGY COMPANY, L.L.C., | ) ) ) | Civ. No.: 1:14-cv-209 Magistrate Judge |
| Plaintiff, | ) ) | Susan Paradise Baxter |
| PENNSYLVANIA INDEPENDENT OIL AND GAS ASSOCIATION, | ) ) ) | **GRANT'S RESPONSE IN OPPOSITION TO PGE'S** |
| Plaintiff-Intervenor, | ) ) | **RENEWED AND SUPPLEMENTAL MOTION** |
| v. | ) ) | **FOR SANCTIONS** |
| GRANT TOWNSHIP, | ) ) | |
| Defendant. | ) ) ) | *Electronically Filed* |

_____

## GRANT TOWNSHIP'S RESPONSE IN OPPOSITION TO PGE'S RENEWED AND SUPPLEMENTAL MOTION FOR SANCTIONS

_____

Grant Township, by and through its undersigned counsel, files this response in opposition to Pennsylvania General Energy Company, LLC's ("PGE's") renewed and supplemental motion for F.R.C.P. 11 sanctions.[1] [ECF Doc. 249]. Grant asks this Court to deny the Motion in its entirety, for the following reasons:

_____

[1] As alternate authority, the company requests sanctions pursuant to 28 U.S.C. §1927 and the inherent power of this Court. [ECF Doc. 249 at 1]. The Motion was not joined by the Plaintiff-Intervenor Pennsylvania Independent Oil and Gas Association ("PIOGA"), most likely for the reasons outlined in section III(A), fn. 15 (pages 13-14), of this response.

I.     **Procedural Background: PGE's Original and "Renewed" Motions for Sanctions, and the Pattern of Harassment Against Grant Township.**

   A.   **PGE's original motion for sanctions against CELDF and Grant Township.**

On December 2, 2015, PGE notified Grant Township that it would be filing a motion for sanctions against Grant's counsel on Christmas Eve. In that notice, PGE asserted that the filing of Grant's original Answer, affirmative defenses, and counterclaim, *over a year prior to that filing - on October 13, 2014 -* was sanctionable under F.R.C.P. 11(b) if those documents were not withdrawn by counsel. [ECF Docs. 10, 119].

On December 17, 2015, Grant's counsel sent a letter to PGE's counsel informing them that the filing of the motion for sanctions was baseless, and that the motion was being filed for improper purposes – namely, to harass Grant Township and needlessly increase the costs of this litigation. *See* Exhibit #1 (*December 17, 2015 Letter from Thomas Linzey, Esq. to James Corbelli, Esq.*). Following a response from PGE that failed to acknowledge the points raised in Grant's letter, Grant's counsel sent a second letter, again informing PGE's counsel that the motion for sanctions was baseless and improper. That letter informed PGE that if the motion was filed, that Grant would be forced to file a notice of sanctions against PGE for the misuse of Rule 11(b). *See* Exhibit #3 (*December 23, 2015 Letter from Thomas Linzey, Esq. to James Corbelli, Esq.*).[2]

On January 15, 2016, forty-five days after the notice was originally given, PGE filed its motion for sanctions. [ECF Doc. 161]. The motion was filed against the Community Environmental Legal Defense Fund ("CELDF"), as the law firm representing Grant Township,

_____

[2] Not surprisingly, PGE failed to include Grant's response letters in either its original motion for sanctions, or its "renewed" motion for sanctions, seeking to falsely portray Grant as indifferent to the proposed filing of the motion.

and Grant Township itself.[3] The *entire* basis for PGE's original motion was that Grant's chosen defense in this case – that the people of Grant possess the right of local, community self-government, and that the right is violated by enforcement of the legal doctrines that PGE asserted in its lawsuit against the Township – is contrary to well-settled precedent, and therefore, that Grant's attorney should be sanctioned for advancing those arguments on behalf of Grant. *See* ECF Doc. 161 (PGE's *First Motion for Sanctions*) at ¶ 16 ("sanctions are warranted given the lack of any precedent supporting Grant Township's claims and the frivolous nature of Grant Township's arguments for modifications of well-settled law.").

Given the improper nature of PGE's original motion for sanctions, Grant gave notice pursuant to Rule 11, and then filed its own motion for sanctions, seeking fees and costs that had been incurred by Grant's counsel to respond to PGE's misuse of F.R.C.P. 11(b). [ECF Docs. 176, 179]. After staying consideration of both parties' motion for sanctions, this Court then dismissed them, directing that they could be re-filed after the motions for summary judgment had been decided. [ECF Doc. 224].

---

[3] The original motion for sanctions was filed solely against CELDF and against Grant Township. *See* ECF Doc. 161 at 1 ("Plaintiff. . . moves this Court for an order entering sanctions against Defendant Grant Township and its counsel, Community Environmental Legal Defense Fund. . ."). The original motion sought "an order striking Grant Township's Answer and Affirmative Defenses," dismissal of Grant's Counterclaim "with prejudice" and denial of Grant's Motion for Reconsideration. PGE then sought attorneys' fees "resulting from the violations." [ECF Doc. 161 at ¶ 30]. The brief supporting the motion was eleven pages in length, did not include a request for a specific monetary amount, and was filed solely under the authority of F.R.C.P. 11. [ECF Doc. 161 at 1].

**B. PGE's "renewed" motion for sanctions against Grant Township, CELDF, Attorney Dunne, Attorney Linzey, and Attorney Schromen-Wawrin.**

PGE filed a "renewed and supplemental motion for sanctions" days before a final settlement conference was scheduled to be held before Judge Schwab. [ECF Doc. 248]. PGE's "renewed" motion expands its original sanctions motion in two ways: first, it now seeks sanctions against Attorneys Thomas Linzey, Elizabeth Dunne, and Lindsey Schromen-Wawrin, in addition to Grant Township and CELDF, and second, it includes an additional twenty-five (25) pages of argument and assertions on top of the original motion's 11 pages. [ECF Doc. 250].[4]

PGE failed to give 21-day notice of its renewed motion, as required by Rule 11(c)(2), and seeks to rely on the original notice given in 2015 to comply with the notice rule. This, even though its renewed motion expands both the parties that it seeks sanctions from, as well as the grounds for those sanctions.[5] Accordingly, Grant Township has filed a motion to strike the sanctions motion on those grounds, and renews those objections within this response. [ECF Doc. 253]. Grant has also served notice of its third motion for sanctions[6] against PGE, for the filing of its "renewed" motion for sanctions, and will then be filing that motion with this Court.

---

[4] While the original motion sought attorneys' fees only for the costs of responding to Grant's *Answer*, *Affirmative Defenses*, *Counterclaim*, and *Motion for Reconsideration*, the "renewed" motion seeks attorneys' fees for the entire case – asking for a finding that *every document* filed in the case is sanctionable. PGE has also expanded its original motion for sanctions to include a request for sanctions pursuant to 28 U.S.C. §1927 and the inherent authority of this Court. [ECF Doc. 250 at 1-2].

[5] One of the likely reasons for the failure to give notice was the inability of PGE to give the requisite notice and still file the motion in an attempt to influence the parties' final settlement negotiations that were held before Judge Schwab the following week.

[6] The first motion for sanctions was filed by Grant on December 8, 2014, after this Court granted a protective order to Grant against subpoenas and deposition notices that were served by PGE. [ECF Doc. 44]. The second motion for sanctions was filed by Grant on February 5, 2016, in response to PGE's filing of its first sanctions motion. [ECF Doc. 171]. Grant's first motion was denied, and its second motion was dismissed in tandem with PGE's motion. [ECF Doc. unnumbered between 70-71, ECF Doc. 224].

PGE's "renewed" motion for sanctions relies on the same primary argument advanced in its original motion – that Grant Township's defense against PGE's lawsuit is sanctionable solely because it asserts arguments "not warranted by existing law." [ECF Doc. 250 at 2].

### C.  PGE's motions for sanctions are part of a scheme of harassment against Grant to force the Township to cease its opposition to the company's plan to drive a frack wastewater injection well into the Township.

PGE's motions for sanctions are part of a larger scheme of harassment against Grant, which has opposed the company's plan to dispose of frack wastewater in the Township ever since the plan became public.[7] In addition to the motions for sanctions, PGE and its partner-intervenor in this litigation, the Pennsylvania Independent Oil and Gas Association ("PIOGA") have engaged in the following conduct:

(a) Sought to depose and take other discovery of the elected officials of Grant, Township staff, and Grant's lawyers, in an effort to probe privileged communications between the Township officials, staff, and counsel, in a case solely challenging the facial legality and constitutionality of an ordinance adopted by the Board of Township Supervisors in its regular course of business. This forced Grant Township to file for, and receive, a protective order against those depositions, causing Grant to expend time and resources against those efforts [ECF Doc. 21];

---

[7] As reiterated in briefing before this Court, PGE plans to dispose of over 151 million gallons of frack wastewater into the proposed injection well over the next ten years, with the wastewater containing both radioactive and toxic contaminants, including barium, radium, strontium, and hydrazine. [ECF Doc. 150]. Given the perpetuity of the disposal, the injection well is guaranteed to leak and thus place the water wells of every household within the Township at risk.

(b) Refused to proceed to summary relief motions early in the litigation, even when Grant proposed a speedy and efficient resolution of the case, thus driving up costs for Grant and delaying the presentation of those motions which, in turn, has delayed the conclusion of this litigation [ECF Doc. 21-1];[8]

(c) Filed for preliminary injunctive relief against Grant Township before being in possession of a state permit to develop and operate the proposed frack wastewater injection well [ECF Doc. 8];

(d) PIOGA filed to intervene in the case, on the sole basis that PGE is a member company of PIOGA, even though none of PIOGA's other member companies are planning to site a frack wastewater injection well in Grant Township [ECF Doc. 16];

(e) PIOGA attempted to expand its scope of intervention, in violation of intervention rules, after being granted intervenor status. PIOGA's attempted filing then forced Grant (and this Court) to expend time and resources to ensure that PIOGA's original complaint-in-intervention was actually filed in this case, instead of the improperly expanded one [ECF Doc. 121, 126];

(f) PIOGA filed a disciplinary complaint against Attorney Thomas Linzey, one of Grant's lawyers in this case, with the Pennsylvania Disciplinary Board, without notifying, or filing those objections in, this Court. That complaint contained allegations and material identical to PGE's motions for sanctions – i.e., that Grant's arguments in this Court were frivolous and sanctionable. While the complaint was

---

[8] In a companion case offering an identical scenario and a similar ordinance, the law firm for the gas corporation conducted no discovery and moved immediately for summary relief. *See Seneca Resources v. Highland Township*, Civ. No. 1:15-cv-60-SPB (WD PA 2015) [ECF Doc. 52].

summarily dismissed by the Disciplinary Board, it required Grant's counsel to expend both time and resources to respond to it (Exhibit #2 to this Response);

(g) Lobbying County District Attorneys to file criminal charges against each of the Grant Township Supervisors individually because of their opposition to the frack wastewater injection well, with the charge being "official oppression";[9]

(h) Filing an initial motion for sanctions in this Court fourteen months after the filing of the documents that were the subject of that motion, and then filing a "renewed" motion for sanctions against additional attorneys on additional grounds, while violating F.R.C.P. 11(c)(2)'s condition of notice, ostensibly to further pressure the Township into agreeing to PGE's settlement terms at the recently-held settlement conference between the parties [ECF Docs. 161, 250]; and

(i) Continuing to pursue a monetary damages claim that is without basis, in that PGE continues to seek damages from the Township for a period of time in which PGE was otherwise unable to operate the injection well because it admitted that it had not carried out the required tests, and because it knew that its state permit was being revoked.

