## UNITED STATES DISTRICT COURT
## THE WESTERN DISTRICT OF PENNSYLVANIA

PENNSYLVANIA GENERAL ENERGY )
COMPANY, L.L.C., ) CIV. NO.: 1:14-cv-209
) Magistrate Judge
Plaintiff, ) Susan Paradise Baxter
)
PENNSYLVANIA INDEPENDENT OIL AND )
GAS ASSOCIATION, )
)
Plaintiff-Intervenor, )
) **APPENDIX TO GRANT**
v. ) **TOWNSHIP'S STATEMENT OF**
) **FACTS IN OPPOSITION TO**
) **PGE'S MOTION FOR**
GRANT TOWNSHIP, ) **SUMMARY JUDGMENT**
)
) *Electronically Filed*
Defendant. )
_____)

### Exhibit "A"

Affidavit of Grant Township Supervisor Stacy Long.

   ***Exhibit #1*** - Section U DESCRIPTION OF BUSINESS, DEP'S Notice of Deficiency to
PGE for UIC Permit Application, "Response to Notice of Deficiency from EPA Region III,
Marjorie C. Yanity #1025 UIC Application."

### Exhibit "B"

Affidavit of Grant Township Board of Supervisors' Chairman Jon Perry.

# APPENDIX, EXHIBIT "A"

*Affidavit of Grant Township Supervisor Stacy Long*

**UNITED STATES DISTRICT COURT**
**THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| PENNSYLVANIA GENERAL ENERGY COMPANY, L.L.C., | ) ) ) | Civ. No.: 1:14-cv-209 Magistrate Judge |
| Plaintiff, | ) ) | Susan Paradise Baxter |
| PENNSYLVANIA INDEPENDENT OIL AND GAS ASSOCIATION, | ) ) ) | **DECLARATION OF** |
| Plaintiff-Intervenor, | ) ) | **SUPERVISOR STACY LONG** |
| v. | ) ) | |
| GRANT TOWNSHIP, | ) ) | |
| Defendant. | ) ) ) | *Electronically Filed* |

---

### DECLARATION OF GRANT TOWNSHIP SUPERVISOR STACY LONG

I, Stacy Long, being an adult over the age of 21 years, and competent to make this unsworn Declaration, do hereby make the statements below, which are true and correct to the best of my knowledge and belief, subject to the penalties for unsworn declarations pursuant to Pennsylvania law:

1. My name is Stacy Long, and I serve as one of the Supervisors for Grant Township. Grant Township is a small rural town in Pennsylvania with a population of approximately 700 people.

2. In 2014, I obtained copies of public records from the Pennsylvania Department of Environmental Protection Southwest Regional Office at 400 Waterfront Drive, Pittsburgh, PA, pertaining to PGE's application to use the Yanity Well as an injection well.

3. I copied portions of PGE's DEP permit. I only copied portions because it is approximately 200 pages. Attached to the permit was a "Response to Notice of Deficiency from EPA Region III, Marjorie C. Yanity #1025 UIC Application" under Section U DESCRITPION OF BUSINESS, prepared by PGE. A true and correct copy of this document is attached hereto as **Exhibit 1**. The first question asks will "the injection well be used just for the injection of PGE's own production fluid?" PGE responded: "PGE plans to only inject fluids produced from PGE operated wells. A revised cover is enclosed."

4. PGE then changed its application to indicate that the proposed well would not be a commercial well. PGE's application is part of the permit.

I sign this Declaration subject to the penalties for unsworn verifications pursuant to Pennsylvania law.

Dated: January 10, 2018.

Stacy Long
Grant Township Supervisor

PGE

# U

## DESCRIPTION OF BUSINESS

**UIC Permit App.**

Copied this entire section

RECEIVED

APR 2 2 2014

DEP SWDO
OIL & GAS

**Attachment U:** DESCRIPTION OF BUSINESS

Pennsylvania General Energy Company, L.L.C. (the "LLC") was formed on July 1, 2003 as a multi-member limited liability company. At that time, Pennsylvania General Energy Corp. ("PGE") contributed substantially all of its operating assets to the LLC. The LLC is engaged in the development, production and operation of oil and gas properties. Its activities are presently concentrated in Pennsylvania but it has also conducted activities in New York, West Virginia and Maryland. PGE currently operates over 1,300 producing oil and gas wells. Although PGE does not currently hold any UIC injection permits, it has operated in excess of 600 permitted injection wells, injecting up to 5,400 BWPD of which 75% was produced water.