These, and other, actions of PGE and its partner-intervenor in this case, PIOGA, place the motions for sanctions into context. As part of a larger pattern and practice, or scheme, of harassment of Grant Township, the motions must be seen for what they are – another effort to

---

[9] *See* Litvak, "Oil and gas industry group ponders criminal prosecution of local officials" (*Pittsburgh Post Gazette*, October 4, 2016); http://powersource.post-gazette.com/powersource/policy-powersource/2016/10/04/Oil-and-gas-industry-group-ponders-criminal-prosecution-of-local-officials/stories/201610040004 (accessed 6/17/2017).

use any tool available to punish Township officials for carrying out their oaths to protect the

health, safety, and welfare of Township residents.[10]

## II. PGE's "renewed" motion for sanctions must be dismissed because of the company's failure to comply with the notice requirements of Rule 11(c)(2).

Rule 11(c)(2) requires that a sanctions motion be "made separately from any other

motion," and that it be served but not "filed or ... presented to the court if the challenged [action]

is withdrawn or appropriately corrected within 21 days after service." F.R.C.P. 11(c)(2).

"A Rule 11 analysis requires the court to first determine whether the party filing the Rule

11 motion complied with the 'safe harbor' provision of Rule 11(c)(2)." *Hampton v. Wetzel*, No.

1:14-CV-1367, 2017 WL 895568, at *2 (M.D. Pa. Mar. 7, 2017). "Under that provision, a party

cannot file a motion for sanctions until it first presents the motion to the offending party, and

allows 21 days for the other party to withdraw or correct the challenged issue." (*Id.* citing *In re*

*Schaefer Salt Recovery, Inc.*, 542 F.3d 90, 99 (3d Cir. 2008) (citing Fed. R. Civ. P. 11(c)(2)).

The Third Circuit Court of Appeals has recognized that

"[i]f the twenty-one day period is not provided, the [Rule 11] motion must be denied." *In re Schaefer Salt Recovery, Inc.*, 542 F.3d 90, 99 (3d Cir. 2008); *see also Radcliffe v. Rainbow Constr. Co.*, 254 F.3d 772, 789 (9th Cir. 2001) (reversing sanctions award where movant "did not follow the mandatory service procedure of Rule 11(c)[(2)]"); *Elliott v. Tilton*, 64 F.3d 213, 216 (5th Cir.1995) ("The plain language of [Rule 11] indicates that this notice and opportunity prior to filing is mandatory. Plaintiffs did not comply with this

---

[10] Kevin Moody, of PGE's intervenor-partner PIOGA, made it clear why PGE and PIOGA are harassing Grant Township, when he declared that Grant and Grant's lawyers "seek to foment social revolution by creating chaos and anarchy to enable a change to governance based on Marxist principles. Local officials who vote for these misguided socialist efforts knowing they are illegal risk criminal prosecution under the 'official oppression' statute in Section 5301 of the Crimes Code." *See* PIOGA, "Finally, Light at the End of the Grant Township Federal Court Litigation" (The PIOGA Press (August, 2016)); https://issuu.com/mattpioga/docs/pioga_press_076_august_2016/7 (accessed 6/19/2017). Through these and other statements, it is clear that PGE and PIOGA are pursuing Grant on ideological grounds, rather than seeking to enforce the rules of this Court to protect the sanctity of these proceedings.

procedural prerequisite. Therefore, the sanction and payment of costs and attorneys' fees ordered by the district court cannot be upheld under Rule 11."); *Hadges v. Yonkers Racing Corp.*, 48 F.3d 1320, 1328 (2d Cir.1995) (reversing sanctions where party did not submit request separately and did not serve twenty-one days before filing).

*Metro. Life Ins. Co. v. Kalenevitch*, 502 F. App'x 123, 125 (3d Cir. 2012).

The purpose of the Rule 11(c)(2) notice requirement is "to give the offending party the opportunity [within the safe harbor period] to withdraw the offending pleading and thereby escape sanctions." *In re Jazz Photo Corp.*, 312 B.R. 524, 531–32 (Bankr. D.N.J. 2004) (quoting *Barber v. Miller*, 146 F.3d 707, 710 (9th Cir. 1998). Moreover, "[o]rdinarily the motion should be served promptly after the inappropriate paper is filed, and, if delayed too long, may be viewed as untimely...."; *In re Jazz Photo Corp.*, 312 B.R. at 534 (citing *Ridder v. City of Springfield*, 109 F.3d 288, 295 (6th Cir. 1997) (quoting Fed.R.Civ.P. 11 Advisory Committee Notes to the 1993 Amendments)); *LabMD, Inc. v. Tiversa Holding Corp.*, CV 15-92, 2016 WL 3002433, at *4 (W.D. Pa. May 23, 2016); *see also Barley v. Fox Chase Cancer Center*, 54 F.Supp.3d 396 (E.D. Pa. 2014) ("the period for a Rule 11 filing ended when we granted Fox Chase's summary judgment motion. Fox Chase's motion is untimely and its failure to comply with the safe harbor cannot be excused.").

PGE's failure to comply with the procedural requirements of Rule 11(c)(2) illustrates a fundamental problem with its renewed and expanded motion. PGE requests that sanctions be imposed against

> Defendant Grant Township and its counsel, Community Environmental Legal Defense Fund ("CELDF"), Thomas Linzey, Esq. ("Attorney Linzey"), Lindsey Schromen-Wawrin, Esq. ("Attorney Schromen-Wawrin"), and Elizabeth Dunne, Esq. ("Attorney Dunne"). . . on the ground that they have filed frivolous pleadings and motions that are against well-established law and are not warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law *and have refused to withdraw their filings and arguments despite receiving notice of PGE's intention to file for sanctions pursuant to Rule 11.*

[ECF No. 250 at 1, 38] (emphasis added).

The latter sentence presumably refers to PGE's December 2, 2015 notice, since that is the only notice PGE has sent. In PGE's December 2, 2015 notice, it demanded that "CELDF withdraw Grant Township's Answer, Affirmative Defenses, and Counterclaim (Docket No. 10) and Motion for Reconsideration (Docket No. 119)". [ECF No. 250 at Exh. D at 2]. PGE's improper demand that Grant Township not defend the case[11] was made a year and a half ago.

While PGE may argue that the Court's decision to wait to resolve the parties' pending cross-motions for sanctions [ECF No. 218, 224] provides some excuse for its delay, it has no excuse for filing its renewed and expanded motion without the required Rule 11 notice.  As illustrated above, since the prior notice letter on December 2, 2015, all parties have made a number of filings and arguments, and the Court has ruled against and in favor of different parties in different instances. Most recently, PGE lost its motion for summary judgment on three of its six claims and the Court has found that there are disputed issues of fact remaining for trial.

PGE's "renewed" motion for sanctions consists of a new request for sanctions against Attorneys Elizabeth Dunne, Thomas Linzey, and Lindsey Schromen-Wawrin, none of whom was served pursuant to Rule 11(c)(2) prior to the filing. In addition, the "renewed" motion is not the same motion that was served for the original filing, the "renewed" brief supporting the motion contains an additional twenty-five pages not included in the original request for sanctions, and PGE demands, for the first time, that the sanction cover all of its attorneys' fees for the entire case.

PGE had a choice when it decided to file its "renewed" motion for sanctions: either *re-file its original motion for sanctions* and rely on its original Rule 11 notice; or it could have

---

[11] PGE concluded its letter by stating that Grant Township could "re-file an Answer and Affirmative defenses, if any." [ECF No. 250 at Exh. D at p. 2].

given new notice and then *filed its expanded motion*. Instead, PGE now attempts to do both – file its new motion against new parties with new matter – while trying to harness its original Rule 11 notice to comply with the rule.

Even if PGE had properly complied with Rule 11(c)(2) procedural requirements, it is difficult to determine exactly what (in terms of either filings or arguments) it could be asking Grant Township to "withdraw." Requiring compliance with Rule 11's procedural requirements ensures that the parties understand, and have an opportunity to respond to, the allegedly sanctionable conduct at issue. *In re Schaefer Salt Recovery, Inc.*, 542 F.3d 90, 99 (3d Cir. 2008). PGE, undoubtedly, would like Grant Township to withdraw from all defense of the case and further concede that PGE can recover damages in whatever amount it wishes, but such a request would be absurd. Grant Township cannot, for instance, retroactively withdraw its motion for summary judgment and opposition to PGE's motion for summary judgment (on which Grant Township partially prevailed). And, the law is clear that PGE is not entitled to sanctions merely because it prevailed on part of its summary judgment motion. *Gaiardo*, 835 F.2d at 483 ("Restated, Rule 11 sanctions awarding counsel fees do not automatically or usually follow an adverse judgment or ruling. Substantially more is required.").

Further, Attorney Dunne was not even admitted into the case at the time of PGE's December 2, 2015 notice. Yet, PGE seeks sanctions against Attorney Dunne for refusing to withdraw filings and arguments despite not having received notice of PGE's intention to file a Rule 11 sanctions motion. Just as PGE cannot rely on the December 2, 2015 notice for

significantly expanding its sanctions request a year and half later, PGE cannot impute the

December 2, 2015 notice to Attorney Dunne.[12]

For those reasons, the "renewed" motion for sanctions filed by PGE must be denied with

prejudice.

### III. The sole purpose of PGE's motions for sanctions is to harass Grant Township because PGE knows that the Pennsylvania Disciplinary Board summarily dismissed an identical complaint filed by PIOGA in 2015, and because the company's motions are time-barred.

PGE's motions for sanctions should be treated for what they are – attempts to intimidate

Grant Township, its lawyers - and any other lawyers representing similar municipalities - from

asserting that people in towns, cities, and counties have a right to stop industrial projects that

threaten to harm them.[13] While the motions are part of PGE and PIOGA's continuing effort to

---

[12] PGE also seeks sanctions pursuant to 28 U.S.C. § 1927, yet courts have ruled that the notice rule of Rule 11 "also applies with equal force to sanctions sought to be imposed under the auspices of that statute." *Northlake Mktg. & Supply, Inc. v. Glaverbel, S.A.*, 194 F.R.D. 633, 636 (N.D. Ill. 2000) ("There is no more reason for permitting an unjustified delay in the submission of a sanctions motion that calls one potential source of such relief into play than there is where another possible source is at issue."). The Third Circuit applies the same timing rule when the court exercises its inherent power to sanction. *Simmerman v. Corino*, 27 F.3d 58, 59-60 (3d Cir. 1994) (holding that imposing sanctions "more than three months after the entry of judgment was untimely"); *Prosser v. Prosser*, 186 F.3d 403, 406 (3d Cir. 1999) ("We see no reason to limit the logic of *Simmerman* to *sua sponte* Rule 11 sanctions. The interests of judicial efficiency, timeliness, and notice are no different when imposing sanctions under the court's inherent power.").