RECEIVED

APR 2 2 2014

DEP SWDO
OIL & GAS



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION III**
**1650 Arch Street**
**Philadelphia, Pennsylvania 19103-2029**

March 4, 2013

Mr. James Ashbaugh
P.E. Vice President Engineering
Pennsylvania General Energy Company, L.L.C.
120Market Street
Warren, PA 16365

Re: UIC Permit Application Submission Notice of Deficiency

Dear Mr. Ashbaugh:

EPA Region III staff has completed their review of Pennsylvania General Energy Company's application to construct and operate one Underground Injection Control (UIC) Class II-D brine disposal injection well in Grant Township, Indiana County, Pennsylvania. Please find enclosed a Notice of Deficiency (NOD) for this permit application. The NOD requires the submission of additional information that will allow this office to complete its review of the application and begin the process of developing a draft permit for the facility. Your application has been assigned the following permit identification: PAS2D013BIND. Please use this permit identification in all future correspondence. If you should have any questions please give me a call at 215-814-5464 or you may email me at platt.steve@epa.gov.

Sincerely,

S. Stephen Platt
Ground Water & Enforcement Branch (3WP22)
Office of Drinking Water & Source Water Protection

Enclosures

RECEIVED

APR 2 2 2014

DEP SWDO
OIL & GAS

Notice of Deficiency

For

Pennsylvania General Energy Company, LLC

Underground Injection Control (UIC) Permit Application PAS2D013BIND

Please provide additional information on the deficiencies outlined below so that EPA Region III can take additional steps to process the UIC permit application. When submitting your response to the notice of deficiency, please provide two copies. You may submit your response as an addendum to the already submitted application. We would also appreciate if you would send a copy of your response to EPA UIC inspector Dave Rectenwald.

**Cover Page**

The cover page indicates that the proposed injection well will be a commercial well. EPA defines a commercial well as a well that would receive fluid for injection from companies other than Pennsylvania General Energy (PGE). Is it PGE's expectation that it will utilize the injection well commercially or will the injection well be used just for the injection of PGE's own production fluid?

**Attachment A: Area of Review**

Although PGE has chosen a fixed radius or one-quarter mile for the area of review, EPA needs to confirm, through a zone of endangering influence calculation, that the one-quarter mile fixed radius is acceptable. Please submit the following information: current injection zone reservoir pressure, injection zone porosity and injection zone permeability.

**Attachment B: Maps of Wells in Area of Review**

EPA also requires a map that extends one mile beyond the injection well location. This map should show topographic highlights as well as depict any water sources, any wells (including private and public drinking water wells, oil and gas production wells, etc.), and any geologic faults, if present. The quarter mile area map that was submitted, that depicted bedrock, was supposed to include a fault line, however, nothing is shown. Is there a fault present nearby? It was noted that the tributary to East Run has a long straight line stream segment. Would this be indicative of the presence of a fracture trace or fault line?

It was noted in the application that the location of the proposed injection well is in an area that was heavily surfaced mined. Please provide maps which depict the surface mining in the area. This information can be included on the one mile map discussed above. Please include

RECEIVED

APR 2 2 2014

DEP SWDO
OIL & GAS

information regarding the depths of these surface mines, especially the Yanity mine located approximately 300 feet northeast of the injection well location.

**Attachment C: Corrective Action**

Please provide information on the names and addresses of property owners that live within one-quarter mile of the Area of Review.

**Attachment G: Geological Data**

Although the application provided ISIP information from the Yanity well 1025 stimulation, EPA did not see the actual stimulation data used to derive the ISIP. Please submit the actual stimulation data information.

The Marcellus formation is located above the Huntersville Chert and could be considered a confining unit. Is there any current or proposed gas development for the Marcellus formation in the vicinity of the injection well site? If development is planned, please explain how the horizontal drilling and fracture stimulation within the Marcellus will not jeopardize the confinement structure above the Huntersville Chert.