[13] Babst, Calland, Clements & Zomnir, P.C. ("Babst Calland"), the law firm for PGE, has demonstrated a particularly distinct interest in "chilling" other lawyers from representing similar municipal clients. On January 12, 2016, the first county in the country – Fayette County, West Virginia – unanimously voted to adopt an Ordinance banning frack wastewater injection wells within the county. Previously, water testing conducted by Duke University concluded that frack wastewater had leaked from an existing injection well into a tributary of the New River. A mere twelve hours after the adoption of the law, Babst Calland, representing a company affected by the ban, filed for emergency injunctive relief to overturn the law, using corporate "rights" as part of its claims. *See* http://wvpress.org/news/fayette-first-wv-county-ban-oil-gas-waste/ (accessed 6/20/2017);http://www.fayettetribune.com/news/injunction-intends-to-fight-waste-ban/article_ec3c6d9a-be42-11e5-82a1-b7ca3975b5cc.html (accessed 6/20/2017).

force Grant Township to cease its opposition to the proposed frack wastewater injection well, the

company and its trade association also seek to use the motions for sanctions to "chill" any other

municipal officials from taking legislative steps to oppose projects proposed by oil and gas

corporations.[14]

   A. **PGE's "renewed" motion for sanctions is identical in content to the Pennsylvania Disciplinary Board complaint filed by PIOGA in 2015, which the Disciplinary Board summarily dismissed based on its finding that Grant's counsel was making reasonable arguments in good faith.**

In addition to the unexplainable tardiness of the sanctions filing, the filing of PGE's

motion is baseless and improper for another reason: that prior to filing its original sanctions

motion, PGE's counsel was informed that the Pennsylvania Office of Disciplinary Counsel had

summarily dismissed an identical complaint, finding that Grant's lawyers possessed a good faith

basis for the litigation defense they have asserted on Grant's behalf in this case. *See* Exhibit #1 at

¶ 8.

In Grant's December 17, 2015 letter to PGE, the Township notified PGE that PGE's

partner in this litigation – the Pennsylvania Independent Oil and Gas Association ("PIOGA") –

had filed a disciplinary complaint against Grant's counsel in October, 2015 and that the Office of

Disciplinary Counsel had summarily dismissed the complaint less than a month later.[15] In that

letter of December 17th, Grant recounted that:

---

[14] Chilling other elected officials across Pennsylvania from regulating oil and gas operations is an admitted goal of intervenor PIOGA. *See* Litvak, "Oil and gas industry group ponders criminal prosecution of local officials" (*Pittsburgh Post Gazette*, October 4, 2016); http://powersource.post-gazette.com/powersource/policy-powersource/2016/10/04/Oil-and-gas-industry-group-ponders-criminal-prosecution-of-local-officials/stories/201610040004 (accessed 6/17/2017) (quoting PIOGA's Kevin Moody as exploring "criminal prosecution" for the purpose of "deterring municipal officials from attempting to block oil and gas development.").

[15] This means that even though PIOGA is a party to this case, PIOGA chose not to file a motion for sanctions with this Court and this judge, but instead attempted an end-around by filing a complaint with the Office of Disciplinary Counsel, *even when PIOGA's entire disciplinary*

- On October 1, 2015, the Pennsylvania Independent Oil and Gas Association ("PIOGA"), an intervenor in the subject case *PGE v. Grant Township*, filed a disciplinary complaint with the Disciplinary Board of the Supreme Court of Pennsylvania against Thomas Linzey, without notifying the District Court of such a filing even though the complaint was based primarily on allegedly substantively frivolous arguments asserted during the course of litigation in that action.

- That eleven (11) page complaint rested almost entirely on the same assertions that you advance in the proposed Rule 11 motion - that the *advancement of arguments* on the "right of local, community self-government" and the *advancement of arguments* that the rights of communities should be elevated above the "rights" of corporations, were frivolous and violated several rules of professional conduct; specifically, Rule 1.7 (conflict of interest); Rule 3.1 (requirement that attorney must "make a good faith argument for an extension, modification, or reversal of existing law" and not make frivolous arguments); and Rule 8.4 (attorney conduct "prejudicial to the administration of justice").

- PIOGA supplemented their complaint with a copy of Judge Baxter's October 14, 2015 ruling and order in *PGE v. Grant Township*, in which Judge Baxter granted PGE's motion for judgment on the pleadings, in part, and overturned six sections of the challenged Ordinance.

- On November 24, 2015, the Office of Disciplinary Counsel dismissed the entire complaint, without requiring a response, and in a one paragraph dismissal, specifically found that Grant Township and Thomas Linzey have a "good-faith basis" for advancing the arguments that have been asserted in the *Grant Township* case. *See Letter from Office of Disciplinary Counsel to Thomas Linzey*, November 24, 2015. Given that finding, and on that basis alone, the filing of your proposed motion for sanctions is frivolous and without basis.

*Id*. at ¶ 5-8.

The original complaint and summary dismissal letter from the Office of Disciplinary Counsel are

attached to this response. *See* Exhibit #2 (PIOGA *Complaint* and *November 24, 2015 Letter from*

*the Pennsylvania Office of Disciplinary Counsel to Thomas Linzey, Esq.*).

---

*complaint was based solely on the substance of the litigation defense run by Grant in this case*. PIOGA's actions simply provide one more example of the tactics used by the oil and gas industry to bully rural municipalities like Grant Township. Indeed, as PGE is entirely capable of defending this case without PIOGA, intervention by PIOGA may have been primarily, perhaps solely, for the purpose of engineering standing for the disciplinary complaint by PIOGA, with the intention all along being that if PIOGA lost there, PGE would seek sanctions here.

In sum then, PGE's counsel was specifically notified, prior to the filing of its initial

motion for sanctions, that the Pennsylvania Office of Disciplinary Counsel had summarily

dismissed an identical complaint with identical arguments: namely, that the *litigation defense*

advanced by Grant in this Court was without merit and required disciplinary action. Yet, PGE

chose to file its motion for sanctions anyway, knowing that it was likely to be denied.[16] The

inference is inescapable—PIOGA tried to have Grant's counsel sanctioned through a disciplinary

complaint, and when that failed, PGE filed the instant motion for a *second bite at the apple*

before this Court. In other words, PGE and PIOGA are engaged in a scheme of harassment

against Grant and its lawyers.[17]

---

[16] The refusal of PIOGA to join PGE in its "renewed" motion for sanctions is likely because PIOGA understands that a filing of a motion for sanctions eerily similar to its summarily-dismissed complaint to the Disciplinary Board would be even more indefensibly sanctionable than PGE's motions. Still, this Court should not stand for these tag-team tactics; PGE should be held fully accountable for proceeding here as it had full knowledge of PIOGA's failure before the Disciplinary Board. It should also be noted that Lisa McManus, co-counsel in this case for PGE, also serves on the Board of Directors of PIOGA. https://www.pioga.org/about/who-we-are/board-and-committees (accessed 6/21/2017).

[17] It is likely that PIOGA even shared its confidential Disciplinary Board complaint with PGE prior to PGE's filing of its first motion for sanctions. *Compare* PIOGA's *Disciplinary Board Complaint* at p. 3, ¶ 1 (Exhibit #2 at 3, ¶ 1):

> Linzey recognizes that the CELDF's tactics are illegal, stating that "overturning legal doctrines that support current injustice requires frontal and direct breaking of existing laws." *Id*. at 24 (emphasis added). The CELDF anticipates that its efforts will result in "thousands of municipal constitutions" that will serve as "a template for new state and federal constitutional structures." *Id*. at 29. The precursors to these "municipal constitutions" are Community Bill of Rights ordinances…

With PGE's *Renewed Motion for Sanctions* at 5-6 (beginning at line 19 on page 5) [ECF Doc. 250 at 5-6]:

> The founder of CELDF recognizes that its tactics are illegal, stating that "overturning legal doctrines that support current injustice requires frontal and direct breaking of existing laws." *Id*. (emphasis added). CELDF anticipates that its efforts will result in "thousands of municipal constitutions" that will serve as "a template for new state and

Against this backdrop, PGE's motion for sanctions should be seen for what it is – another frivolous effort to harass Grant Township and drive up Grant's litigation costs in this action. PGE's prosecution of this litigation is rife with examples of such efforts. As noted earlier in this response, PGE's misbehavior has also drawn a motion for attorneys' fees from Grant in the early stages of this litigation. [ECF Doc. 44].

Indeed, the docket for this case is filled with motions filed by the Plaintiffs for the sake of filing motions - including PGE's issuance of subpoenas to Grant's lawyers seeking privileged communications - an action that required a protective order from this Court.[18] [ECF Doc. 21]. In a case that could have been resolved quickly through the filing for summary relief, PGE instead has filed for preliminary injunctive relief and an expedited hearing for such relief [ECF Doc. 8], a motion to expedite discovery in support of that relief [ECF Doc. 14], a motion to strike Grant's response to preliminary injunctive relief [ECF Doc. 41], a renewed motion for preliminary injunctive relief [ECF Doc. 61], and various other motions that have littered the docket and needlessly consumed both judicial and litigant resources.

In Grant's December 23, 2015 letter to PGE, it noted that PGE had a history of attempting to intimidate and harass Grant Township into repealing its law, and that the current motion for sanctions was filed for similar improper purposes:

- As raised at the inception of this litigation, there was a simpler and more efficient path for the resolution of this litigation – one that your law firm and your client chose

---

federal constitutional structures." *Id*. The precursor to the "municipal constitution" is the Community Bill of Rights Ordinance. . .

[18] At the beginning of this case, PGE issued subpoenas to Grant's lawyers, seeking to take depositions and gather documents related to privileged communications. PGE also sought depositions, interrogatories, and document production from Grant's elected officials and office staff – all in a case dealing solely with the facial constitutionality and legality of a municipal legislative enactment. Such tactics go beyond zealous lawyering – they rise to the level of sanctionable behavior aimed at harassing Grant Township into submission.

to reject for no apparent reason. That path would have involved the immediate filing of motions for judgment on the pleadings by both parties in December of 2014, with a resolution of the case in the early part of 2015. In a letter dated October 7, 2014, Grant Township suggested that course of litigation, and it was summarily rejected by you. *See* ECF Doc. 21-1 in *PGE v. Grant Township*, 1:14-cv-209 (WD PA) (Letter of October 7, 2014 from Thomas Linzey, Esq. to Kevin Garber, Esq. suggesting *December 14, 2014* as a deadline for filing dispositive motions). You and your client chose not to pursue that path, but instead sought to engage in unwarranted discovery[19] and other unnecessary motions which have now caused a delay in the resolution of this case. It is our belief that your chosen delay in resolution was a result of the desire to increase billable hours on behalf of your client, and that you now seek to use Rule 11 sanctions to recover some of those unnecessary billable hours. Any objective review of the docket reveals that your choices have not been made in the best interest of the efficient resolution of this case, but in the best interests of your law firm. Indeed, it was Grant Township, not your client, which has sought a speedy and efficient resolution to this case. It was that approach which you summarily rejected, which has now directly led to a year's worth of unnecessary litigation. As such, you seek Rule 11 sanctions for an inappropriate, and in our belief, sanctionable purpose.

*See* Exhibit #3 at ¶ 5.[20]

Clearly, and without any doubt, PGE has filed a baseless, improper, and frivolous motion for sanctions against Grant, the true purpose of which is to harass and intimidate Grant while increasing the cost of this litigation to a small, rural municipality. Not only must PGE's motion be denied, but this Court should act under the authority of its inherent power, 28 U.S.C. §1927, and F.R.C.P. 11(c)(2) to punish PGE for its filing by awarding attorney's fees to Grant. As the Third Circuit said in *Gaiardo v. Ethyl Corp.*, 835 F.2d 479 (3d Cir. 1987):

---

[19] Which included issuing subpoenas and seeking to take depositions from the lawyers representing Grant Township, seeking attorney-client privileged communications. [footnote included in original letter].

[20] PGE is aware that Grant Township lacks any insurance coverage that would allow PGE's counsel to recover attorney's fees through Grant's insurer. [ECF Doc. 61 (renewal of motion for preliminary injunctive relief on the basis that Grant's lack of insurance coverage might prevent recovery of damages and fees)]. Because of that potential inability to recover attorney's fees in the event of an award of those fees, PGE now seeks to recoup those attorney's fees from Grant's lawyers; requesting sanctions for documents filed over a year ago precisely for that reason. [footnote included in original letter].