**Attachment H: Operating Data**

The application requested a maximum injection volume of 2000 barrels/day based on a short term injectivity test. This equates to a monthly injection volume of approximately 60,000 barrels. Based on just the data from the short term injectivity test, EPA is not inclined to permit the injection well for this high a volume. Do you have further data to support this high an injection volume? Injection pressure will ultimately dictate injection volume and rate. EPA would like to see the injection well operate for a period of time to be able to justify a 60,000 barrel/month injection volume. How much produced fluid does PGE anticipate sending to this injection well?

EPA did not see an analysis of Total Organic Carbon (TOC) in the analysis of the injection fluid submitted with the application. Please submit an analysis of the TOC.

**Attachment K: Injection Procedures**

The application indicates that the injection well will be equipped with an automatic shut down device set at maximum tubing and casing pressures. What does maximum casing pressure mean? Since a maximum injection pressure will be set for the well, it would be better to define the casing shut down pressure as a percentage of the operating pressure or some positive pressure, so that if a leak does occur, it would trip the automatic shut down device and shut the well in.

RECEIVED

APR 2 2 2014

DEP SWDO
OIL & GAS

## Attachment L: Construction Procedures

A complete set of drillers logs for the Yanity 1025 need to be submitted. Only partial logs were submitted with the application. At minimum, the submission should include gamma ray, density, neutron and caliper logs. In addition, please submit a Cement Evaluation Log (CEL) or Cement Bond/Variable Density Log (CBL/VDL) that shows the bonding of the cement run on the 4 ½ inch long string casing. If a CEL or CBL/VDL is not available, then one will need to be run, prior to running tubing and packer into the well, and submitted as part of the injection well completion report.

When the 2 3/8 inch tubing and packer is run inside the long string casing, it will need to be set no more than 50 feet above the uppermost perforations.

Please describe how PGE will provide and maintain security for the facility to prevent illegal trespass. For example, will the facility have fencing, locked gates, cameras, etc.? What will be the facility's anticipated hours of operation and will the facility be manned during hours of operation?

## Attachment P: Monitoring Program

The application did not mention that cumulative volume will be monitored. Cumulative volume needs to be monitored continuously throughout the injection well's operation.

## Attachment Q: Plugging and Abandonment

The plugging and abandonment plan did not show a final surface plug placed in the well. EPA typically requires a surface plug to be placed in the well during plugging. If for some EPA's requirement does not meet the Pennsylvania Department of Environmental Protection's requirements, then please stipulate.

## Attachment R: Necessary Resources

EPA also requires that a Schedule A form be submitted with the Standby Trust Agreement. A copy of the Schedule A form has been enclosed with this deficiency notice for your use.

**Response to Notice of Deficiency from EPA Region III**

**Marjorie C. Yanity #1025 UIC Application**

**Cover Page**

Question: The cover page indicates that the proposed injection well will be a commercial well.  EPA defines a commercial well as a well that would receive fluid for injection from companies other than Pennsylvania General Energy (PGE).   Is it PGE's expectation that it will utilize the injection well commercially or will the injection well be used just for the injection of PGE's own production fluid?

Response:  PGE plans to only inject fluids produced from PGE operated wells.   A revised cover is enclosed.

**Attachment A: Area of Review**

Question:  Although PGE has chosen a fixed radius or one-quarter mile for the area of review, EPA needs to confirm, through a zone of endangering influence calculation, that the one-quarter mile fixed radius is acceptable.  Please submit the following information: current injection zone reservoir pressure, injection zone porosity and injection zone permeability.

Response:   From analysis of the pre-injection test pressure data a current injection zone reservoir pressure of 1,450 psi was determined.  Analysis of geophysical well logs and the injection test rate and pressure data determined a porosity of 3% and permeability of 2.2 md.  Published porosity values for the Huntersville formation range from 2.5 to 8%, "Atlas of Major Appalachian Gas Plays".

**Attachment B: Maps of Wells in Area of Review**

Question:  EPA also requires a map that extends one mile beyond the injection well location.  This map should show topographic highlights as well as depict any water sources, any wells (including private and public drinking water wells, oil and gas production wells, etc.), and any geologic faults, if present.  The quarter mile area map that was submitted, that depicted bedrock, was supposed to include a fault line, however, nothing is shown.  Is there a fault present nearby?  It was noted that the tributary to East Run has a long straight line stream segment.  Would this be indicative of the presence of a fracture trace or fault line?