The growing tendency to extend the Rule beyond its texts and intent concerns us, as does the noticeable increase in unjustified requests for sanctions. The Rule is being perverted when used as a tool for harassment rather than as an instrument to prevent abuse….

The use of Rule 11 as an additional tactic of intimidation and harassment has become part of the so-called 'hardball' litigation techniques espoused by some firms and their clients. Those practitioners are cautioned that they invite retribution from courts which are far from enchanted with such abusive conduct.

*Gaiardo* at 485.

**B. PGE's "renewed" motion for sanctions must be dismissed for the same reason that the original motion for sanctions was subject to dismissal – the original motion was filed fourteen months after Grant's filings.**

On December 2, 2015, PGE served Rule 11(c)(2) notice on Grant Township and the Community Environmental Legal Defense Fund, indicating that the company planned to file a motion for sanctions against those parties. On December 17, 2015, Grant sent a letter to PGE's counsel, explaining why the filing of that original motion for sanctions would be baseless and subject PGE to being sanctioned.

In that letter, Grant noted that the original motion would be filed *over a year* after Grant filed the documents that were the subject of that motion, and that PGE apparently had not considered them to be frivolous at the time of filing, else it would have filed its motion in response to them. In that letter, Grant noted that

- The notice of the intent to file for Rule 11 sanctions requests that Grant Township withdraw filings made *over a year ago* in the U.S. District Court for the Western District of Pennsylvania, and based on that issue alone, the filing of a proposed motion for sanctions would not only be frivolous, but would constitute an effort to use the sanctions process for an improper purpose – namely, to harass - and increase the costs of litigation to - Grant Township. Your client and law firm have engaged in such behavior previously, in attempting to use invasive discovery in a case dealing solely with a facial challenge to an adopted ordinance. That behavior drew a motion seeking fees filed by Grant Township, which was eventually denied by the District Court. [ECF Doc. 44 in *PGE v. Grant Township*].

- PGE seeks sanctions for the filing of Grant Township's Answer, Affirmative Defenses, and Counterclaim. The document containing those items was filed on October 13, 2014, almost fourteen (14) months prior to the filing of the [original] sanctions motion. [ECF No. 10 in *PGE v. Grant Township*]. PGE also seeks sanctions for the recent filing of Grant Township's Motion for Reconsideration, yet the grounds for that reconsideration are based on the same claims advanced by Grant's Answer, Affirmative Defenses, and Counterclaim, which were, in turn, filed with the District Court over a year ago. Again, seeking sanctions from the filing of these prior documents when no sanctions request was filed in response to the filing of those documents, reveals that there's no basis for this sanctions request, and that your proposed motion would be filed for an improper purpose – to further harass Grant Township in an attempt to escalate litigation costs for the Township.

*See* Exhibit #1 at ¶ 11-12.

The "renewed" motion for sanctions rests on the same timing – "renewing" its sanctions request for the filing of those documents, which were filed fourteen months prior to PGE's original motion for sanctions. On that basis alone – that PGE attempts to sanction Grant for documents filed in this Court *fourteen months before PGE's initial motion* – the company's motion is baseless, and thus, PGE has filed it for an improper purpose. And so it is frivolous for that reason alone.[21] This Court should treat it accordingly – by denying the motion and sanctioning PGE with an award of attorney's fees pursuant to F.R.C.P. 11(c)(2).[22] In short, the motion is far too late under the supervisory rule that applies in the Third Circuit:

> Promptness in filing valid motions will serve not only to foster efficiency, but in many instances will deter further violations of Rule 11 which might otherwise occur during the remainder of the litigation. *See* Schwarzer, *Sanctions Under the New Federal Rule 11: A Closer Look*, 104 F.R.D. 181, 194–95 (1985). If a party's action is "abusive" as contemplated by Rule 11, the adversary should be able to realize immediately that an offense has occurred. Seldom should it be necessary to wait for the district court or the

---

[21] Further illustrating the arbitrariness of its original motion for sanctions, PGE failed to seek sanctions for two documents filed by Grant which presented to this Court the full argument for which PGE now seeks sanctions. Those two documents were Grant's response in opposition to PGE's request for preliminary injunctive relief, and Grant's motion for judgment on the pleadings – both of which incorporated all elements of the filings which PGE sought to sanction, but which were not listed as sanctionable within the company's original sanctions motion. [ECF Docs. 40, 52, 53].

[22] Rule 11(c)(2) allows for the recovery of attorneys' fees to the "prevailing party" on a sanctions motion if a baseless motion is made pursuant to the Rule.

court of appeals to rule on the merits of an underlying question of law. If there is doubt how the district court will rule on the challenged pleading or motion, the filing of the paper is unlikely to have violated Rule 11. As stated before, mere failure to prevail does not trigger a Rule 11 sanction order. We do not retreat from our earlier admonition in *Cement Express*, 841 F.2d at 68; *Gaiardo*, 835 F.2d at 483; and *Morristown Daily Record, Inc. v. Graphic Communications Union, Local 8N*, 832 F.2d 31, 32n.1 (3d Cir. 1987), against routine and indiscriminate invocation of Rule 11: sanctions under this Rule are reserved for only exceptional circumstances.

We will henceforth require prompt action by a litigant whenever a Rule violation appears. In that way, the district court will be able to decide the matter in a timely fashion so as to eliminate additional appeals.

To carry out the objectives of expeditious disposition, we adopt as a supervisory rule for the courts of the Third Circuit a requirement that all motions requesting Rule 11 sanctions be filed before the entry of a final judgment. Where appropriate, such motions should be filed at an earlier time—as soon as practicable after discovery of the Rule 11 violation.

*Mary Ann Pensiero, Inc. v. Lingle*, 847 F.2d 90, 99–100 (3rd Cir. 1988). *See, e.g., Landon v. Hunt*, 938 F.2d 450,453 (3rd Cir. 1991) (delay of six months from actionable conduct to filing of Rule 11 motion was "inordinate").

### IV. PGE's motion for sanctions must be denied because Grant's defense in this litigation is supported by existing law, is a reasonable argument in support of the extension, modification, or reversal of existing law, and seeks to establish new law.

PGE's entire basis for the filing of its motion for sanctions rests on its assertion that

Grant's litigation defense in this case violated the ethical standard established by F.R.C.P.

11(b).[23] That standard declares that all arguments to the court must be "warranted by existing law

or by a nonfrivolous argument for extending, modifying, or reversing existing law or for

establishing new law." *See* F.R.C.P. 11(b). Since "sanctions under Rule 11 involve a less onerous

standard than §1927, it is self-evident that failing to trigger sanctions under Rule 11 would

---

[23] While PGE also argues that sanctions should be awarded pursuant to 28 U.S.C. §1927 and the inherent power of this Court, those grounds were added in PGE's "renewed" motion for sanctions. Because PGE seeks to rely on the original notice given prior to its original motion, Grant focuses here on the standard established by Rule 11, which, if met, automatically satisfies the other standards. *See Anjelino v. New York Times Co.*, 200 F.3d 73, 100-01 (3d Cir. 1999).

correlate to the same result under the loftier §1927. *Anjelino v. New York Times Co.*, 200 F.3d

73, 100-01 (3d Cir. 1999).

Grant's counsel reminded PGE in its letters of December 17, 2015 and December 23,

2015 - prior to PGE's filing of its motion for sanctions - of the reasons why Grant's defense

clearly satisfied the standard set forth by the federal rule:

- Every substantive brief filed by this firm in defense of Grant Township has included an acknowledgment of adverse precedent, an *ethical requirement* mandated by Rule 3.3 "Candor Toward the Tribunal" of the Pennsylvania Rules of Professional Conduct ("a lawyer shall not knowingly fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel."). *See Grant's Brief in Opposition to Preliminary Injunctive Relief* [ECF No. 40 in *PGE v. Grant Township*] and *Grant's Brief in Support of Motion for Judgment on the Pleadings* [ECF No. 53 in *PGE v. Grant Township*]. Those briefs were filed in direct support of motions advancing the counterclaim and affirmative defenses of the Defendant – specifically, that a right of local, community self-government is possessed by the residents of Grant Township, and that certain legal doctrines violate that right. Disclosure of adverse precedent is not *proof* that an argument is frivolous - it is, instead, an *ethical mandate* for all attorneys.

- Your filing of the proposed sanctions motion ignores the line of cases in which courts in the United States have explicitly found that people possess a right of local, community self-government, and therefore, that asserting such a right on behalf of the people of Grant cannot be considered to be anything other than an argument warranted by existing law or an argument for extending and modifying existing law. *See, e.g., Commonwealth v. McElwee*, 327 Pa. 148, 193 A.628 (Pa. 1937); *People v. Hurlbut*, 24 Mich. 44 (1871).

- Your client's proposed interpretation of the reach of Rule 11 would effectively foreclose any evolution of jurisprudence and the law. Without arguments made "contrary" to existing law, *Brown v. Board of Education*, 347 U.S. 483 (1954) would not have been possible, or any of the other thousands of judicial decisions which have nullified prior precedent. Such a rule would stultify the development of the law, and would succeed only in freezing corporate "rights" and privileges in place, while further subordinating municipal and people's governance rights to those corporate "rights" and privileges. Such is, we believe, your underlying goal of advancing such a constricted, and unsupported, view of the purpose and content of FRCP 11(b).

- No court in the United States that has heard arguments related to the right of local, community self-government has ever assessed sanctions against attorneys representing clients in those cases. That includes several cases cited by you in *PGE v. Grant Township*, including *SWEPI, LP v. Mora County, New Mexico*, 81 F. Supp.3d 1075 (D.N.M. 2015), and *Pennsylvania Ridge Coal LLC v. Blaine Township*, C.A. No. 08-

1452P (2009). The fact that no other Court in the United States has ever granted a motion for sanctions based on the grounds that you advance, additionally undermines your proposed request for sanctions, and illuminates the improper purpose for which you seek to file.

- Your proposed motion for sanctions *rests entirely on the substance of the legal defense asserted by Grant Township* – that Grant has defended the adoption of its Ordinance through arguments that are not "reasonable" arguments for either a reinterpretation of the law or a changing of the law. As you know, however, even jurists on the United States Supreme Court have challenged the concept that corporations (and other business entities) are capable of asserting constitutional "rights" on their behalf, with or without a local legal enactment that challenges that assertion.[24] Given that a large portion of your Amended Complaint is focused purely on corporate "rights," you must acknowledge that reasonable jurists – even those currently sitting on, or who have sat on – the United States Supreme Court, have entertained similar views. Because your argument fails in that respect and others, the filing of your proposed motion for Rule 11 sanctions seeks to use the Rule inappropriately.

*See* Exhibit #1 at ¶¶ 10, 16-18; Exhibit #3 at ¶ 5.