Response:

- Revised maps depicting all of the information requested above except water wells are enclosed. A survey of water wells within a 1-mile radius of the Yanity 1025 well is ongoing and a revised water source map will be supplied upon completion of the survey.
- The Bedrock/Fault Map legend had a "Fault" symbol listed, but PGE identified no actual faults in the mapped area.

RECEIVED

APR 22 2014

DEP SWDC
OIL & GAS

- Review of the available geophysical (seismic) control indicates no evidence of faults that reach the surface from depth in this area. Any linear surface features in this area are a result of years of small scale surface mining operations and extensive farming.
- In regards to the "long, straight line stream segment" the EPA specifically noted in its Notice of Deficiency letter of March 4, 2013, on April 2, 2013 Michael Yanity, the surface owner of the subject premises, informed PGE that this straight section of stream was created by a previous farmer who had wanted to better facilitate plowing his land (note that the "straight segment" stops at the property boundary). Prior to that work, the stream had the same general morphology as the sections northwest and southeast of it (20' to 30' meanders). After straightening the creek, the farmer had dumped rocks into it to help maintain the straight segment. For their part, the Yanitys have periodically kept it cleaned out. As a result of this exchange, PGE has concluded the straight segment was a man-made linear feature, not a natural one.

Question: It was noted in the application that the location of the proposed injection well is in an area that was heavily surface mined. Please provide maps which depict the surface mining the area. This information can be included on the one mile map discussed above. Please include information regarding the depths of these surface mines, especially the Yanity mine located approximately 300 feet northeast of the injection location.

Response: The Majorie C. Yanity well 1025 is located within an abandoned strip mine as evidenced by a high wall to the north and irregular topography to the southeast of the existing well location. The Pennsylvania Bureau of Abandoned Mine Reclamation was consulted to obtain details of the strip mining activities that have occurred on the Yanity parcel. Mining occurred between 1948 and 1960 with a total disturbance of approximately 42 acres. The primary coal seam targeted was likely the Upper Freeport coal seam, although it is possible that the Lower Freeport could have also been mined. The maximum overburden thickness to the Upper Freeport is 60 feet while the maximum overburden thickness is approximately 100 feet to the Lower Freeport. Given that the Lower Freeport reaches a maximum thickness of 5 feet in Grant Township, It is concluded that the depth of strip mining activities would not have exceeded 110 feet.

**Attachment C: Corrective Action**

Question: Please provide information on the names and addresses of property owners that live within one-quarter mile of the Area of Review.

Response: Enclosed is contact information for landowners within the one-quarter mile Area of Review.

**Attachment G: Geologic Data**

Question: Although the application provided ISIP information from the Yanity well 1025 stimulation, EPA did not see the actual stimulation data used to derive the ISIP. Please submit the actual stimulation data information.

RECEIVED

APR 2 2 2014

DEP SWDO
OIL & GAS

_Response:_ A plot of the injection rate and wellhead pressure from the initial acid frac stimulation of the Yanity well 1025 is enclosed. The ISIP noted in the initial service company report and the projected fracture closure stress based on the pressure plot are both noted on the plot.

Question: The Marcellus Formation is located above the Huntersville Chert and could be considered a confining unit. Is there any current or proposed gas development for the Marcellus Formation in the vicinity of the injection well site? If development is planned, please explain how the horizontal drilling and fracture stimulation within the Marcellus will not jeopardize the confinement structure above the Huntersville Chert?

Response:

- Since the inception of the Marcellus play in 2005, only one (1) Marcellus well was drilled within 3.5 miles of the Yanity injection site. It is the Chevron 10H Buterbaugh (37-063-37021), and is located roughly 3.4 miles to the southeast of the prospect. This well was completed in the Marcellus Shale on December 20, 2011 with reportedly poor results. No additional Marcellus wells have been permitted or drilled since that time.
- The Yanity 1026 was drilled on the upper flank of a relatively narrow salt-cored anticline, one that has 4-way closure. Although this structural style facilitated the trapping of natural gas within the anticline, and created a drilling target for primary production from the Huntersville Chert, it is generally considered a "geohazard" with respect to Marcellus Shale drilling operations and would result in shortened lateral wellbores. Operators in this region appear to be focusing their efforts on the more tectonically-quiet synclinal areas or broad, gentle anticlinal features in order to maximize their lateral lengths.
- Although PGE does not control the oil and gas rights to the Marcellus Shale under the 147 acre Marjorie C. Yanity tract itself, the company currently holds Marcellus rights under the adjoining properties on three sides. Within a 1.0 mile radius around the Yanity well, PGE holds roughly 920 acres of Marcellus rights, while roughly the same amount of acreage is held by various other Operators. For its part, PGE has no intention of conducting Marcellus operations in this area. In addition, it is extremely unlikely another Operator would attempt to drill Marcellus laterals on the Yanity tract or the surrounding area for several reasons. First, the presence of the steep, narrow anticline discussed above represents a serious impediment to drilling a lateral of any reasonable length while staying within the targeted zone. Second, the fact that PGE currently holds the Marcellus rights on the tracts surrounding the Yanity precludes another Operator from being able to develop wells with sufficiently long wellbores to be economic as a result of PGE's Marcellus acreage position. PGE does not believe it to be economic or prudent for our company, or any other Operator, to attempt to develop a Marcellus Shale project within this immediate area.