---

[24] In ECF Doc. 53 at 34-35, fn.44, filed in the underlying case, we recounted those jurists' opinions. *See Connecticut General Life Insurance Co. v. Johnson*, 303 U.S. 77, 85-90 (1938) (Black, J., dissenting) (declaring that "[n]either the history nor the language of the Fourteenth Amendment justifies the belief that corporations are included within its protection"); *Wheeling Steel Corp. v. Glander*, 337 U.S. 562, 576-581 (1949) (Douglas, J., and Black, J., dissenting) (declaring that "I can only conclude that the *Santa Clara* case was wrong and should be overruled"); *See also, Hale v. Henkel*, 201 U.S. 43, 78 (1906) (Harlan, J., concurring) (declaring that "in my opinion, a corporation—an artificial being, invisible, intangible, and existing only in contemplation of law—cannot claim the immunity given by the 4th Amendment; for it is not a part of the 'people' within the meaning of that Amendment. Nor is it embraced by the word "persons" in the Amendment"); *Bell v. Maryland*, 378 U.S. 226, 263 (1964) (Douglas, J., dissenting) (declaring that "[t]he revolutionary change effected by affirmance in these sit-in cases would be much more damaging to an open and free society than what the Court did when it gave the corporation the sword and shield of the Due Process and Equal Protection Clauses of the Fourteenth Amendment"); *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 822 (1978) (Rehnquist, J., dissenting) (declaring that "[t]his Court decided at an early date, with neither argument nor discussion, that a business corporation is a 'person' entitled to the protection of the Equal Protection Clause of the Fourteenth Amendment"); *Citizens United v. Federal Election Commission*, 558 U.S. 310, 466 (2010) (Stevens, J., concurring in part, dissenting in part) ("corporations have no consciences, no beliefs, no feelings, no thoughts, no desires. . . they are not themselves members of "We the People" by whom and for whom our Constitution was established. . . [today's decision] is thus a rejection of the common sense of the American people, who have recognized a need to prevent corporations from undermining self-government since the founding. . ."); *Burwell v. Hobby Lobby Stores, Inc.*, 134 S.Ct. 2751, 2802 (2014) (Ginsburg, J., dissenting) (the "exercise of religion is characteristic of natural persons, not artificial legal entities."). [footnote included in the original communication].

22

From the beginning of this action, Grant's defense has been clear - the people of Grant possess an inherent, constitutionally-protected right of local, community self-government, they have exercised that right through the adoption of the challenged Ordinance, and the application of certain federal and state legal doctrines unconstitutionally infringes upon that right. *See, e.g.*, ECF Doc. 10 (Counterclaim); ECF Doc. 53 (brief in support of motion for judgment on the pleadings).

Grant's defense pivots first and foremost on judicial recognition of the right itself. To that end, Grant has based part of its defense on a showing that local self-governance is "so rooted in the traditions and conscience of our people as to be ranked as fundamental." *See Griswold v. Connecticut*, 381 U.S. 479, 486-87 (1965) (holding that certain fundamental but unenumerated interests are constitutionally protected as basic liberty rights). That showing requires courts to determine whether the right can be denied without violating those "fundamental principles of liberty and justice which lie at the base of all our civil and political institutions" and which emanate "from experience with the requirements of a free society." *Id*. at 493 (Goldberg, J., concurring).

To support its argument that the right of local self-government exists and is fundamental, Grant has cited over a dozen state supreme court cases across the United States, including the Pennsylvania Supreme Court's decision in *Commonwealth v. McElwee*, 193 A. 628 (1937),[25] a decision which has never been modified or reversed and so remains good law today. *See* Grant's

---

[25] In *McElwee*, the Pennsylvania Supreme Court declared that "[t]he constitution has been adopted in view of a system of local government, well understood and tolerably uniform in character, existing from the very earliest settlement of the country; never for a moment suspended or displaced, and the continued existence of which is assumed. . . and that the liberties of the people have generally been supposed to spring from, and be dependent upon, that system." *McElwee* at 630.

*Brief in Support of its Motion for Summary Judgment* at 9-10 [ECF Doc. 158 at 9-10].[26] Thus,

Grant's argument that a right of local, community self-government exists cannot be deemed to be

sanctionable, as it is an argument that seeks to recognize and apply that body of law.

---

[26] The other state supreme court cases include the seminal one, *People v. Hurlbut*, 24 Mich. 44 (1871), and others that followed it, only one of which has been overturned: *People v. Lynch*, 51 Cal. 15, 27 (1875) (approving Judge Cooley's opinion that the right of local self-government is implied in our constitutions, and adding in this regard, "By the Tenth Amendment of the Constitution of the United States … The Government of the United States can exercise only such powers as are expressly granted to it, and such as are necessarily implied from those granted. It follows from this, that the people of the States respectively retain such powers as have neither been granted, expressly or by implication, to the Government of the United States, nor conferred on the State governments."); *State v. Moores*, 76 N.W. 175, 177-180 (Neb. 1898), *overruled*, *Redell v. Moores*, 88 N.W. 243 (Neb. 1901) ("It cannot be asserted that the only rights reserved to the people are those enumerated in said article of the constitution, since section 26 thereof declares, "This enumeration of rights shall not be construed to impair or deny others, retained by the people, and all powers not herein delegated, remain with the people…. On the contrary, it is very evident that the constitution was framed upon the theory of local self-government."); *State ex rel. Pearson v. Hayes*, 61 N.H. 264, 322 (1881) ("Local self-government (including much administration of law, and the extensive use of the law-making powers of taxation and police), introduced not only before the organization of both the state and province of New Hampshire, but also before the extension of Massachusetts jurisdiction to the Piscataqua, and continuing in uninterrupted operation more than two hundred years, has been constitutionally established by recognition and usage."); *Rathbone v. Wirth*, 45 N.E. 15, 17 (N.Y. 1896) (the right of local self-government "inheres in a republican government and with reference to which our Constitution was framed …. [A]s Judge Cooley has remarked with reference to the Constitutions of the states, 'if not expressly reserved, it is still to be understood that all these instruments are framed with its present existence and anticipated continuance in view.'"); *Helena Consol. Water Co. v. Steele*, 49 P. 382, 386 (Mont. 1897) ("We think the two provisos of the law under discussion are in violation of the clauses of the constitution quoted and referred to above, as well as the spirit of our governmental system, which recognizes 'that the people of every hamlet, town, and city of the state are entitled to the benefits of local self-government.'"); *State v. Standford*, 66 P. 1061, 1062 (Utah 1901) ("An examination into its early history will show the existence of a system of territorial subdivisions of the state into counties when the present constitution was adopted. At this early date the system of local self-government existed under the general laws of the territory, and there is no provision in the constitution which can be construed as impairing that right …. [T]he Constitution implies a right of local self-government to each county"); *Schubel v. Olcott,* 60 Or. 503, 513 (1912) ("The principle of local self-government is regarded as fundamental in American political institutions. It is not an American invention, but is traditional in England, and is justly regarded as one of the most valuable safeguards against tyranny and oppression."); *Simpson v. O'Hara,* 70 Or. 261, 263 (1914) ("Local self-government lies at the very foundation of freedom, and the private and local affairs of a community are sacred from the interference of the central power, unless oppressive and unreasonable encroachment on the liberties of the

The rest of Grant's argument in defense of its Ordinance flows naturally from recognition of the right. If the right exists and is fundamental, then other legal doctrines not grounded in fundamental rights must give way to the right, and PGE's attempts to enforce such legal doctrines (i.e., corporate "rights," ceiling preemption, and Dillon's Rule) must be seen as a violation of the right. *See, e.g.*, Grant's *Brief in Support of its Motion for Summary Judgment* at 20-21 [ECF Doc. 158 at 20-21]. In other words, reasoning from the existence of a fundamental right of local self-government, Grant's argument that the right invalidates PGE's grounds for attacking the Ordinance is "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law." *See* F.R.C.P. 11(b)(2). As the Third Circuit explained in *Gaiardo*:

> Similarly, just as mere failure to prevail does not trigger a sanction award, neither does advocating new or novel theories. The Advisory Committee expressed particular concern that the Rule might be interpreted to inhibit imaginative legal or factual approaches to applicable law or to unduly harness good faith calls for reconsideration of settled doctrine.
>
> The Committee Note observes that '[t]he rule is not intended to chill an attorney's enthusiasm or creativity in pursuing factual or legal theories.' The Rule is not breached if after reasonable legal research and adequate factual investigation, a party and counsel in good faith decide to challenge existing law. Responsible, albeit adventuresome, lawyers must not be sanctioned in those circumstances, especially when they advise the court of existing law and their considered decision to seek its modification or reversal.

*Gaiardo*, 835 F.2d at 483.[27]

---

citizen renders such interference imperatively necessary…"); *Federal Gas & Fuel Co. v. City of Columbus*, 118 N.E. 103, 105 (Ohio 1917) ("If all political power is inherent in the people, as written in our Constitution, for the government of the state, it would seem at least of equal importance that all political power should be inherent in the people for the government of our cities and villages."); *State v. Essling*, 195 N.W. 539, 541 (Minn. 1923) ("The doctrine that local self-government is fundamental in American political institutions; that it existed before the states adopted their Constitutions, and that it is more than a mere privilege conceded by the Legislature in its discretion is ably discussed in *People v. Hurlbut*."); *Town of Holyoke v. Smith*, 226 P. 158, 158 (Colo. 1924) ("The central idea of government in this country was and is that in local matters municipalities should be self-governing.").

[27] *See also Ario v. Underwriting Members of Syndicate 53 at Lloyds for 1998 Year of Account*, 618 F.3d 277, 297 (3d Cir. 2010) (*citing Mary Ann Pensiero, Inc. v. Lingle*, 847 F.2d 90, 94 (3d

Grant's arguments, while admittedly not conventional ones made in defense of local legislative enactments, have been advanced precisely for the reason that conventional arguments have failed to secure the right of communities to govern themselves for their health, safety, and well-being, as they deem necessary. Well-grounded in existing law and constitutional principles, however, those arguments are not frivolous. They clearly well exceed the requirements of F.R.C.P. 11 in all respects, and therefore, PGE's sanctions motion must be denied.[28]

Although PGE's "renewed" motion for sanctions appears to be an act of throwing spaghetti against the wall simply to see what sticks, the company did note with particularity several specific filings of Grant that it contends are sanctionable. Grant responds to each of those allegations below.

### A. Grant's Answer, Affirmative Defenses, and Counterclaim consist of good faith arguments advanced for the extension, modification, or reversal of existing law.

Both PGE's original motion for sanctions and its "renewed" motion assert that Grant's filing of its Answer, Affirmative Defenses, and Counterclaim is sanctionable because those

---

Cir. 1988) for the propositions that Rule 11 "must not be used as an automatic penalty against an attorney or party advocating the losing side of a dispute" and "should not be applied to adventuresome, though responsible, lawyering which advocates creative legal theories"); *Teamsters Local Union No. 430 v. Cement Exp., Inc.*, 841 F.2d 66, 70 (3d Cir. 1988) (ruling that the District Court abused its discretion in granting sanctions under Rule 11 when the pleading at issue, "while novel and unsuccessful, was not plainly unreasonable"); *Morristown Daily Record, Inc. v. Graphic Communications Union, Local 8N*, 832 F.2d 31, 32 (3d Cir. 1987) ("Because the issues in this case are close, we consider the company's invocation of Rule 11 to border on the abusive. We caution litigants that Rule 11 is not to be used routinely when the parties disagree about the correct resolution of a matter in litigation. Rule 11 is instead reserved for only exceptional circumstances.").

[28] In an exhibit to this response, Grant includes a Declaration from Professor Jules Lobel of the University of Pittsburgh Law School (and formerly President of the Center for Constitutional Rights), in which Professor Lobel declares his opinion that none of the substantive arguments advanced by Grant are sanctionable under Rule 11 because they all constitute reasonable, good faith arguments for the extension, modification, or reversal of existing law. *See* Exhibit #6 to this response.

documents assert frivolous arguments concerning PGE's liability pursuant to 42 U.S.C. §1983.[29] The arguments made by Grant within those documents assert that the people of Grant possess a constitutional right of local, community self-government; that the doctrines asserted by PGE violate that right; and that PGE should be held liable pursuant to the standards established for violation of the civil rights of the people of the Township through §1983. While PGE appears to admit that the assertion of the constitutional right itself is not sanctionable, it argues that Grant's argument concerning PGE's role as a state actor under the law is not a good faith argument for the extension, modification, or reversal of existing law. [ECF Doc. 250 at 12].