**Attachment H: Operating Data**

RECEIVED

APR 2 2 2014

DEP SWDO
OIL & GAS

_Question:_  The application requests a maximum injection volume of 2,000 barrels/day based on a short term injectivity test.  This equates to a monthly injection volume of approximately 60,000 barrels.  Based on just the data from the short term injectivity test, EPA is not inclined to permit the injection well for this high a volume.  Do you have further data to support this high an injection volume?  Injection pressure will ultimately dictate injection volume and rate.  EPA would like to see the injection well operate for a period of time to be able to justify a 60,000 barrel/month injection volume.  How much produced fluid does PGE anticipate sending to this well?

_Response:_   To meet PGE's disposal needs and minimize on-site storage, we propose an initial monthly limit of 30,000 bbls and maximum rate of 1,500 bbl/day subject to wellhead pressure limitations.

_Question:_  EPA did not see an analysis of Total Organic Carbon (TOC) in the analysis of the injection fluid submitted with the application.  Please submit an analysis of the TOC.

_Response:_  Enclosed

**Attachment K: Injection Procedures**

_Question:_  The application indicates that the injection well will be equipped with an automatic shut down device set at maximum tubing and casing pressures.  What does maximum casing pressure mean?  Since maximum injection pressure will be set for the well, it would be better to define the casing shut down pressure as a percentage of the operating pressure or some positive pressure, so that if a leak does occur, it would trip the automatic shutdown device and shut the well in.

_Response:_  A Programmable Logic Controller (PLC) would be used to control operation of the injection pump.  This would allow for decisions on pump speed to be made based on input from multiple sources (injection rate, tubing pressure, casing pressure, etc.).  One of the operating parameters would be the "maximum allowable casing pressure" (MACP).  Casing pressure is the pressure in the annulus between the 2 3/8" injection string and the 4 ½" production casing.   The MACP will be set as 200 psi above the base operating casing pressure.  The base operating casing pressure is the pressure in the annulus under normal operating conditions which is anticipated to be less than 300 PSI.  If a leak in the tubing or packer should occur, the increased pressure due to the leak will cause the casing pressure to increase and shut the pump down at a maximum allowable casing pressure of 500 psi.  The 4 ½" production casing is rated for 7,780 psi.

**Attachment L:  Construction Procedures**

_Question:_  A complete set of drillers logs for the Yanity 1025 need to be submitted.  Only partial logs were submitted with the application.  At a minimum, the submission should include gamma ray, density, neutron, and caliper logs.  In addition, please submit a Cement Evaluation Log (CEL) or Cement Bond/Variable Density Log (CBL/VDL) that shows the bonding of the cement run on the 4-1/2" long string casing.  If a CEL or CBL/VDL is not available, then one will need to be run prior to running tubing and packer into the well, and submitted as part of the injection well completion report.

RECEIVED

APR 2 2 2014

DEP SWDO
OIL & GAS

_Response:_ Enclosed is a complete Litho-Density/Compensated Neutron/GR/Caliper log for the Yanity _1025._ Also enclosed is a CBL/VDL run April 16, 2013. The CBL/VDL starts at a depth 7,490 ft as a plug was set at 7,510 ft, 34 ft above the perforations, so the long string casing could be filled with water to run the CBL/VDL.

Question: When the 2-3/8" tubing and packer is run inside the long string casing, it will need to be set no more than 50 feet above the perforations.