PGE continues to intentionally misconstrue Grant's arguments in this respect. Through its Counterclaim, Grant argues several alternative theories of liability – first, that the legal doctrines themselves constitute state action, in that ceiling preemption, Dillon's Rule, and corporate "rights" are all legal doctrines created by governmental action [ECF Doc. 10 at ¶ 44-48]; second, that PGE's assertion of those doctrines transforms the company into a state actor for purposes of enforcement of those doctrines [*Id.* at ¶ 50-52]; third, that because PGE is a company chartered by the state and bestowed certain corporate "rights" by the state, that such conferrals transform the company into a state actor in the current situation [*Id.* at ¶ 53-54]; and fourth, that PGE, as a private corporation, can be held liable for violating the constitutional right of local, community self-government because the right does not require state action [*Id.* at ¶ 49].

As noted in Grant's filings, all of those arguments are anchored in existing law, and Grant's argument moved for this Court to apply existing law, and, barring that, to extend,

---

[29] While most of PGE's "renewed" motion for sanctions is focused on a general screed concerning CELDF's political philosophy, PGE's specific attack on Grant's Answer, Affirmative Defenses, and Counterclaim seems to focus on Grant's inability to satisfy the requirements of §1983, and so, this section responds to that general allegation.

modify, or reverse that law. As recounted in Grant's brief in support of its motion for summary

judgment:

> Liability arises under 42 U.S.C. §1983 if the actor depriving constitutional rights is a "state actor." *Harvey v. Plains Tp. Police Dept.*, 421 F.3d 185, 189 (3d Cir. 2005) (*quoting West v. Atkins,* 487 U.S. 42, 48 (1988)). A showing that the party used some state-derived authority to cause the alleged harm is sufficient to show state action. *See Abbott v. Latshaw*, 164 F.3d 141,146 (3d Cir.1998). Generally, "state actor" status can be determined by the U.S. Supreme Court's "nexus" or "joint action" test.
>
> Under the nexus test, state action is present if the state has "exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Blum v. Yaretsky*, 457 U.S. 991, 993 (1982). A court determines under the nexus test whether there is a sufficiently close nexus between the state and the challenged conduct, such that the conduct "may be fairly treated as that of the state itself." *Jackson v. Metro. Edison Co*., 419 U.S. 345, 351 (1974).
>
> Under the joint action test, state action may be found if the private party is a "willful participant in joint action with the State or its agents." *Dennis v. Sparks*, 449 U.S. 24, 27 (1980) (quoting *United States v. Price*, 383 U.S. 787, 794 (1966)). Courts look to "whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights." *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1453 (10th Cir. 1995). "[I]f there is a substantial degree of cooperative action between state and private officials . . . or if there is overt and significant state participation, in carrying out the deprivation of the plaintiff's constitutional rights, state action is present." *Id.* at 1454 (internal quotations and citations omitted); *Reitman v. Mulkey*, 387 U.S. 369 (1967) (holding that state action is involved if a law significantly encourages and involves the state in discrimination).
>
> In the instant case, depriving Grant residents of their constitutional right of local, community self-government requires many hands – the hands of the state in the legal creation of the Plaintiff company, the action of the state in its permit and regulatory capacity to enable PGE to construct and operate its proposed frack wastewater injection well, and the hands of state and federal government to bestow certain legal and constitutional powers and "rights" onto the Plaintiff. Indeed, the instant action really was filed at the end of a long chain of state and federal events without which the action would not have been possible. So, the instant action is merely one of enforcement – PGE's enforcement of pre-existing rights and protections that have been created and recognized by both state and federal authority.
>
> Thus, in addition to PGE being a creature of the state - a company whose form and very existence resulted from state action - the state has enabled and protected PGE to do what it seeks to do in the instant matter. That "overt" and "significant" state action thereby transforms what the law has generally treated as a "private" business entity into one almost completely dependent upon state power and authority to carry out projects harmful to the community in which it seeks to operate. For all intents and purposes, including for liability pursuant to 42 U.S.C. §1983, PGE therefore acts under the "color of state law" when it seeks to enforce its corporate constitutional "rights" against the

people of Grant Township.

[ECF Doc. 158 at 22-24].

Clearly, the assertion that PGE can be held liable pursuant to §1983 - for the infringement of the constitutional right of local, community self-government possessed by the people of Grant - is a reasonable argument for the extension of existing caselaw which holds that governmental action may transform a private entity into a state actor for limited purposes. As noted by Professor Jules Lobel in his Declaration filed with this response, the argument that "corporations should be deemed to be 'state actors' when they act to enforce certain state and federal doctrines" constitutes a "good faith argument for the extension, modification, or reversal of existing law." [*See* Exhibit #6 at ¶¶ 21-22 (LOBEL DECLARATION at ¶¶ 21-22)].

**B. Grant's motion for judgment on the pleadings consists of good faith arguments advanced for the extension, modification, or reversal of existing law.**

Most of PGE's specific arguments about sanctionability focus on Grant's motion for judgment on the pleadings, which, in turn, was based on the Counterclaim asserted by Grant against PGE. [ECF Doc. 250 at 25-26]. For the same reasons as noted above, the motion for judgment on the pleadings consists of good faith arguments for the extension, modification, or reversal of existing law.

PGE seeks sanctions for the filing of Grant's motion for judgment on the pleadings specifically, however, because that motion recognizes that some of Grant's arguments run contrary to existing law. *Id.* ("Grant Township and Counsel recognize and admit. . . that their arguments are contrary to current law. . . [and] have conceded publicly on multiple occasions that Grant Township's claims are against existing precedent. . . ).

While PGE attempts to use those disclosures as evidence of sanctionable conduct, it continues to ignore the reality that disclosure of adverse precedent to the Court is an *ethical*

*requirement* mandated by the Pennsylvania Rules of Professional Conduct. Rule 3.3 requires that all lawyers "shall not knowingly fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client." *See* Pennsylvania Rules of Professional Conduct 3.3. Acknowledging adverse precedent does not amount to admission that one lacks a good faith argument.

### C.  Grant's motion to strike PGE's Ashbaugh Affidavit was a reasonable request and was well-reasoned.

As further argument that Grant and Grant's lawyers should be sanctioned, PGE contends that Grant's motion to strike PGE's Ashbaugh Affidavit was frivolous and filed solely for the purpose of exacerbating this litigation. [ECF Doc. 250 at 18]. PGE attempts to prove that point by asserting that this Court's dismissal of that motion made that motion sanctionable. [*Id.*]

Grant's motion to strike the Affidavit was made for three supportable reasons: first, because PGE attached the Affidavit solely to a Reply, and Grant challenged its use in that respect pursuant to *Alston v. Forsyth*, 379 F.App'x 126, 129 (3d. Cir. 2010); second, because PGE failed to make any part of the Affidavit part of PGE's statement of material facts – a violation of the local rules requiring that all evidence asserted by a party be included in that statement; and third, because the Affidavit was speculative, as it hypothesized that PGE "would have obtained a prompt and positive result" from a test that it did not conduct. [ECF Doc. 193 at 2-3]. While it is true that this Court did deny Grant's motion, that denial is not sufficient to give rise to a claim for sanctions, as Grant's arguments to strike were well-grounded in the law, and offered a reasoned basis for its challenge to the inclusion of the Affidavit.

**D.  The enforcement of the rights of nature provisions within the original Grant ordinance is not sanctionable.**

In its "renewed" motion for sanctions, PGE claims that Attorney Lindsey Schromen-Wawrin's filing of a motion to intervene in this litigation on behalf of a community group and the Little Mahoning Watershed "exacerbated the situation by. . . unreasonably multiplying the proceedings." [ECF Doc. 250 at 32]. That intervention, however, was supportable on two independent grounds – first, that the intervention rules provide that those with an interest in the litigation may intervene in the underlying action (F.R.C.P 24(a) and (b)); and second, that the Grant Ordinance specifically recognized a "right to intervene" on behalf of the residents and ecosystems of the Township. [ECF Doc. 1-1 at §2(f)].[30] In addition, the Grant Ordinance explicitly recognized the rights underlying those intervention interests – recognizing that the people of the community possessed a right to clean air and clean water; and that ecosystems within the Township also possessed their own interests – to exist and flourish. *Id*. at §2(b), (c), and (d).[31] Without intervention, both residents and ecosystems would be completely dependent upon the legal defense proffered by the Grant Township Board of Supervisors, whose interests were not necessarily parallel.[32]

---

[30] That section of the Ordinance established a "right to enforce," in that "[a]ll residents of Grant Township possess the right to enforce the rights and prohibitions secured by this Ordinance, which shall include the right of Township residents to intervene in any legal action involving the rights and prohibitions of this Ordinance."

[31] Those sections of the Ordinance established a "right to clean air, water and soil," a "right to scenic preservation," and "rights of natural communities and ecosystems." Those sections also provided for a right to be free from any activities, including the depositing of waste from oil and gas extraction, that would violate those rights.

[32] This Court ultimately decided that the community and the ecosystem were adequately represented by the defense offered by the Grant Township Supervisors. The denial of the motion on those grounds, however, does not make the intervention motion – or an appeal of that denial – sanctionable.

The inclusion of rights for nature in the Grant Township Ordinance, and now, into Grant Township's Charter, is slowly becoming a legislative norm. In 2010, the City of Pittsburgh, through a unanimous decision of its City Council, voted to recognize the rights of ecosystems, including rivers, within the City.[33] Two years earlier, the people of Ecuador voted – in a national referendum - to recognize rights for nature and ecosystems through the adoption of their new, national constitution.[34] In 2017, New Zealand's government granted the Whanganui River the same rights as a living "person."[35] In November, 2016, the Constitutional Court of Colombia held that the Atrato River basin possessed certain rights to "protection, conservation, maintenance, and restoration;" and in 2017, the High Court of Uttarakhand, India (the state supreme court of the State of Uttarakhand) ruled that the River Ganga and Yumana were "persons" entitled to preservation and conservation, while further ruling that the glaciers of the Gangotri and Yamunotri Rivers were entitled to the same fundamental rights of living persons.[36]

---

[33] *See* Pittsburgh Home Rule Charter at §104 ("The City of Pittsburgh Bill of Rights"). Section (b) of the Bill of Rights declares that "natural communities and ecosystems, including, but not limited to wetlands, streams, rivers, aquifers, and other water systems, possess inalienable and fundamental rights to exist and flourish within the City of Pittsburgh. Residents of the City shall possess legal standing to enforce those rights on behalf of those natural communities and ecosystems." *See* https://library.municode.com/pa/pittsburgh/codes/code_of_ordinances?nodeId=HORUCHPIPE_ART1HORUPOEF_S104THPIBIRI (accessed 6/19/2017).

[34] *See* Mihnea, Tanasescu, "The Rights of Nature in Ecuador: The Making of an Idea," INT'L J. ENVT'L STUDIES (October 2013). *See* http://www.academia.edu/4994860/The_Rights_of_Nature_in_Ecuador_The_Making_of_an_Idea (accessed 6/20/2017).

[35] *See* Lui, Kevin, "New Zealand's Whanganui River Has Been Granted the Same Legal Rights as a Person," Time (March 15, 2017); http://time.com/4703251/new-zealand-whanganui-river-wanganui-rights/ (accessed 6/19/2017).

[36] *See* George, Nirmala, "India Gives Ganges, Yamuna Rivers Same Rights as a Human," (USA Today, March 21, 2017); https://www.usatoday.com/story/news/world/2017/03/21/court-gives-2-indian-rivers-same-rights-human/99439956/ (accessed 6/19/2017); Ebus, Bram, "Colombia's Constitutional Court Grants Rights to the Atrato River and Orders the Government to Clean Up its Waters," (Mongabay Series, May 22, 2017); https://news.mongabay.com/2017/05/colombias-constitutional-court-grants-rights-to-the-atrato-river-and-orders-the-government-to-clean-up-its-waters/ (accessed 6/20/2017).