Response: The packer, with a plug installed in it, was set at 7,510 feet to facilitate running of the CBL/VDL. Details of the packer setting can be found in the enclosed well log dated April 16, 2013. After the CBL was run, the tubing was run back in the well, an inhibited packer fluid was circulated into the tubing/casing annulus and the tubing seated in the packer. The plug was then removed from the packer.

Question: Please describe how PGE will provide and maintain security for the facility to prevent illegal trespass. For example, will the facility have fencing, locked gates, cameras, etc.? What will be the facility's anticipated hours of operation and will the facility be manned during hours of operation?

Response: The offloading, storage and pumping facilities will be fenced and gated. Anticipated hours of operation for offloading fluids is 7 am to 7 pm. The facility will be manned during all offloading operations. Pumping operations will operate continuously as long as fluid is available. In addition to the automated shutdown controls, the pumps will be connected to a SCADA network to allow remote monitoring and control of the system.

### Attachment P: Monitoring Program

Question: The application did not mention that cumulative volume will be monitored. Cumulative volume needs to be monitored continuously throughout the injection well's operation.

Response: A meter that registers both instantaneous rate and cumulative volume will be used to monitor the well.

### Attachment Q: Plugging and Abandonment

Question: The plugging and abandonment plan did not show a final surface plug placed in the well. EPA typically requires a surface plug to be placed in the well during plugging. If for some reason EPA's requirement does not meet the Pennsylvania Department of Environmental Protection's requirements, then please stipulate.

Response: Pa Code Title 25 Chapter 78.95 (a)(3) requires that we set a 100 foot cement plug from 50 feet below the surface casing shoe to 50 feet inside the surface casing and fill the casing to surface with a noncementing material.

### Attachment R: Necessary resources

RECEIVED

APR 2 2 2014

DEP SWDO
OIL & GAS

*Question:*  EPA also requires that a Schedule A form be submitted with the Standby Trust Agreement.  A *copy of* the Schedule A form has been enclosed with this deficiency notice for your use.

*Response:*  A completed Schedule A is enclosed.

RECEIVED

APR 2 2 2014

DEP SWDO
OIL & GAS

# APPENDIX, EXHIBIT "B"

*Affidavit of Grant Township Board of Supervisors' Chairman Jon Perry*

**UNITED STATES DISTRICT COURT**
**THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| PENNSYLVANIA GENERAL ENERGY COMPANY, L.L.C., | ) ) ) | Civ. No.: 1:14-cv-209 Magistrate Judge |
| Plaintiff, | ) ) | Susan Paradise Baxter |
| PENNSYLVANIA INDEPENDENT OIL AND GAS ASSOCIATION, | ) ) ) | **DECLARATION OF** |
| Plaintiff-Intervenor, | ) ) ) | **JON PERRY** |
| v. | ) ). | |
| GRANT TOWNSHIP, | ) ) | |
| Defendant. | ) ) | *Electronically Filed* |

---

### <u>DECLARATION OF GRANT TOWNSHIP SUPERVISOR JON PERRY</u>

I, Jon Perry, being an adult over the age of 21 years, and competent to make this unsworn Declaration, do hereby make the statements below, which are true and correct to the best of my knowledge and belief, subject to the penalties for unsworn declarations pursuant to Pennsylvania law:

1. My name is Jon Perry, and I serve as Chairman of the Supervisors for Grant Township. Grant Township is a small rural town in Pennsylvania with a population of approximately 700 people. I have lived in Grant Township for 24 years. I have been a Supervisor since April 2014. The Supervisors act as the legislative body for the Township. I served on the Board of Supervisors at the time Grant Township passed the Ordinance.

2.  The Township Supervisors are not aware of any individuals in the Township engaged in the depositing of waste from oil and gas extraction, and, in particular, to any degree that would be a threat to residents' health, safety, welfare, and environmental rights.

3.  In June 2014, the Township passed the Ordinance to address the depositing of waste from oil and gas extraction by corporations within the Township. The Ordinance prohibited the activity by corporations because corporations, and not individuals, pose risks to, and threaten, the people's right to clean, air, water, and soil.

4.  The Ordinance did not include individuals because it was not the intent of the Ordinance to be construed to prohibit individuals from engaging in activities, such as changing the oil in their cars.