Clearly, in terms of moving past a failed system of environmental protection premised on recognizing nature and ecosystems as mere property to be owned and exploited, rights for nature and ecosystems is an idea whose time has come. As one of the early adopters of the concept, Grant Township is to be congratulated, not sanctioned, for attempting to enforce and defend those rights against those actors intent on violating them.[37]

### E. Because PGE's exclusionary zoning claims constitute an assertion of corporate constitutional "rights," Grant did not fail to address that count in its response to PGE's claims.

In its "renewed" motion for sanctions, PGE claims that "Grant Township did not even oppose PGE's motion [with regards to its exclusionary zoning claim]…apparently recognizing that the Ordinance [was] *de jure* exclusionary as it completely bans a legitimate use." [ECF Doc. 250 at 18]. In making its assertion, however, PGE ignores that its claim of exclusionary zoning was *constitutional* in nature, thus resting on the question of whether PGE's constitutional "substantive due process" and "equal protection" rights were violated by the Grant Ordinance, which banned corporate depositing of oil and gas waste materials within the Township. *See, e.g., Surrick v. Zoning Hearing Bd. of Upper Providence Twp.*, 382 A.2d 105 (1977); *S. Burlington Cnty. NAACP v. Mount Laurel Twp.*, 456 A.2d 390 (1983) (a claim of exclusionary zoning requires that a zoning ordinance be examined to determine whether it violates the constitutional requirements "of due process and equal protection").

Precisely because Grant's underlying Ordinance, and its defense in this Court, were focused on whether PGE had, and could assert, those constitutional protections, Grant's defense

---

[37] Sanctioning counsel for the proposed intervenors for asserting the rights of nature would be akin to sanctioning the first lawyers that raised the argument that corporations possessed constitutional rights under the law.

included a defense to that particular claim. In other words, if Grant had prevailed on its assertion that PGE could not legitimately wield its constitutional "rights" against the Grant Ordinance, it would have automatically prevailed on the exclusionary zoning claim. Thus, Grant *did* defend against that claim and PGE's request for sanctions on that aspect of the case is without foundation.

### V. Because Grant's defense against PGE's lawsuit has been premised entirely on specific provisions of Grant's Self-Government Ordinance, it is grounded in that local law and is not frivolous.

In its motions, and as it has done throughout this litigation, PGE confuses Grant's *lawyers* with the *Grant Township Board of Supervisors*. It was the Board of Supervisors, exercising their lawful authority as the legislative body of Grant Township, who adopted the original Ordinance which became the subject of this litigation; it was the Board of Supervisors who held a public vote in which they decided to defend the Ordinance; it was the Board of Supervisors who voted to retain legal counsel; it was the Board of Supervisors who offered multiple settlement offers and declined PGE's settlement offers; it was the Board of Supervisors who was present at this Court's mediation efforts and settlement conferences[38]; and it was the Board of Supervisors who have determined the contours of their own defense of the Ordinance.

Grant's defense of its Ordinance has been based on the structure and content of the Ordinance itself. PGE seeks sanctions against Grant's lawyers for defending the Ordinance, when the defense against PGE's lawsuit has been based entirely on the substantive provisions, language, and principles of the Ordinance itself. Adopted originally by a unanimous vote of the Board of Township Supervisors, the Ordinance sets forth the reasoning for the law, declaring

---

[38] At the most recent settlement conference on June 14th in Pittsburgh, all three Supervisors attended the settlement conference pursuant to a court order that all three Supervisors attend. Those Supervisors are Jon Perry, Stacy Long, and Ron Jarvie.

Whereas, this community finds that the depositing of waste from oil and gas extraction violates the rights of Grant Township residents, including our right to make decisions about what happens to the places where we live; and

Whereas, private corporations engaged in the depositing of waste from oil and gas extraction are wrongly recognized by the federal and state government as having more "rights" than the people who live in our community, and thus, recognition of corporate "rights" is a denial of the rights of the people of Grant Township; and

Whereas, such denials violate the inherent right of people to local self-government; the guarantees of the Pennsylvania Constitution; and the guarantees of the Declaration of Independence and the United States Constitution; and
. . . .
Whereas, this ordinance establishes a Community Bill of Rights to further recognize the right to local self-government in Grant Township, and secures that right by prohibiting those activities that would violate this local bill of rights.

[ECF Doc. 1-1 at ¶¶ 2-4, 7].

The body of the Ordinance then recognizes a range of civil, political, and environmental rights, and the following proviso necessary for the enforcement of those rights:

(a) *Right to Local Self-Government*. All residents of Grant Township possess the right to a form of governance where they live which recognizes that all power is inherent in the people and that all free governments are founded on the people's consent. Use of the municipal corporation "Grant Township" by the people for the making and enforcement of this law shall not be deemed, by any authority, to eliminate, limit, or reduce that sovereign right.

*Id*. at §2(a).

Recognizing that corporate "rights" and preemptive authority of the state government could prevent Grant residents from securing and enforcing the rights contained within the Ordinance, the Supervisors added two other provisions dealing with those issues:

(b) No permit, license, privilege, charter, or other authority issued by any state or federal entity which would violate the prohibitions of this Ordinance or any rights secured by this Ordinance, the Pennsylvania Constitution, the United States Constitution, or other laws, shall be deemed valid within Grant Township.
. . . .
(a) Corporations that violate this Ordinance, or that seek to violate this Ordinance, shall not be deemed to be "persons," nor possess any other legal rights, privileges, powers, or protections which would interfere with the rights or prohibitions enumerated by this Ordinance. "Rights, privileges, powers, or protections" shall include the power to assert

state or federal preemptive laws in an attempt to overturn this Ordinance, and the power to assert that the people of this municipality lack the authority to adopt this Ordinance. *Id*. at §3(b); §5(a).

The belief that such provisions were necessary to the enforcement of the Ordinance, and the securing of the rights contained within the law, is also evidenced by the inclusion of these principles in the newly-adopted and popularly-ratified Grant Home Rule Charter. Drafted by seven individuals elected at large by the voters of the Township, and adopted by an overwhelming majority of voters within the Township, the Charter reflects an understanding that the current system of law operates in an undemocratic matter – divesting the people of Grant of democratic control of their municipality, while ceding that control to companies who wish to use the Township for activities that could cause harm to Township residents.

Most recently, the Board of Supervisors adopted a public resolution outlining the reasons for their continued defense of the Grant law. Through that resolution, the Board:

> Recognize[d] that if the Board of Supervisors fails to enforce the provisions of the home rule Charter, or had failed to enforce its Community Bill of Rights Ordinance which was repealed by the Charter, that the Board of Supervisors would have placed the Township at great financial and other risk that may have been caused by the siting and operation of a frack wastewater injection well within the Township; and

> Recognize[d] that the proposal for the frack wastewater injection well includes plans to dispose of radionuclides, benzene, toluene, trichlororethane, vinyl chloride, arsenic, uranium, and a myriad of other chemicals, biocides, and radioactive materials into the well, as evidenced by the representative injection fluid sample analysis accompanying the permit application for the injection well.

*See* Exhibit #4 (December 1, 2015 *Resolution of the Grant Township Board of Supervisors*) (adopted unanimously).[39]

---

[39] Contrary to PGE's assertions, Grant's defense of its Ordinance has also been heralded by the Indiana County Board of County Commissioners, the Pennsylvania State Senator representing Grant Township, Don White, and other organizations. *See* Exhibit #5 (various letters of support from governmental officials and others).

PGE's motions for sanctions attempt nothing less than to penalize Grant's *Board of Supervisors* for adopting the self-government ordinance, by punishing Grant's lawyers for defending the Township based on its provisions.[40] Indeed, PGE's recent sanctions motion goes even further, stating the company's intent to punish the *people of Grant themselves* for daring to assert their right of local self-government:

> Accordingly, by adopting a Community Bill of Rights Ordinance and pursuing its claims in the action *sub judice*, Grant Township, through its supervisors and with the support of its residents, has violated and continues to violate the oath to obey and defend the Constitution of the United States and the Commonwealth and have utilized and misused the judicial system to do so. Accordingly, Grant Township is subject to sanctions in this matter.

ECF Doc. 250 at 9.[41]

PGE also explicitly admits its desire to make Grant an example for other municipalities who attempt to protect their communities from unwanted and harmful corporate projects. In its renewed motion for sanctions, PGE bluntly states that if successful in its quest for sanctions, that "other municipalities or governmental units will be forewarned. . . .[about] the risks attendant with such misconduct." [ECF Doc. 250 at 29]. This is in addition to statements made by PIOGA, PGE's intervenor-partner in this case, which has publicly declared – in their own newsletter –

---

[40] The effort to penalize Grant has been openly admitted by PIOGA's Kevin Moody, who once said that "we are very frustrated with the proliferation of these ordinances. . . and we're trying to figure out a way to stop this." Susan Phillips, "Indiana County Township Claims Ecosystem has Legal Rights," NPR's StateImpact (December 1, 2014); https://stateimpact.npr.org/pennsylvania/2014/12/01/indiana-county-township-claims-ecosystem-has-legal-rights/ (accessed 6/22/2017).

[41] This quote makes it clear that PGE's expansion of the motion for sanctions to include "Grant Township" is an effort to sanction the entire Grant Township community, and thus, all of the people within it. Boiled down to its nub, PGE argues that any assertion of local self-government that interferes with its proposal for a frack wastewater injection well is unconstitutional.

that municipal officials must be criminally charged for adopting local laws that seek to regulate and control oil and gas operations in their communities.[42]

As it has done throughout this litigation, PGE seeks to treat the lawmaker and the lawmaker's lawyers as one and the same. In Grant's December 17 and 23, 2015 letters to PGE's counsel, Grant again pointed out PGE's efforts to confuse the issue:

- As with prior filings by your firm on behalf of PGE, the proposed sanctions motion ignores the existence of a municipal client which has adopted a local law to govern their own community. That local law, the Community Bill of Rights Ordinance, asserted that the Ordinance was adopted pursuant to the inherent right of the people of the Township to local, community self-government. [ECF No. 1-1 at "whereas" clauses and at §2(a)]. Further, the Ordinance adopted by the Grant Township Board of Supervisors recognized that corporate "rights," certain types of preemption, and non-delegation of municipal authority were issues that interfered with the people's right of local, community self-government. [ECF No. 1-1 at §5(a) and §5(b) and "whereas" clauses]. The defense of the underlying Ordinance, by this firm, has been based entirely on the framework of that local law and on the decision by the Board of Supervisors to defend that law.

- To provide a defense not anchored in the language of the Ordinance would violate Rule 1.3 of the Pennsylvania Rules of Professional Conduct, which requires lawyers to "act with commitment and dedication to the interests of the client and with zeal in advocacy upon the client's behalf." Your proposed motion for sanctions essentially seeks to deprive our client of the freedom to pursue a defense of its own choosing - for a law it has enacted by its own choosing - by eliminating the ability of that client's chosen legal counsel to assert the client's chosen defense.

- You contend that our law firm has a bias, and that the Township Supervisors are not the real legislative body, but that our law firm is. We believe that you fabricated this misconception purely in an attempt to create liability on behalf of the Township's legal counsel, since you may not be able to extract fees and damages from the Township itself. From the very day that the Supervisors learned of the proposed injection well, they have fought its construction and operation, and they believe that they have a right to say "no" to the construction and operation of the injection well as part of their right to govern themselves to protect the health, safety, and welfare of their residents. Our representation of the Township and our defense of their Ordinance has, again, been based entirely on the framework and assertions of that Ordinance. In addition, we have diligently defended the

---

[42] *See* PIOGA, "Finally, Light at the End of the Grant Township Federal Court Litigation" (The PIOGA Press (August, 2016)) ("local officials who vote for these misguided socialist efforts knowing they are illegal risk criminal prosecution under the 'official oppression' statute in Section 5301 of the Crimes Code."); https://issuu.com/mattpioga/docs/pioga_press_076 _august_2016/7 (accessed 6/19/2017).