5.  The Township Supervisors determined that corporations pose a risk to, and threaten, the people's right to clean, air, water, and soil, because we are aware of, and reviewed documentation regarding, water pollution and other environmental contamination and degradation that has occurred as a result of activities related to oil and gas extraction, in particular, the depositing of waste from oil and gas extraction.

6.  In passing the Ordinance, the Supervisors were very concerned that other corporations would seek to deposit their waste in Grant Township, if PGE was successful in gaining its permits. The Supervisors discussed this concern with residents of Grant Township at public meetings.

7. *Because the Township* Supervisors are not aware of any individuals who have engaged in the depositing of waste from oil and gas extraction or who have been permitted by the Environmental Protection Agency or the DEP to do so, the Township believed that it was reasonable, necessary, logical, legitimate, and prudent to prohibit such activities by corporations, and not individuals.

8. In passing the Ordinance, the Township Supervisors were aware of numerous complaints before the Pennsylvania Department of Environmental Protection regarding corporations engaged in oil and gas activities. In many instances, the complaints have not been investigated. In a few instances, the DEP has issued notices of violations to corporations, including PGE--but only in a few instances, and *after* the environmental contamination has occurred.

9. Community members informed me about the threats posed by the permanent storage of fracking waste, and I recall an article shared with me entitled "*Injection Wells: The Poison Beneath Us*", dated June 21, 2012, (www.propublica.org/article/injection-wells-the-poison-beneath-us).

10. Individuals, as opposed to corporations, and the government agencies that work with those corporations to permit the activities that pose risks to, and threaten, the people's right to clean, air, water, and soil, are not the problem. Corporations (and government permitting agencies) are the threat. So, the Ordinance applies to corporations.

11. The Township considered the information described in the above paragraphs in passing the Ordinance, and those considerations are summarized in the "Whereas" clauses of the Ordinance.

12. The Township and the people have determined that EPA's and DEP's permitting processes, and other state and federal laws, do not protect their health, safety, welfare and environmental rights. In issuing permits to corporations such as PGE, the EPA and DEP place economic interests above environmental rights, when the people of Grant Township have demanded, and the Pennsylvania Constitution requires, otherwise.

13. Prior to, at the time of passing, after passing, and after this Court found the Ordinance to be invalid, many residents of the Township expressed concerns about the depositing of fracking waste in the community. The concerns are about impacts on their health, safety, and welfare, and about impacts on clean air, water, soil, and on the natural landscape.

14. The Township determined that trucking fracking waste around the town, up and down the town's roads, and, then injecting it into a well, located in very close proximity to residents, near our important watershed and sole source of drinking water is a threat. A very serious threat.

4

15. PGE's activities are a threat, but they are not the only threat. Other corporations seeking to engage in, or engaging in the depositing of waste from oil and gas activities are also a threat. That is why the town passed the Ordinance: to stop this activity by any corporation and to stop the government agencies that continue to permit such activities, without regard to the impact on the people's health, safety, welfare, and environmental rights, from doing so.

16. The Township has legitimate (and compelling) reasons to believe that corporations pose risks to, threaten to harm, have harmed, and will continue to harm residents' environmental rights. Fracking waste disposal is a relatively new activity in Pennsylvania, with known and unknown risks. The Township has legitimate (and compelling) reasons to prohibit corporations from engaging in the depositing of oil and gas waste within the Township.

17. The Township has an obligation -- a duty -- to protect its residents' environmental rights. We not only believe it makes sense – it is logical, legitimate, rational, and necessary -- but, it is our *duty* to protect people's health and the environment.

18. Many residents of Township asked the Supervisors to take action to address the threat posed by fracking waste.

19. The people have a right to clean air and water. We do not have to stand by while the people's water supply is threatened, and its air quality and scenic landscape harmed.

5

We do not have to wait for a Flint, Michigan incident. We understand our public trustee duties to be much greater. We understand that once the environmental degradation has occurred, once the waste has been injected, we cannot just go backwards. It takes years for the environment to heal and it may never heal. These are unacceptable impacts and risks.

20. In passing the Ordinance, the Township determined that corporations should not have greater rights than people. The people have the fundamental and inherent right of local, community self-government. Section 2(a) of the Ordinance enumerated that right. The popularly enacted Grant Township Charter now also enumerates that right.

I sign this Declaration subject to the penalties for unsworn verifications pursuant to Pennsylvania law.

Dated: January 9, 2018.

Jon Perry
Grant Township Supervisor, Chairman

6