Township in the relevant Court, meeting every deadline for filing and providing this Court with grounds for a defense of the Township's law as well as with satisfying the elements necessary for the Counterclaim filed against your client.[43]
*See* Exhibit #1 at ¶¶ 13-14; Exhibit #3 at ¶ 8.

In sum, Grant Township's adoption of the Ordinance was a legislative and political act, not subject to Rule 11 sanctions; and the lawyers that Grant Township hired to defend the Ordinance were required to construct the best good faith defense possible – actions also not subject to Rule 11 sanctions. If PGE's motion succeeds, then when municipalities enact groundbreaking legislation and get sued, all lawyers must refuse to take the case, leaving the municipality defenseless. This Court should not set such a dangerous precedent for the people's lawmaking.

## VI. Despite twenty-two years of representing municipalities and other clients, neither the Community Environmental Legal Defense Fund, nor any of its contract lawyers, have ever been sanctioned pursuant to Rule 11 or any other authority.

While PGE asserts that a handful of documents filed by Grant's lawyers during the course of this litigation violate the provisions of Rule 11, the bulk of the company's motions for sanctions are comprised of a general screed against the work of the Community Environmental Legal Defense Fund. [ECF Doc. 250 at 4-6]. That screed represents the company's attempt to make Grant's entire defense a sanctionable action.

---

[43] Grant's brief in support of its motion for judgment on the pleadings was fifty (50) pages long, and laid the foundation for Grant's primary arguments. [ECF Doc. 53]. In an earlier effort to prevent Grant from defending itself with a defense of its own choosing, PGE filed a motion to limit the length of Grant's briefs, an effort which was rightly rejected by this Court. [ECF Doc. 41]. [footnote included in original communication].

Often facing off against some of this country's largest corporations, CELDF has provided legal counsel to municipal officials and their communities since 1995.[44] Its work has included many years of litigating this country's seminal environmental laws - efforts culminating in the realization that those laws had failed to protect the human and natural communities they were adopted to help. In partnership with municipal officials, community leaders, and municipal lawyers, CELDF began to assist local governments and residents to defend themselves against corporate projects by seeking a recognition in the law that the people of those localities possessed the right to determine the future of the places where they live.

In a recent law review article submitted for publication, lawyers associated with CELDF described the problems with existing law, and the need for a modification of the law, thusly[45]:

> Every day, people in municipalities across the United States confront industrial and commercial projects siting or expanding in their communities. Many of those projects, however, will harm those communities, with adverse effects ranging from health impacts caused by pollution, to impacts on drinking water supplies, to larger impacts on the climate and natural environment.
>
> Since the advent of the nation's major environmental laws - and the rise of a regulatory system comprised of environmental regulations and the issuance of permits by regulatory agencies - most community activism against harmful projects has focused on trying to influence environmental agency decisionmaking, and then using administrative and judicial fora to challenge the issuance of permits by such agencies.
>
> As several legal commentators have noted, environmental regulations controlling the issuance of agency permits, however, are heavily influenced by the very entities ostensibly regulated by those legal frameworks. While the capture of agency officials by industry has been a focus of various studies over the past forty years, those studies have essentially ignored the very process by which environmental regulations are developed – a process characterized by heavy involvement of the affected corporations in every aspect of that development. Given that involvement in both the shaping of those regulations and their application, it is not surprising that the general state of the environment is worse now than before the passage of the environmental laws from which those regulations spring.

---

[44] It should be noted that Attorneys Dunne and Schromen-Wawrin operate independently through their own law firms and are not employees of CELDF.

[45] Footnotes have been omitted for the purpose of reprinting the selection here. The selected text has been excerpted from the introduction to the article.

Ignored even more have been those commentators who have questioned the very foundation of the modern regulatory state – raising the issue of whether environmental regulations are intended to protect health, safety, and welfare, or whether they are primarily designed to "legalize" certain emissions and extractions that, under other principles of law, would otherwise be illegal.

Regardless of whether the core problem at the root of the accelerated degradation of our natural environment is the design of the environmental regulatory process or the actions of participants within it, communities faced with the sole option of working within that system are often left remediless if they determine that the best interest of their communities requires an outright rejection of a proposed commercial or industrial project. If those communities refuse to invest resources and energy into the regulatory system because of the nature of that system, and instead attempt to use their local lawmaking power to ban proposed projects, they encounter three "well-settled" legal doctrines that block their way.

First, a corporation affected by such local laws generally can assert constitutional "rights" against them, especially if the corporation possesses a federal or state permit that authorizes the project. Those constitutional "rights" may include the corporation's Fifth Amendment right against having its permit nullified by the local law, as a "taking" of corporate property, or a claim under the U.S. Constitution's Commerce Clause, asserting that the local law seeks to regulate interstate commerce unlawfully. Many times, the corporation asserts its rights as a civil rights claim, with a corresponding demand for damages and attorneys' fees against the offending municipality.

Second, most major energy, agribusiness, and waste disposal projects are protected by state and federal preemption laws, which prohibit municipal communities from legislating in those – and other - areas. Preemption laws, while adopted by the state legislature or by Congress, are privately enforceable, enabling corporations to file preemption claims in lawsuits brought against the offending municipality. While there are many types of preemption, it is common practice for state legislatures to "ceiling preempt" all local regulation of certain industries. That type of preemption eliminates the ability of municipalities to ban certain activities, or to establish more stringent standards for those activities.

Third, a doctrine known as "Dillon's Rule" is applicable to community lawmaking in almost all states. It says that a municipal corporation only has the lawmaking power granted to it by the state, and that if the municipal community attempts to legislate in areas outside of those powers, that any adopted law is void. As with the legal doctrine of ceiling preemption, Dillon's Rule is privately enforceable – enabling corporations to file a Dillon's Rule claim in lawsuits brought against offending municipalities.

Taken together, these three doctrines generally eliminate the authority of municipal communities to ban, or to stringently regulate, many industrial and commercial activities within their communities, regardless of the harm or danger inherent in those projects. Working to convince their state legislature or Congress to overturn these long-standing doctrines – the only option outside of judicial changes in the doctrines - seems futile, given the key position and wealth that particular industries hold over those governments.

> Given the wholesale degradation of the globe's ecosystems, something has to give. While the scope of these three legal doctrines is considered to be "well-settled" by most legal commentators, failure to limit their reach will continue to result in the inability of municipal communities to stop the threats posed by these projects. Assenting to life within their confines only guarantees the continued decline of all ecological systems and the life support systems upon which they depend.

Linzey and Brannen, A PHOENIX FROM THE ASHES: RESURRECTING A CONSTITUTIONAL RIGHT OF LOCAL, COMMUNITY SELF-GOVERNMENT IN THE NAME OF ENVIRONMENTAL SUSTAINABILITY at 2 (submitted for publication).

Only two aspects of PGE's general screed deserve an individualized response from Grant. First, PGE contends that "Attorney Linzey and CELDF have openly encouraged.  .  .[Grant Township] to file for bankruptcy if an award of attorneys' fees is awarded against it." [ECF Doc. 250 at 28]. PGE fails to produce any evidence for this "fact" because there is none.[46] The quandary for communities like Grant, however, is self-evident – they can either acquiesce to the corporate project and accept the harms (or "externalities" as they are known to the project proponents), or fight. If they fight and lose, and if the fight itself stops the project for a given period of time before the ultimate loss, a damages claim is likely; and that given the small size of municipalities like Grant (and the size of the corporate project proponents), it is likely that even a small damages claim could be very difficult to pay.

Second, PGE claims that CELDF's goals can only be attained through some kind of political revolution, and that it seeks to "use" the courts not to achieve victories on behalf of its municipal clients, but merely to "gain media attention for their cause." [ECF Doc. 250 at 6]. As evidenced by the Grant's voluminous filings, however, it would be clear to any objective

---

[46] PGE is fond of using a quote from Attorney Linzey that deals with bankruptcy of municipal communities sued by corporations. [ECF Doc. 250 at fn. 1]. Far from voicing an aspiration, it constitutes a bleak acknowledgement that the kind of confrontation that has occurred in Grant may become commonplace, and if it does, that the inability to pay a damage or attorneys' fee award might present a municipal community with none other than the difficult choice of filing for bankruptcy. A lawyer is obligated to apprise his client of such a possibility.

observer that the change sought by CELDF can occur through the judiciary. Through those filings, CELDF asserts that the "right of local, community self-government" is already part of our constitutional fabric, and that judges and courts need look no further than the organic laws and history of the United States to find the existence of that right. Once found, CELDF urges judges and courts to vindicate that right by enforcing it against those violating it.

**VII.** **This Court should grant Grant's motion to bifurcate a finding of sanctionability from any potential award, as PGE has failed to connect its billing entries with alleged sanctionable behavior, and Grant and CELDF have an inability to pay the requested award.**

In response to PGE's "renewed" motion for sanctions, Grant filed a motion to strike PGE's motion and a separate motion to, in the alternative, bifurcate the briefing schedule - to allow arguments on the type and amount of sanctions, if any, to be determined only if this Court finds sanctionable conduct. [ECF Docs. 253, 257]. In its filing, PGE has failed to connect any of its billing entries to what it contends is sanctionable behavior, in an effort to force Grant, CELDF, and its attorneys to pay for what appears to be *all of its legal fees thus far incurred, for the entire case*. [ECF Doc. 249 at Exhibit E]. Grant asserts that requiring the Defendant to parse through these billing entries, at this time, would be both unduly burdensome and likely unnecessary. In addition, neither Grant nor CELDF possess the resources to pay PGE's requested award, and therefore, should be given the opportunity to show their inability to pay such an award.[47]

---

[47] *See* Declaration of Jon Perry, Grant Township Supervisor, at ¶¶ 7-8 [Exhibit #7 to this Response]; Declaration of Stacey Schmader, Community Environmental Legal Defense Fund, at ¶¶ 10-12 [Exhibit #8 to this Response].

**VIII.  PGE's improper filing of Rule 11 sanctions warrants the award of attorney's fees against PGE pursuant to Rule 11(c)(2).**

For the reasons outlined in this response, and because PGE knowingly filed a baseless motion for sanctions, and filed the motion for improper reasons, an award of attorney's fees to Grant for the cost of responding to the motion is warranted. F.R.C.P. 11 provides the authority to this Court to "award to the prevailing party the reasonable expenses, including attorney's fees, incurred for the motion." *See* F.R.C.P. 11(c)(2).

**IX.  Request for argument.**

If PGE's motion is not summarily dismissed for the reasons discussed in this Response, Grant hereby requests oral arguments on both PGE's "renewed" motion for sanctions, as well as the motion for sanctions that Grant will be filing.

**X.  Conclusion**

PGE's "renewed" motion for sanctions must be DENIED because it lacks any basis and was filed for improper purposes, namely to further harass Grant Township and needlessly drive up litigation costs.

Respectfully submitted ***June 26, 2017***


*For Defendant Grant Township:*


**/s/ Thomas Alan Linzey**
Thomas Alan Linzey, Esq.
Community Environmental Legal Defense Fund
P.O. Box 360
Mercersburg, Pennsylvania 17236
(717) 498-0054 (v)
(717) 977-6823 (c)
tal@pa.net